UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

NORTH COLLIER FIRE CONTROL AND
RESCUE DISTRICT FIREFIGHTER
PENSION PLAN, Individually and on Behalf
of All Others Similarly Situated,

     Plaintiff,

  vs.

MDC PARTNERS, INC., MILES S. NADAL,
DAVID B. DOFT, and MICHAEL C.
SABATINO,

     Defendants.

——————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff, North Collier Fire Control and Rescue District Firefighter Pension Plan, individually and on behalf of all others similarly situated, makes the following allegations based upon the investigation of Plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MDC Partners Inc. ("MDC" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased MDC Class A subordinate voting shares (referred to herein as "common shares" or "common stock") between September 24, 2013 and April 27, 2015, inclusive (the "Class Period"), against MDC and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  The Company's principal executive offices are located at 745 Fifth Avenue, New York, NY 10151.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ National Market ("NASDAQ"), a national securities exchange located in this District.

## PARTIES

6.      Plaintiff North Collier Fire Control and Rescue District Firefighter Pension Plan acquired MDC common stock, as set forth in the attached certification, and has been damaged thereby.

7.      Defendant MDC is a holding company that provides a range of customized marketing, activation, communications and consulting services via its subsidiaries.  The Company is headquartered in New York, New York.

8.      Defendant Miles S. Nadal ("Nadal") is, and at all relevant times was, the Chairman, Chief Executive Officer and President of the Company.

9.      Defendant David B. Doft ("Doft") is, and at all relevant times was, the Chief Financial Officer of the Company.  On April 23, 2015, Defendant Doft assumed the additional role of the Company's Principal Accounting Officer.

10.     Defendant Michael C. Sabatino ("Sabatino") served as Senior Vice President and Chief Accounting Officer of the Company through April 22, 2015.  Effective April 23, 2015, Defendant Sabatino was assigned to "work[ing] on special projects," and Defendant Doft became the Company's Principal Accounting Officer.

11.     Defendants Nadal, Doft and Sabatino are referred to herein as the "Individual Defendants."  Defendant MDC and the Individual Defendants are collectively referred to herein as "Defendants."

12.    The Individual Defendants made, or caused to be made, false statements which caused the price of MDC common stock to be artificially inflated during the Class Period.

13.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of MDC, were privy to confidential and proprietary information concerning MDC, its operations, finances, financial reporting and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning MDC. Because of their positions with MDC, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of MDC's business.

15.    The Individual Defendants, because of their positions with the Company, also controlled, and/or possessed the authority to control, the contents of the Company's filings with the SEC, press releases and presentations to securities analysts and through them, to the investing public.

- 3 -

The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading, prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

16.     As senior executive officers and/or directors and as controlling persons of a publicly traded company, whose common stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to MDC's financial condition and performance, growth, operations, financial statements, executive compensation, related party transactions, business, products, markets, management, earnings and present and future business prospects.  The Individual Defendants also had the duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of MDC common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of MDC common stock by disseminating materially false and misleading statements and/or concealing materially false and material facts.  The scheme: (i) deceived the investing public regarding MDC's business, operations and management and the intrinsic value of MDC common stock; (ii) allowed certain of the Individual Defendants and other Company insiders to collectively sell their personally held MDC common stock for proceeds in excess of $163.7 million; and (iii) caused Plaintiff and members of the Class to purchase MDC common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MDC common stock between September 24, 2013 and April 27, 2015, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times herein, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the common stock of MDC was actively traded on the NASDAQ and Toronto Stock Exchange ("TSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MDC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of MDC;

(c)      whether the price of MDC common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

23.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

24.      Formerly MDC Corporation Inc., Defendant MDC is a holding company incorporated under the laws of Canada.  The Company, which operates through "Partner" companies, provides a comprehensive range of customized marketing, activation, communications and consulting services.  These services include a wide range of advertising and consumer communication services, media management, interactive and mobile marketing, direct marketing, database and customer relationship management, sales promotion, corporate communications, market research, design and branding, social media, marketing, and other related services.

25.      In the years prior to the Class Period, the SEC has raised issues with MDC's disclosures concerning executive compensation and the Company's goodwill accounting.  On

November 27, 2012, the SEC issued a comment letter to MDC seeking clarification about certain of the Company's disclosures in MDC's 2012 SEC filings. The SEC's comments included issues relating to Defendant Nadal's executive compensation and a possible impairment in the value of MDC's reported goodwill.

26.     On December 10, 2012, MDC responded to the SEC's comments and acknowledged its responsibility for the adequacy and accuracy of the disclosures contained in its filings made with the SEC.

27.     On January 15, 2013, the SEC issued MDC a comment letter stating that it had completed its review of the Company's filings.

28.     Unbeknownst to investors, on or about October 5, 2014, MDC received a subpoena from the SEC seeking documents relating to, among other things, MDC's reimbursement of expenses purportedly incurred by Defendant Nadal, as well as MDC's accounting for goodwill.

**SEC Rules And Regulations Concerning
Disclosure of Executive Compensation, Trends And Financial Statements**

29.     The SEC has promulgated rules governing the disclosure of executive compensation. Item 11 of Form 10-K, *Executive Compensation* and Item 9A of Form 10-K, *Controls and Procedures*, respectively require that issuers disclose the information called for pursuant to Items 402 of Regulation S-K and Items 307 and 308 of Regulation S-K.

30.     Item 402 of Regulation S-K requires detailed disclosure about the compensation of an entity's principal executive officer, including perquisites, personal benefits and other items. Item 307 of Regulation S-K requires that a principal executive of an SEC registrant disclose his or her conclusions about the effectiveness of the registrant's disclosure controls and procedures. Item 308 of Regulation S-K requires that the management of an SEC registrant disclose its assessment of the effectiveness of the registrant's internal control over its financial reporting.

31.     In addition, Item 7 of Form 10-K and Item 2 of Form 10-Q require issuers to furnish the information called for under Item 303 of Regulation S-K, *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") [17 C.F.R. §229.303] and Item 15 of Form 10-K and Item 1 of Form 10-Q requires that MDC furnish financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

32.     Item 303(a) of Regulation S-K requires issuers to describe any known trends or uncertainties that are reasonably expected to have a material impact on a registrant's income from continuing operations.  Instruction 3 of Item 303(a) of Regulation S-K requires that "the discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results. . . ."  In addition, the SEC's Interpretive Release to Item 303 of Regulation S-K provides that MD&A disclosure address any material implications of uncertainties associated with the methods, assumptions and estimates underlying the company's critical accounting measurements.  See e.g., *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* [Release Nos. 33-8350; 34-48960; FR-72].

33.     GAAP, in Accounting Standards Codification Topic ("ASC") 850, *Related Party Disclosures*, requires that financial statements provide detailed disclosure about transactions involving related parties, including those with an entity's executive management.  GAAP also requires, in ASC Topic 350, *Intangibles - Goodwill and Other*, the recognition of a loss when the carrying amount of reporting unit's goodwill exceeds the implied fair value of that goodwill.

**Materially False and Misleading Statements Issued Prior to the
Class Period That Remained Live and Uncorrected During the Class Period**

34.     On February 21, 2013, MDC issued a press release announcing its financial results for the three and twelve months ended December 31, 2012.  The press release reported that the Company's goodwill totaled $720.1 million on December 31, 2012.

35.     On March 7, 2013, MDC filed its Form 10-K for the year ended December 31, 2012 with the SEC which was signed by the Individual Defendants (the "2012 Form 10-K").  The 2012 Form 10-K contained materially false and misleading representations about MDC's executive compensation, MD&A, financial statements and disclosure and internal controls, as well as the certifications thereon by Defendants Nadal and Doft.

36.     Concerning the MDC's Executive Compensation disclosure obligations pursuant to Item 402 of Regulation S-K, the 2012 Form 10-K stated: "[r]eference is made to the sections captioned "Compensation of Directors" and "Executive Compensation" in our next Proxy Statement, which is incorporated herein by reference."

37.     The 2012 Form 10-K contained financial statements, which falsely represented, among other things, that:

> MDC Partners Inc. (the "Company") has prepared the consolidated financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC") and in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP").
>
>                      \*      \*      \*
>
> **16.     Related Party Transactions**
>
> (a)     The Company incurred fees and paid cash incentive awards totaling $2,739, $3,375 and $1,343 in 2012, 2011 and 2010, respectively, relating to companies controlled by the Chairman and Chief Executive Officer ("CEO") of the Company in respect of services rendered pursuant to a management services agreement and incentive plans.

On April 27, 2007, the Company entered into a new Management Services Agreement (the "Services Agreement") with Miles Nadal and with Nadal Management, Inc. to set forth the terms and conditions on which Mr. Nadal continues to provide services to the Company as its Chief Executive Officer. The Services Agreement has a three-year term with automatic one-year extensions. Pursuant to the Services Agreement, the annual base compensation for Mr. Nadal's services was increased to $1,500, effective April 27, 2010. The Services Agreement also provides for an annual bonus with a targeted payout of up to 250% of the base compensation. The Company also makes an annual cash payment of $500 in respect of retirement benefits, employee health benefits and perquisites. In addition, in the discretion of the Compensation Committee, the Company may grant long term equity incentives with a grant-date value of up to 300% of the then current base retainer. In addition during 2012, 2011 and 2010, in accordance with the Services Agreement, Mr. Nadal repaid to the Company an additional $475, $102, and $95, respectively, of loans due to the Company.

\*　　\*　　\*

*Goodwill and Indefinite Lived Intangible.*

In accordance with the FASB Accounting Standards Codification topic, Goodwill and Other Intangible Assets, goodwill and indefinite life intangible assets (trademarks) acquired as a result of a business combination which are not subject to amortization are tested for impairment annually, and more frequently if events and circumstances indicate that the asset might be impaired. An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value. For goodwill, this determination is made at the reporting unit level and consists of two steps. First, the Company determines the fair value of a reporting unit and compares it to its carrying amount. Fair value is determined based on earnings multiples of each subsidiary. Second, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill.

\*　　\*　　\*

As of December 31, 2012 and 2011, there was no impairment of goodwill and no reporting units were at risk of failing step one of annual test.

38.　　The 2012 Form 10-K also contained false and misleading representations about MDC's disclosure controls and internal controls over financial reporting, stating, in pertinent part, as follows:

We conducted an evaluation, under the supervision and with the participation of our management, including our CEO, our CFO and our management Disclosure Committee, of the effectiveness of our disclosure controls and procedures as of the

end of the period covered by this report pursuant to Rule 13a-15(b) of the Exchange Act.  Based on that evaluation, the Company has concluded that its disclosure controls and procedures were effective.

*        *        *

We evaluated the effectiveness of our internal control over financial reporting as of December 31, 2012.  In making this assessment, we used the criteria set forth in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of acquisitions made during 2012, which are included in the consolidated balance sheets of the Company, and the related consolidated statements of operations, comprehensive loss, stockholders' deficit, and cash flows for the year then ended.  2012 acquisitions constituted 13% of total assets, as of December 31, 2012, and 9% of revenue for the year then ended.  Management did not assess the effectiveness of internal control over financial reporting of the 2012 acquisitions, because of the timing of the acquisitions.

Based on our assessment, we believe that, as of December 31, 2012, we maintained effective internal control over financial reporting based on these criteria.

39.     The representations in the 2012 Form 10-K about MDC's disclosure controls and

internal controls over financial reporting were then falsely and misleadingly certified by Defendants

Nadal and Doft:

I, [Defendants Nadal and Doft] certify that:

1.     I have reviewed this annual report on Form 10-K for the year ended December 31, 2012 of MDC Partners Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.      The above representations concerning the Company's disclosure and internal controls were, in all material respects, repeated and certified by Defendants Nadal and Doft in the Forms 10-K and 10-Q that MDC filed with the SEC through the end of the Class Period.

41.     On April 25, 2013, MDC issued a press release announcing its financial results for the three months ended March 31, 2013.  The press release reported that the Company's goodwill totaled $718.5 million on March 31, 2013.

42.     On April 29, 2013, MDC filed with the SEC its 2013 Definitive Proxy Statement (the "2013 Proxy Statement"), which previously was identified as being incorporated by reference in the 2012 Form 10-K signed by the Individual Defendants.  The 2013 Proxy Statement included MDC's Summary Compensation Table, which was represented to provide an overview of the amounts paid to or earned by MDC's named executive officers during the prior three fiscal years:

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | Bonus ($)[6] | Stock Awards ($)[1] | | Option Awards ($)[2] | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)[3] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Stock Awards ($) | EVARs ($) | | | | |
| Miles S. Nadal, Chairman, Chief Executive Officer and President[4] | 2012 | 1,500,000 | 1,260,735 | 5,958,343 | 0 | 0 | 0 | 558,343 | 9,277,422 |
| | 2011 | 1,500,000 | 213,068 | 13,092,218 | 8,433,000 | 0 | 0 | 559,138 | 23,797,424 |
| | 2010 | 1,343,407 | 0 | 4,311,191 | | 0 | 0 | 627,594 | 6,282,192 |
| David B. Doft, Chief Financial Officer | 2012 | 375,000 | 120,074 | 168,489 | 0 | 0 | 0 | 50,581 | 714,144 |
| | 2011 | 368,750 | 148,565 | 680,907 | 421,650 | 0 | 0 | 49,372 | 1,669,243 |
| | 2010 | 350,000 | 0 | 315,317 | | 0 | 0 | 47,270 | 712,587 |
| Stephen Pustil, Vice Chairman[5] | 2012 | 400,240 | 142,071 | 266,520 | 0 | 0 | 0 | 34,757 | 843,588 |
| Mitchell Gendel, General Counsel and Corporate Secretary | 2012 | 375,000 | 140,248 | 249,399 | 0 | 0 | 0 | 45,581 | 810,228 |
| | 2011 | 368,750 | 86,187 | 638,612 | 421,650 | 0 | 0 | 44,372 | 1,559,571 |
| | 2010 | 350,000 | 0 | 280,207 | | 0 | 0 | 42,270 | 672,477 |
| Michael Sabatino, Chief Accounting Officer | 2012 | 375,000 | 127,053 | 277,247 | 0 | 0 | 0 | 46,822 | 826,122 |
| | 2011 | 368,750 | 81,502 | 691,345 | 421,650 | 0 | 0 | 45,540 | 1,608,787 |
| | 2010 | 350,000 | 0 | 264,331 | | 0 | 0 | 42,973 | 657,304 |

43.     Footnote 3 to the Summary Compensation Table included in the 2013 Proxy Statement represented, in pertinent part, as follows:

"All other compensation" is comprised of the following perquisites, personal benefits and other items for our NEOs [named executive officers] in 2012:

(a)     for Mr. Nadal, a $58,274 interest benefit received on account of interest-free loans that were grandfathered under the Sarbanes-Oxley Act of 2002; and a $500,000 perquisite allowance in respect of retirement benefits and employee health benefits. As of April 26, 2013, Mr. Nadal has repaid and satisfied in full the remaining principal balance of all previously outstanding loans made by the Company to Mr. Nadal and his affiliates.  In addition to the amounts set forth in the table, on limited occasions, while Mr. Nadal is traveling on business, a member of his family has

- 13 -

accompanied him on the corporate aircraft. There is no incremental cost to the Company for this use of the aircraft by Mr. Nadal's family member. For business purposes during travel from outside of New York City, Mr. Nadal and certain of the Company's executive officers have the use of a corporate apartment located near the Company's offices in New York City. Mr. Nadal personally paid for all furnishings in this corporate apartment, and also pays for 50% of the leasehold cost. The Company believes that such arrangement is more cost effective than the alternative costs of a hotel in New York City;

44.    In addition, the 2013 Proxy Statement represented, in pertinent part, that:

*Miles S. Nadal*

On April 25, 2007, the Company entered into a new Management Services Agreement (the "Services Agreement") with Miles Nadal and with Nadal Management, Inc. to set forth the terms and conditions on which Miles Nadal will continue to provide services to the Company as its Chief Executive Officer. The Services Agreement renewed on April 27, 2010, in accordance with its terms and conditions, and is subject to automatic one-year extensions unless either party gives to the other a 60-day advance written notice of its intention not to renew. In addition, effective April 27, 2010, the annual retainer amount (base salary) under the Services Agreement was increased to $1,500,000. The Services Agreement also provides for an annual incentive bonus with a targeted payout of 250% of the base compensation. For 2012, the Company paid Mr. Nadal a cash incentive payment in an amount equal to $1,875,000 in November 2012, and a subsequent cash incentive payment of $1,875,000 on February 15, 2013. Each of these incentive cash payments are subject to repayment if Mr. Nadal resigns or is terminated for cause prior to December 31, 2015. The Company also pays an annual cash payment of $500,000 in respect of retirement benefits, employee health benefits, and perquisites and may, in the discretion of the Compensation Committee, grant long term equity incentives with a targeted grant-date value of up to 300% of his then current retainer (base salary). In March 2011, February 2012 and again in February 2013, the Compensation Committee determined, in light of certain factors (including the Company's adjusted EBITDA achievement) and in exercising its discretionary authority, that each of the 2011 CEO LTIP award, the 2012 CEO LTIP award and the 2013 CEO LTIP Award should be valued at an amount equal to 300% of his then current base retainer amount.

45.    On May 8, 2013, MDC filed with the SEC its Form 10-Q for the quarter ended March 31, 2013, which was signed by Defendant Sabatino (the "Q1 2013 Form 10-Q"). The Q1 2013 Form 10-Q contained materially false and misleading representations about MDC's MD&A, financial statements and disclosure and internal controls, as well as certifications thereon by Defendants Nadal and Doft.

46.     The financial statements contained in the Q1 2013 Form 10-Q falsely represented, among other things, that:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed consolidated interim financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP") have been condensed or omitted pursuant to these rules.
>
> The accompanying financial statements reflect all adjustments, consisting of normally recurring accruals, which in the opinion of management are necessary for a fair presentation, in all material respects, of the information contained therein. Results of operations for interim periods are not necessarily indicative of annual results.

47.     The Q1 2013 Form 10-Q also included false and misleading representations about MDC's disclosure controls and internal controls over financial reporting and certifications thereon by Defendants Nadal and Doft.

48.     On July 25, 2013, MDC issued a press release announcing its financial results for the three months ended June 30, 2013.  The press release reported that the Company's goodwill totaled $715.7 million on June 30, 2013.

49.     On August 2, 2013, MDC filed with the SEC its Form 10-Q for the quarter ended June 30, 2013, which was signed by Defendant Sabatino (the "Q2 2013 Form 10-Q").  The Q2 2013 Form 10-Q contained materially false and misleading representations about MDC's MD&A, financial statements and disclosure and internal controls, as well as certifications thereon by Defendants Nadal and Doft.

50.     The financial statements contained in the Q2 2013 Form 10-Q falsely represented, among other things, that:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed consolidated interim financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC").

Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP") have been condensed or omitted pursuant to these rules.

The accompanying financial statements reflect all adjustments, consisting of normally recurring accruals, which in the opinion of management are necessary for a fair presentation, in all material respects, of the information contained therein. Results of operations for interim periods are not necessarily indicative of annual results.

51.     The Q2 2013 Form 10-Q also contained false and misleading representations about MDC's disclosure controls and internal controls over financial reporting and certifications thereon by Defendants Nadal and Doft.

**Materially False and Misleading
Statements Issued During the Class Period**

52.     On October 28, 2013, MDC issued a press release announcing its financial results for the three months ended September 30, 2013.  The press release reported that the Company's goodwill totaled $711.3 million on September 30, 2013.

53.     On November 5, 2013, MDC filed its Form 10-Q for the quarter ended September 30, 2013 with the SEC which was signed by Defendant Sabatino (the "Q3 2013 Form 10-Q").  The Q3 2013 Form 10-Q contained materially false and misleading representations about MDC's MD&A, financial statements and disclosure and internal controls, as well as the certifications thereon by Defendants Nadal and Doft.

54.     The financial statements contained in the Q3 2013 Form 10-Q falsely represented, among other things, that:

MDC Partners Inc. (the "Company") has prepared the unaudited condensed consolidated interim financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP") have been condensed or omitted pursuant to these rules.

The accompanying financial statements reflect all adjustments, consisting of normally recurring accruals, which in the opinion of management are necessary for a fair presentation, in all material respects, of the information contained therein. Results of operations for interim periods are not necessarily indicative of annual results.

55.     The Q3 2013 Form 10-Q also contained false and misleading representations about MDC's disclosure controls and internal controls over financial reporting and certifications thereon by Defendants Nadal and Doft.

56.     On November 12, 2013, MDC filed a Form 8-K with the SEC to update certain items in the Company's 2012 Form 10-K (the "updated 2012 Form 10-K"). The updated 2012 Form 10-K represented, in pertinent part, as follows:

MDC Partners Inc. (the "Company") has prepared the consolidated financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC") and in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP").

*       *       *

**Transactions With Related Parties**

*CEO Services Agreement*

On April 27, 2007, the Company entered into a Management Services Agreement (the "Services Agreement") with Miles Nadal and with Nadal Management, Inc. to set forth the terms and conditions on which Mr. Nadal would continue to provide services to the Company as its Chief Executive Officer. The Services Agreement renewed on April 27, 2010, in accordance with its terms and conditions. In addition, effective April 27, 2010, the annual retainer amount under the Services Agreement was increased to $1.5 million. During 2010, 2011 and 2012 and in accordance with this Services Agreement, Mr. Nadal repaid an amount equal to $0.1 million, $0.1 million, and $0.5 million, of loans due to the Company. At December 31, 2012, outstanding loans due from Nadal Management to the Company, with no stated maturity date, amounted to C$5.5 million ($5.5 million), which have been reserved for in the Company's accounts. For further information, see Note 16 Related Party Transactions.

*       *       *

- 17 -

*Goodwill and Indefinite Lived Intangible.*  In accordance with the FASB Accounting Standards Codification topic, Goodwill and Other Intangible Assets, goodwill and indefinite life intangible assets (trademarks) acquired as a result of a business combination which are not subject to amortization are tested for impairment annually, and more frequently if events and circumstances indicate that the asset might be impaired.  An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.  For goodwill, this determination is made at the reporting unit level and consists of two steps.  First, the Company determines the fair value of a reporting unit and compares it to its carrying amount.  Fair value is determined based on earnings multiples of each subsidiary.  Second, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill.  The implied fair value of goodwill is determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation, in accordance with the FASB Accounting Standards Codification topic, Business Combinations.  The residual fair value after this allocation is the implied fair value of the reporting unit goodwill.

*         *         *

Impairment losses, where applicable, will be charged to operating profit.  The Company identifies certain intangible assets (trademarks) as indefinite life if there are no legal, regulatory, contractual or economic factors that limit the useful life.  If the carrying amount of an indefinite life intangible exceeds its fair value, an impairment loss is recognized for the excess.  As of December 31, 2012 and 2011, there was no impairment of goodwill and no reporting units were at risk of failing step one of annual test.

57.    On November 12, 2013, MDC also issued a press release announcing that it commenced a private offering of an additional $100 million aggregate principal amount of its senior notes maturing in 2020 to qualified institutional buyers, as well as to non-U.S. persons in transactions outside the United States.

58.    On November 15, 2013, MDC issued a press release announcing the completion of its private offering of an additional $110 million aggregate principal amount of its senior notes due 2020.

59.    On February 20, 2014, MDC issued a press release announcing its financial results for the three and twelve months ended December 31, 2013.  The press release reported that the Company's goodwill totaled $744.3 million on December 31, 2013.

60.     On March 10, 2014, MDC filed its Form 10-K for the year ended December 31, 2013 with the SEC which was signed by the Individual Defendants (the "2013 Form 10-K").  The 2013 Form 10-K contained materially false and misleading representations about MDC's executive compensation, MD&A, financial statements and disclosure and internal controls, as well as certifications thereon by Defendants Nadal and Doft.

61.     Concerning the MDC's Executive Compensation disclosure obligations pursuant to Item 402 of Regulation S-K, the 2013 Form 10-K stated: "[r]eference is made to the sections captioned "Compensation of Directors" and "Executive Compensation" in our next Proxy Statement, which is incorporated herein by reference."

62.     The financial statements contained in the 2013 Form 10-K falsely represented, among other things, that:

> MDC Partners Inc. (the "Company") has prepared the consolidated financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC") and in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP").

> *        *        *

> **16.     Related Party Transactions**

> (a)     The Company incurred fees and paid cash incentive awards totaling $15,992, $2,739 and $3,375 in 2013, 2012 and 2011, respectively, relating to companies controlled by the Chairman and Chief Executive Officer ("CEO") of the Company in respect of services rendered pursuant to a management services agreement and incentive plans.

> On April 25, 2007, the Company entered into a new Management Services Agreement (as amended and restated on May 6, 2013, the "Services Agreement") with Miles Nadal and with Nadal Management, Inc. to set forth the terms and conditions on which Miles Nadal will continue to provide services to the Company as its Chief Executive Officer.  The Services Agreement is subject to automatic one-year extensions unless either party gives to the other a 60-day advance written notice of its intention not to renew.  Effective January 1, 2013, the annual retainer amount (base salary) under the Services Agreement was increased to $1,750 and effective January 1, 2014, the annual retainer amount was increased to $1,850.

During 2011, 2012 and 2013 and in accordance with this Services Agreement, Mr. Nadal repaid an amount equal to $102, $475 and $5,445 of loans due to the Company.  As of April 26, 2013, Mr. Nadal has repaid and satisfied in full the remaining principal balance of all previously outstanding loans made by the Company to Mr. Nadal and his affiliates.  After giving effect to this final repayment by Mr. Nadal to the Company, there is currently $0 remaining due and owing to the Company in respect of all prior loans.

(b)      Pursuant to the amended Services Agreement, the Company agreed to provide to its CEO, Miles S. Nadal a special bonus of C$10,000 upon the first to occur of (i) the average market price of the Company's Class A subordinate voting shares is C$30 per share or more for more than 20 consecutive trading days (measured as of the close of trading on each applicable date) or (ii) a change of control of the Company.  This bonus is payable until the date that is three years after the date on which Mr. Nadal is no longer employed by the Company for any reason. During November 2013, this bonus was earned and paid to Mr. Nadal in the amount of C$10,000 (US $9,649).

*      *      *

*Goodwill and Indefinite Lived Intangible.*  In accordance with the FASB Accounting Standards Codification topic, Goodwill and Other Intangible Assets, goodwill and indefinite life intangible assets (trademarks) acquired as a result of a business combination which are not subject to amortization are tested for impairment annually, and more frequently if events and circumstances indicate that the asset might be impaired.  An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.  For goodwill, this determination is made at the reporting unit level and consists of two steps.  First, the Company determines the fair value of a reporting unit and compares it to its carrying amount.  Fair value is determined based on earnings multiples of each subsidiary.  Second, if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill.  The implied fair value of goodwill is determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation, in accordance with the FASB Accounting Standards Codification topic, Business Combinations.  The residual fair value after this allocation is the implied fair value of the reporting unit goodwill.

*      *      *

Impairment losses, where applicable, will be charged to operating profit.  The Company identifies certain intangible assets (trademarks) as indefinite life if there are no legal, regulatory, contractual or economic factors that limit the useful life.  If the carrying amount of an indefinite life intangible exceeds its fair value, an impairment loss is recognized for the excess.  As of December 31, 2013 and 2012, there was no impairment of goodwill and no reporting units were at risk of failing step one of the Company's annual impairment test.

- 20 -

63.     On March 28, 2014, MDC issued a press release announcing that it has commenced a private offering of an additional $75 million aggregate principal amount of its senior unsecured notes due 2020 to qualified institutional buyers, as well as to non-U.S. persons in transactions outside the United States.

64.     On April 2, 2014, MDC issued a press release announcing that it had completed its private offering of an additional $75 million aggregate principal amount of its senior unsecured notes maturing in 2020.

65.     On April 24, 2014, MDC issued a press release announcing its financial results for the three months ended March 31, 2014.  The press release reported that the Company's goodwill totaled $873.9 million on March 31, 2014.

66.     On April 25, 2014, MDC filed its 2014 Definitive Proxy Statement (the "2014 Proxy Statement") with the SEC which previously was identified as being incorporated by reference into the 2013 Form 10-K signed by the Individual Defendants.  The 2014 Proxy Statement included MDC's Summary Compensation Table, which was represented to provide an overview of the amounts paid to or earned by MDC's named executive officers during the prior three fiscal years:

| Name and Principal Position | Year | Salary ($) | Bonus ($)[1] | Stock Awards ($) | | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Stock Awards ($)[2] | EVARs ($)[5] | | | | |
| Miles S. Nadal, Chairman Chief Executive Officer and President[5] | 2013 | 1,750,000 | 14,242,342 | 4,186,920 | 0 | 0 | 0 | 500,000 | 20,679,263 |
| | 2012 | 1,500,000 | 1,260,735 | 5,958,343 | 0 | 0 | 0 | 558,343 | 9,277,422 |
| | 2011 | 1,500,000 | 213,068 | 13,092,218 | 8,433,000 | 0 | 0 | 559,138 | 23,797,424 |
| David B. Doft, Chief Financial Officer | 2013 | 412,500 | 323,947 | 226,721 | 0 | 0 | 0 | 53,084 | 1,016,252 |
| | 2012 | 375,000 | 120,074 | 168,489 | 0 | 0 | 0 | 50,581 | 714,144 |
| | 2011 | 368,750 | 148,565 | 680,907 | 421,650 | 0 | 0 | 49,372 | 1,669,243 |
| Stephen Pustil, Vice Chairman[6] | 2013 | 388,312 | 229,991 | 227,521 | 0 | 0 | 0 | 32,696 | 878,520 |
| | 2012 | 400,240 | 142,071 | 266,520 | 0 | 0 | 0 | 34,757 | 843,588 |
| Mitchell Gendel, General Counsel and Corporate Secretary | 2013 | 412,500 | 309,775 | 225,083 | 0 | 0 | 0 | 48,084 | 995,442 |
| | 2012 | 375,000 | 140,248 | 249,399 | 0 | 0 | 0 | 45,581 | 810,228 |
| | 2011 | 368,750 | 86,187 | 638,612 | 421,650 | 0 | 0 | 44,372 | 1,559,571 |
| Michael Sabatino Chief Accounting Officer | 2013 | 412,500 | 420,622 | 226,721 | 0 | 0 | 0 | 46,272 | 1,106,816 |
| | 2012 | 375,000 | 127,053 | 277,247 | 0 | 0 | 0 | 46,822 | 826,122 |
| | 2011 | 368,750 | 81,502 | 691,345 | 421,650 | 0 | 0 | 45,540 | 1,608,787 |

67.     Footnote 4 to the Summary Compensation Table included in the 2014 Proxy Statement represented, in pertinent part, as follows:

"All other compensation" is comprised of the following perquisites, personal benefits and other items for our NEOs [named executive officers] in 2013:

(a)     for Mr. Nadal, a $500,000 perquisite allowance in respect of retirement benefits and employee health benefits.  In addition to the amounts set forth in the table, on limited occasions, while Mr. Nadal is traveling on business, a member of his family has accompanied him on the corporate aircraft.  There is no incremental cost to the Company for this use of the aircraft by Mr. Nadal's family member.  For business purposes during travel from outside of New York City, Mr. Nadal and certain of the Company's executive officers have the use of a corporate apartment located near the Company's offices in New York City.  Mr. Nadal personally paid for all furnishings in this corporate apartment, and also pays for 50% of the leasehold cost.  The Company believes that such arrangement is more cost effective than the alternative costs of a hotel in New York City;

68.     In addition, the 2014 Proxy Statement represented, in pertinent part, that:

*Miles S. Nadal*

On May 6, 2013, the Company entered into an amended Management Services Agreement (as amended, the "**Services Agreement**") with Miles Nadal and with Nadal Management Limited to set forth the terms and conditions on which Miles

Nadal will continue to provide services to the Company as its Chief Executive Officer. The Services Agreement is subject to automatic one-year extensions unless either party gives to the other a 60-day advance written notice of its intention not to renew. Effective January 1, 2013, the annual retainer amount (base salary) under the Services Agreement was increased to $1,750,000. The annual retainer amount was increased to $1,850,000, effective January 1, 2014, given that MDC achieved the contractual EBITDA target growth amount of more than 5% in 2013 compared to 2012. The Services Agreement also provides for an annual incentive bonus with a targeted payout of 250% of the base compensation. For 2013, the Company paid Mr. Nadal a cash incentive payment in an amount equal to $2,187,500 in November 2013, and a subsequent cash incentive payment of $2,187,500 on February 21, 2014. Each of these incentive cash payments are subject to repayment if Mr. Nadal resigns or is terminated for cause prior to December 31, 2016. The Company also pays an annual cash payment to Mr. Nadal of $500,000 in respect of retirement benefits, employee health benefits, and perquisites and may, in the discretion of the Compensation Committee, grant long term equity incentives (or cash) with a targeted grant date value of up to 300% of his then current retainer (base salary). In February 2013 and again in February 2014, the Compensation Committee determined, in light of certain factors (including the Company's EBITDA achievement) that each of the 2012 CEO LTIP award and the 2013 CEO LTIP Award should be valued at an amount equal to 300% of his then current base retainer amount.

Pursuant to the amended Services Agreement, the Company further agreed to provide to Mr. Nadal a special bonus of Cdn$10 million upon the first to occur of (i) the average market price of the Company's Class A Shares is C$30 ($30) per share or more for more than 20 consecutive trading days (measured as of the close of trading on each applicable date) or (ii) a change of control of the Company. This exceptional stock price target, representing an "all time high" price at the time, was achieved on October 24, 2013 and the Company paid Mr. Nadal the amount of this special bonus (U.S. $9.6 million). Following this one-time payment, this special bonus provision of the Services Agreement is terminated and Mr. Nadal will not be entitled to any additional special bonus tied solely to the Company's Class A share price.

69.     On April 24, 2014, MDC issued a press release announcing its financial results for the three months ended March 31, 2014. The press release reported that the Company's goodwill totaled $873.9 million on March 31, 2014.

70.     On April 29, 2014, MDC filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC which was signed by Defendant Sabatino (the "Q1 2014 Form 10-Q"). The Q1 2014 Form 10-Q contained materially false and misleading representations about MDC's MD&A,

financial statements and disclosure and internal controls, as well as certifications thereon by Defendants Nadal and Doft.

71.     The financial statements contained in the Q1 2014 Form 10-Q falsely represented, among other things, that:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed consolidated interim financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP") have been condensed or omitted pursuant to these rules.
>
> The accompanying financial statements reflect all adjustments, consisting of normally recurring accruals, which in the opinion of management are necessary for a fair presentation, in all material respects, of the information contained therein. Results of operations for interim periods are not necessarily indicative of annual results.

72.     The Q1 2014 Form 10-Q also contained false and misleading representations about MDC's disclosure controls and internal controls over financial reporting and certifications thereon by Defendants Nadal and Doft.

73.     On May 5, 2014, MDC filed with the SEC a prospectus supplement offering to sell 4.025 million MDC common shares (assuming the exercise of the underwriter's over-allotment option to purchase 525,000 MDC common shares) owned by Defendant Nadal.

74.     On May 16, 2014, Defendant Nadal filed with the SEC a Form 4 representing that he sold 3.5 million MDC common shares at $23.13 per share for proceeds of approximately $5.7 million.  The shares sold by Defendant Nadal represented more than 38% of his ownership in MDC common shares.

75.     On July 24, 2014, MDC issued a press release announcing its financial results for the three months ended June 30, 2014.  The press release reported that the Company's goodwill totaled $882.7 million on June 30, 2014.

76.     On August 19, 2014, MDC filed with the SEC its Form 10-Q for the quarter ended

June 30, 2014, which was signed by Defendant Sabatino (the "Q2 2014 Form 10-Q"). The Q2 2014

Form 10-Q contained materially false and misleading representations about MDC's MD&A,

financial statements and disclosure and internal controls, as well as certifications thereon by

Defendants Nadal and Doft.

77.     The financial statements contained in the Q2 2014 Form 10-Q falsely represented,

among other things, that:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed
> consolidated interim financial statements included herein pursuant to the rules and
> regulations of the United States Securities and Exchange Commission (the "SEC").
> Certain information and footnote disclosures normally included in annual financial
> statements prepared in accordance with generally accepted accounting principles
> ("GAAP") of the United States of America ("US GAAP") have been condensed or
> omitted pursuant to these rules.
>
> The accompanying financial statements reflect all adjustments, consisting of
> normally recurring accruals, which in the opinion of management are necessary for a
> fair presentation, in all material respects, of the information contained therein.
> Results of operations for interim periods are not necessarily indicative of annual
> results.

78.     The Q2 2014 Form 10-Q also contained false and misleading representations about

MDC's disclosure controls and internal controls over financial reporting and certifications thereon

by Defendants Nadal and Doft.

79.     On October 29, 2014, MDC issued a press release announcing its financial results for

the three months ended September 30, 2014. The press release reported that the Company's

goodwill totaled $928.2 million on September 30, 2014.

80.     On November 6, 2014, MDC filed its Form 10-Q for the quarter ended June 30, 2014

with the SEC which was signed by Defendant Sabatino (the "Q3 2014 Form 10-Q"). The Q3 2014

Form 10-Q contained materially false and misleading representations about MDC's MD&A,

financial statements and disclosure and internal controls, as well as the certifications thereon by

Defendants Nadal and Doft.

81.     The financial statements contained in the Q3 2014 Form 10-Q falsely represented,

among other things, that:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed
> consolidated interim financial statements included herein pursuant to the rules and
> regulations of the United States Securities and Exchange Commission (the "SEC").
> Certain information and footnote disclosures normally included in annual financial
> statements prepared in accordance with generally accepted accounting principles
> ("GAAP") of the United States of America ("US GAAP") have been condensed or
> omitted pursuant to these rules.

> The accompanying financial statements reflect all adjustments, consisting of
> normally recurring accruals, which in the opinion of management are necessary for a
> fair presentation, in all material respects, of the information contained therein.
> Results of operations for interim periods are not necessarily indicative of annual
> results.

82.     The Q3 2013 Form 10-Q also contained false and misleading representations about

MDC's disclosure controls and internal controls over financial reporting and certifications thereon

by Defendants Nadal and Doft.

83.     On February 23, 2015, MDC issued a press release announcing its financial results for

the three and twelve months ended December 31, 2014.  The press release reported that the

Company's goodwill totaled $851.4 million on December 31, 2014.

84.     On March 2, 2015, MDC filed with the SEC its Form 10-K for the year ended

December 31, 2014, which was signed by the Individual Defendants (the "2014 Form 10-K").  The

2014 Form 10-K contained materially false and misleading representations about MDC's executive

compensation, MD&A, financial statements and disclosure and internal controls, as well as

certifications thereon by Defendants Nadal and Doft.

85.     The 2014 Form 10-K contained financial statements which falsely represented,

among other things, that:

MDC Partners Inc. (the "Company") has prepared the consolidated financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC") and in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("U.S. GAAP").

\*       \*       \*

### Transactions With Related Parties

#### CEO Services Agreement

On April 25, 2007, the Company entered into a new Management Services Agreement (as amended and restated on May 6, 2013, the "Services Agreement") with Miles Nadal and with Nadal Management, Inc. to set forth the terms and conditions on which Miles Nadal will continue to provide services to the Company as its Chief Executive Officer. The Services Agreement is subject to automatic one-year extensions unless either party gives to the other a 60-day advance written notice of its intention not to renew. Effective January 1, 2013, the annual retainer amount (base salary) under the Services Agreement was increased to $1,750,000; effective January 1, 2014, the annual retainer amount was increased to $1,850,000; effective January 1, 2015, the annual retainer amount was increased to $2,000,000.

During 2012 and 2013 and in accordance with this Services Agreement, Mr. Nadal repaid an amount equal to $0.5 million and $5.4 million of loans due to the Company, respectively. As of April 26, 2013, Mr. Nadal has repaid and satisfied in full the remaining principal balance of all previously outstanding loans made by the Company to Mr. Nadal and his affiliates. After giving effect to this final repayment by Mr. Nadal to the Company, there is currently $0 remaining due and owing to the Company in respect of all prior loans. For further information, see Note 15 of the Notes to the Consolidated Financial Statements included herein.

#### Use of Private Aircraft

Beginning in 2014, MDC has chartered for business purposes an airplane and helicopter (together, the "Aircraft") owned by entities controlled by Mr. Nadal and leased to an independent corporate aircraft management company. Entities controlled by Mr. Nadal paid for the purchases of the Aircraft and are legally responsible and have paid for all operating, personnel and maintenance costs associated with the Aircraft's operations. Payments by third parties to charter the Aircraft from the corporate aircraft management company will offset a portion of the costs. Payments by MDC for the business use of the Aircraft by Mr. Nadal and other Executive employees of MDC are made to the corporate aircraft management company at a fixed hourly rate set forth in the aircraft service agreement between the aircraft management company and entities controlled by Mr. Nadal. In 2014, MDC paid a total of $1.6 million for the business use of the Aircraft.

\*       \*       \*

*Goodwill and Indefinite Lived Intangible*.  In accordance with the FASB Accounting Standards Codification topic, Goodwill and Other Intangible Assets, goodwill and indefinite life intangible assets (trademarks) acquired as a result of a business combination which are not subject to amortization are tested for impairment annually on October 1, and more frequently if events and circumstances indicate that the asset might be impaired.  An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.  The Company's conclusion was based on a detailed analysis of the aggregation criteria set forth in the FASB ASC Topic 280, Segment Reporting, and the guidance set forth in FASB ASC Topic  350, Intangibles - Goodwill and Other.  Consistent with our fundamental business strategy, the agencies within the reporting units serve similar clients in similar industries, and in many cases the same clients.  The main economic components of each agency are employee compensation and related costs and direct service costs and office and general costs, which include rent and occupancy costs, technology costs that are generally limited to personal computers, servers and off-the shelf software and other overhead expenses.

*       *       *

Impairment losses, where applicable, will be charged to operating profit.  The Company identifies certain intangible assets (trademarks) as indefinite life if there are no legal, regulatory, contractual or economic factors that limit the useful life.  If the carrying amount of an indefinite life intangible exceeds its fair value, an impairment loss is recognized for the excess.  As of December 31, 2014 and 2013, there was no impairment of goodwill and no reporting units were at risk of failing the Company's annual impairment test.

86.     The statements referenced above in ¶¶34-35, 37-39, 41-51, 52-57, 59-62, 64-73 and 75-85 were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     the Company's executive compensation related disclosures in its filings made with the SEC materially understated the Company's executive compensation;

(b)     the related party disclosures in the Company's financial statements failed to disclose certain related party transactions;

(c)     the Company's reported goodwill was materially overstated;

- 28 -

(d)     the Company's Forms 10-K and 10-Q failed to disclose then known risks and events or uncertainties in accordance with the requirements of Item 303 of Regulation S-K;

(e)     the Company's financial statements were presented in violation of GAAP and were materially false and misleading;

(f)     the Company's disclosure controls and internal controls over its financial reporting were materially deficient;

(g)     the certifications issued by Defendants Nadal and Doft associated with MDC's disclosure controls and internal controls over MDC's financial reporting were materially false and misleading; and

(h)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business prospects and future operating performance.

87.     After the close of trading, MDC issued the April 27, 2015 press release announcing its financial results for the three months ended March 31, 2015.  The April 27, 2015 press release also reported that the SEC had been conducting a formal investigation into the Company's reporting of executive compensation and goodwill and that MDC formed a Special Committee of independent directors (the "Special Committee") to review matters relating to the reimbursement of expenses purportedly incurred by Defendant Nadal, stating, in pertinent part, as follows:

> Since October 5, 2014, the Company has been actively cooperating with the production of documents for review by the Securities and Exchange Commission (the "SEC") pursuant to a Subpoena.  In connection with this production of documents, the Company formed a Special Committee of independent directors to review certain matters relating to the reimbursement of expenses incurred by the CEO.  The Special Committee is being advised by Bruch Hanna LLP, as special independent advisor, and by Simpson Thacher & Bartlett LLP, as legal counsel.  The Special Committee, through its counsel, received full cooperation from Company management and Board members, reviewed and analyzed thousands of documents, emails and other accounting information, and interviewed several individuals.
>
> The Special Committee completed an extensive review of perquisites and payments made by the Company to or on behalf of Miles Nadal and Nadal Management

Limited during the six-year period from 2009 through 2014. The review included a detailed analysis of the available back-up documentation supporting such payments, as well as consideration of the Management Services Agreement among Mr. Nadal, Nadal Management Limited and the Company and certain historical practices. These payments included, among other things, travel and commutation expenses, charitable donations, medical expenses, and certain expenses for which the information was incomplete.

88.    In addition, the April 27, 2015 press release noted that, following the Special Committee's investigation, Defendant Nadal agreed to repay the Company $8.6 million; that the Company has adopted and implemented a series of remedial steps to improve and strengthen its internal controls and procedures; and that the SEC's investigation into the Company's accounting for goodwill and certain other accounting practices was believed to be in "an early stage" stating, in pertinent part, as follows:

> Mr. Nadal cooperated fully with the review. Following the review, Mr. Nadal agreed to reimburse the Company for perquisites and payments for which the Company sought reimbursement, in the aggregate amount of $8.6 million. The Company does not expect there will be any impact to its previously issued financial statements as a result of the review.

> *    *    *

> In addition to this reimbursement, the Special Committee recommended, the Audit Committee has adopted, and the Company has adopted and implemented, a series of remedial steps to improve and strengthen the Company's internal controls and procedures regarding travel, entertainment and related expenses. . . .

> *    *    *

> The Subpoena received from the SEC also requested production of documents relating to the Company's goodwill and certain other accounting practices, as well as information relating to trading in the Company's securities by third parties. The Company has been fully cooperating with the SEC and believes that the inquiries are at an early stage.

89.    Following the April 27, 2015 press release, Defendant Doft, on a conference call MDC held with analysts and investors to discuss the Company's earnings and operations, reiterated that the SEC's investigation was on-going.

90.     In response to these revelations, the price of MDC common stock, which traded near the Class Period high of $28.65 per share on the last day of the Class Period, plummeted ***27.8%***, or $7.78 per share, from $27.98 per share on April 27, 2015 to close at $20.20 per share on April 28, 2015.

91.     On April 30, 2015, MDC filed with the SEC its Form 10-Q for the quarter ended March 31, 2015, which was signed by Defendant Doft (the "Q1 2015 Form 10-Q").  The Q1 2015 Form 10-Q noted that MDC sought reimbursement from Defendant Nadal for purported medical expenses, travel and commutation expenses, charitable donations and other expenses which "lacked appropriate substantiation, over a six year period," stating, in pertinent part, as follows:

> On October 5, 2014, the Company received a subpoena from the Securities and Exchange Commission (the "SEC").  In a letter accompanying the subpoena, the SEC stated that it is conducting an investigation of the Company.  See "Item 3 - Legal Proceedings" of this Quarterly Report on Form 10-Q for more information about the subpoena and related matters.  The SEC's subpoena requests the production of documents and communications that, among other things, relate to: (i) reimbursement of expenses on behalf of the Company's CEO; (ii) the Company's goodwill and certain other accounting practices; and (iii) information relating to trading in the Company's securities by third parties.  The investigation is ongoing and the Company is fully cooperating with the SEC.

> In connection with this production of documents, the Company formed a Special Committee of independent directors to review certain matters relating to the reimbursement of expenses incurred by the CEO.  The Special Committee completed an extensive review of perquisites and payments made by the Company on behalf of the CEO during the period 2009 through 2014.  These payments included medical expenses, travel and commutation expenses, charitable donations and other expenses which lacked appropriate substantiation, over a six (6) year period.  Following the review, the CEO agreed to reimburse the Company for the expenses for which the Company sought reimbursement, in an aggregate amount of $8.6 million.

92.     The market for MDC common stock was open, well-developed and efficient at all relevant times.  As a result of materially false and misleading statements and omissions of material fact, MDC common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased MDC common stock relying upon the integrity of the market

price of MDC common stock and market information relating to MDC, and have been damaged thereby.

93.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of MDC common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

94.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about MDC's business, executive compensation, related party transactions, goodwill, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of MDC and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the MDC common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

95.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding MDC, their control over, and/or receipt and/or modification of MDC's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

96.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of the personnel at the highest levels of the Company, including the Individual Defendants.

97.    The Individual Defendants, because of their positions with MDC, controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of MDC's corporate statements and is therefore responsible and liable for the representations contained therein.

98.    Defendants' scienter is further demonstrated by the Sarbanes-Oxley-mandated certifications of Defendants Nadal and Doft, which acknowledged their responsibility to investors

for establishing and maintaining controls to ensure that material information about MDC was made known to them and that the Company's disclosure and internal controls were operating effectively.

99.   Defendants were further motivated to engage in this course of conduct in order to allow certain Company insiders to collectively sell 6.1 million common shares of their personally held MDC common stock for gross proceeds of approximately $163.7 million during the Class Period.   During the Class Period, Defendant Nadal sold 5.6 million MDC common shares, representing a sizable portion of his ownership in the Company, for proceeds totaling approximately $146.2 million.

## LOSS CAUSATION/ECONOMIC LOSS

100.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MDC common stock and operated as a fraud or deceit on Class Period purchasers of MDC common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of MDC common stock fell precipitously as the prior artificial inflation came out.

101.   As a result of their purchases of MDC common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused MDC common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $28.65 per share on March 31, 2015.

102.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of MDC's business and prospects.   When the truth about the Company was revealed to the market, the price of MDC common stock fell precipitously.   The

decline removed the inflation from the price of MDC common stock, causing real economic loss to investors who had purchased MDC common stock during the Class Period.

103.     The decline in the price of MDC common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in MDC common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of MDC common stock and the subsequent significant decline in the value of MDC common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

104.     At all relevant times, the market for MDC common stock was an efficient market for the following reasons, among others:

(a)     MDC common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the TSE, highly efficient stock markets;

(b)     as an SEC registrant, MDC filed periodic public reports with the SEC, the NASDAQ and the TSE;

(c)     MDC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     MDC was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

105.    As a result of the foregoing, the market for MDC common stock promptly digested current information regarding MDC from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of MDC common stock during the Class Period suffered similar injury through their purchase of MDC common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

106.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MDC who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

110.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MDC common stock.  Plaintiff and the Class would not have purchased MDC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of MDC common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

112.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.    The Individual Defendants acted as controlling persons of MDC within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of MDC, and their ownership of MDC common stock, the Individual Defendants had the power and authority to cause MDC to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled MDC and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 31, 2015                        ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                        SAMUEL H. RUDMAN


                                                             */s/ Samuel H. Rudman*
                                                        SAMUEL H. RUDMAN

                                                        58 South Service Road, Suite 200
                                                        Melville, NY  11747
                                                        Telephone:  631/367-7100
                                                        631/367-1173 (fax)
                                                        srudman@rgrdlaw.com

                                                        SUGARMAN & SUSSKIND, P.A.
                                                        ROBERT A. SUGARMAN
                                                        100 Miracle Mile, Suite 300
                                                        Coral Gables, FL 33134
                                                        Telephone:  305/529-2801
                                                        305/447-8115 (fax)

                                                        *Attorneys for Plaintiff*

- 39 -

CERTIFICATION OF NAMED PLAINTIFF
<u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTER PENSION PLAN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

MDC PARTNERS

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of July, 2015.

NORTH COLLIER FIRE CONTROL AND
RESCUE DISTRICT FIREFIGHTER
PENSION PLAN

By: _____

Its: _Chairperson_____

- 2 -

MDC PARTNERS

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|:---:|:---:|:---:|
| 01/28/2015 | 3,685 | $24.64 |