UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTH COLLIER FIRE CONTROL and RESCUE DISTRICT FIREFIGHTER PENSION PLAN, and PLYMOUTH COUNTY RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MDC PARTNERS, INC., MILES S. NADAL, DAVID B. DOFT, MICHAEL C. SABATINO, MITCHELL GENDEL, and MICHAEL J.L. KIRBY,<br><br>Defendants. | Civil Action No. 1:15-cv-06034-RJS<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u><br><br><u>ECF CASE</u> |

**AMENDED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS


I. NATURE AND SUMMARY OF THE ACTION ........ 2
- A. MDC's Growth Through Acquisitions ........ 2
- B. Defendants Falsely Portrayed MDC's True Financial Condition ........ 7

II. JURISDICTION AND VENUE ........ 11

III. PARTIES ........ 11
- A. Lead Plaintiffs ........ 11
- B. Defendants ........ 12
  - 1. MDC Partners, Inc. ........ 12
  - 2. Individual Defendants ........ 13

IV. BACKGROUND ........ 14
- A. Lead Plaintiffs' Investigation and Confidential Sources ........ 14
  - 1. Confidential Witness 1 ........ 14
  - 2. Confidential Witness 2 ........ 16
  - 3. Confidential Witness 3 ........ 17
- B. Whistleblower Complaint and Ongoing SEC Investigation ........ 17
  - 1. MDC's "Persistent Mischaracterization of EBITDA" and Other Metrics ........ 18
  - 2. MDC's Artificially Inflated Financial Results From the Failure to Record Goodwill Impairments ........ 22
  - 3. Nadal's Misappropriation of Corporate Assets ........ 27
  - 4. Other Evidence Supporting Allegations of Defendants' Fraud are Revealed in the Whistleblower Complaint and Documents Submitted in Support Thereof ........ 28
- C. Relevant Accounting Standards and Defendants' Violations of GAAP ........ 29
  - 1. Goodwill Impairments ........ 29
  - 2. Additional GAAP Violations Regarding Zyman and Goodwill ........ 33
  - 3. EBITDA ........ 37

V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED TO DISCLOSE MATERIAL INFORMATION DURING THE CLASS PERIOD ........ 43
- A. MDC'S Earnings Releases Issued During the Class Period ........ 43
- B. MDC's SEC Forms 10-Q Filed During the Class Period ........ 45
- C. MDC's Restatement of Certain FY 2012 Financial Data, FY 2013 10-K, and FY 2014 10-K ........ 51
- D. MDC's 2014 Definitive Proxy Statement ........ 57

VI. THE TRUTH IS REVEALED ........ 58

VII. SUBSEQUENT REVELATIONS EVIDENCING DEFENDANTS' FRAUD ........ 61

VIII. SCIENTER ALLEGATIONS .................... 63
A. Insider Trading Generally .................... 63
B. Defendant Nadal .................... 64
1. Defendant Nadal Engaged in Substantial and Suspicious Insider Trading .................... 64
2. MDC's Internal Investigation Found that Defendant Nadal Owes the Company Over Ten Million Dollars in Improper Expense Payments .................... 65
3. Defendant Nadal Abruptly Resigned During the SEC Investigation and MDC's Own Internal Investigation .................... 65
4. Defendant Nadal's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA Calculation .................... 66
5. As Chairman of the Board, Defendant Nadal Could Influence Appointments to MDC's Audit and Compensation Committees .................... 67
6. Defendant Nadal Was Personally Involved at the Highest Level Concerning MDC's Financial Accounting and Reporting .................... 67
C. Defendant Doft .................... 68
1. Defendant Doft Engaged in Substantial and Suspicious Insider Trading .................... 68
2. Defendant Doft Knew of or Was Reckless in Not Knowing Facts Indicating that Zyman's Goodwill Was Impaired .................... 69
3. Defendant Doft Approved Nadal's Personal Expenses on Various Occasions .................... 70
4. Defendant Doft's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA metric .................... 70
5. As MDC's CFO, Doft Was Personally Involved in the Highest Levels Of MDC's Financial Reporting .................... 71
D. Defendant Sabatino .................... 71
1. Defendant Sabatino Engaged in Substantial and Suspicious Insider Trading .................... 71
2. Defendant Sabatino Approved Nadal's Personal Expenses .................... 72
3. Defendant Sabatino Was Reassigned and Subsequently Resigned Abruptly During the SEC Investigation and MDC's Own Internal Investigation .................... 73
4. Defendant Sabatino's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA metric .................... 73
5. As Chief Accounting Officer, Sabatino Was Personally Involved in MDC's Financial Accounting and Reporting .................... 73
E. Defendant Gendel .................... 74

1. Defendant Gendel Engaged in Substantial and Suspicious Insider Trading ........ 74
2. Defendant Gendel's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA Metric ........ 75
3. Defendant Gendel Was Personally Involved in MDC's Financial Accounting and Reporting ........ 75

F. Defendant Kirby ........ 75
1. Defendant Kirby Engaged in Substantial and Suspicious Insider Trading ........ 75
2. As Chairman of MDC's Audit Committee, Defendant Kirby Had Broad Oversight of MDC's Accounting Policies, Financial Disclosures, Related Party Transactions, and Internal Controls ........ 76
3. Defendant Kirby Recklessly Abdicated His Duties as Chairman of MDC's Audit Committee and Lacks the Requisite Expertise to Execute Those Duties ........ 77
4. As a Member of MDC's Human Resources & Compensation Committee, Defendant Kirby Was Reckless in Overseeing Nadal's and Other MDC Executives' Compensation ........ 78

IX. LOSS CAUSATION AND ECONOMIC LOSS ........ 79
X. CLASS ACTION ALLEGATIONS ........ 82
XI. NO SAFE HARBOR ........ 85

COUNT I
Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ........ 86

COUNT II
Violation of §20(a) of the Exchange Act Against the Individual Defendants ........ 89

PRAYERS FOR RELIEF ........ 90
DEMAND FOR TRIAL BY JURY ........ 91

Court-appointed Lead Plaintiffs Plymouth County Retirement Association ("PCRA") and North Collier Fire Control and Rescue District Firefighter Pension Plan ("North Collier") (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring claims arising under the Securities Exchange Act of 1934 (the "Exchange Act"), individually and on behalf of a class of similarly situated persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Class A Subordinate Voting Shares in MDC Partners, Inc. ("MDC" or the "Company") from October 28, 2013 through and including April 27, 2015 (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon an investigation by their counsel that included, among other things, (i) review and analysis of documents filed publicly by MDC with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning MDC and other Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning MDC's securities and business; (iv) discussions with consulting experts; (v) discussions with confidential witnesses including former employees of MDC or its subsidiaries; (vi) review and analysis of pleadings filed in other litigation naming MDC as a defendant or nominal defendant; and (vii) review and analysis of confidential whistleblower submissions made to the SEC between February 26, 2014 and August 24, 2015, and interviews with the individual whistleblower. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discovery.

# I. NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired MDC's Class A subordinate voting shares (referred to as "common stock" or "stock" herein) during the Class Period, against MDC and certain of its current and former officers and directors for violations of the Exchange Act.

2. As set forth below, this action seeks to hold MDC and certain of its former and current officers and directors liable for making materially false and misleading statements and omitting to disclose material information in violation of the federal securities laws regarding: (a) undisclosed executive compensation and related party transactions involving MDC's then-Chairman, Chief Executive Officer ("CEO"), and President; (b) MDC's accounting for goodwill, including but not limited to the value of goodwill carried on MDC's balance sheet and the corresponding overstatement of the Company's earnings due to the failure to write down certain "impaired" goodwill; (c) MDCs' financial performance based on accounting metrics not governed by Generally Accepted Accounting Principles ("GAAP") – *i.e.* "non-GAAP metrics" – that were nonstandard and fundamentally misleading; and (d) the adequacy of MDC's internal controls.

## A. MDC's Growth Through Acquisitions

3. MDC's story is deeply intertwined with the personal story of its founder and former Chairman of the Board, CEO, and President, Defendant Miles S. Nadal ("Nadal"). In 1980, Nadal, a twenty-two-year old college dropout, used a $500 credit card advance to launch a photography and marketing services business in his hometown of Toronto, Ontario, Canada. Soon thereafter, Nadal made a series of small "opportunistic acquisitions" to diversify and expand his business. In a few short years, the Company, then known as Multi Discipline Communications ("MDC"), became one of Canada's largest printing companies, specializing in secure documents such as checks, airline and event tickets, and postage stamps. In October 1987, MDC became a NASDAQ-

traded public company. By the late 1990s, Nadal had again pivoted the Company, divesting MDC of its printing businesses to focus on marketing, advertising, and public relations, with an increasing presence in the United States. After acquiring several advertising and public relations firms, MDC's breakthrough came in 2001, when Nadal convinced partners of the Miami-based advertising "mega hot shop," Crispin Porter + Bogusky ("CP+B"), to sell a 49% stake in their firm to MDC. The CP+B acquisition gave MDC instant credibility in the advertising industry, and launched MDC's "partnership" model through which it typically takes a less than 100% interest in the agencies it acquires. MDC's early-2000s acquisition spree drew attention to the previously little-known company and its highly ambitious CEO, including a February 16, 2004 FORBES magazine article titled, "'Who is This Guy?' A Canadian check-printer comes out of nowhere to take on Madison Avenue," and a profile in the Canadian marketing industry publication, "'Miles from nowhere': How a nobody from Toronto built the MDC empire – and snapped up the hottest shops in the States along the way." Defendant Nadal continued to expand MDC through acquisition, growing the Company from a collection of nineteen small to midsize marketing firms in 2004 to a network of fifty-one "agency partners" in 2015.

4. In about a decade, MDC rocketed from "nowhere" to become one of the ten largest and most notable advertising holding companies in the world. Despite this growth, MDC's worldwide annual revenues remain only a fraction of those of the "big five" agency holding companies: WPP, Omnicom, Publicis, Interpublic, and Dentsu. While MDC's growth burnished Nadal's reputation as an entrepreneur with an eye for talent, his compensation far exceeded MDC's relative position in the industry. For example, in a May 19, 2012 article, *BUSINESS INSIDER* ranked Nadal number two on a list of the "33 Richest People in Advertising, Ranked by Income," based on his 2011 compensation of nearly $24 million. Nadal's pay was topped only by the CEO of the

third largest agency in the world, Publicis, who received approximately $26.1 million in 2011. Defendants Michael C. Sabatino ("Sabatino") and David B. Doft ("Doft") also appeared on the BUSINESS INSIDER list. Sabatino ranked number twenty-four based on his 2011 compensation of $1.6 million, and Doft ranked number twenty-three based on his 2011 compensation of nearly $1.7 million. More recently, on May 16, 2015, the *New York Times* listed Nadal among the 200 highest paid CEOs in America, ranking 109th with total 2014 compensation of over $16.8 million.

5. As a result of MDC's numerous acquisitions, the Company generated an enormous and increasing amount of "goodwill," a residual intangible asset created when a business is acquired for a price greater than the value of its net identifiable assets (*e.g.*, cash, investments, buildings, equipment, inventory, accounts receivable, and certain identifiable intangible assets). Goodwill is MDC's single largest asset, comprising more than half of the Company's total assets throughout the Class Period. For example, in MDC's FY 2014 Annual Report on SEC Form 10-K, the Company reported goodwill of nearly $851.4 million, approximately 52% of MDC's total assets of $1.649 billion in 2014. Moreover, the amount of goodwill on MDC's balance sheet grew steadily, on an annual basis, prior to and during the Class Period, from $514.5 million in FY 2010, to $605.2 million in FY 2011, to $720.1 million in FY 2012, to $744.3 million in FY 2013, to $851.4 million in FY 2014.

6. The growth of MDC's goodwill did not go unnoticed. Prior to the Class Period, in the wake of the 2008 financial crisis, the SEC Division of Corporation Finance ("SEC Corp Fin"), the SEC division that seeks to ensure that investors are provided with material information in order to make informed investment decisions, wrote to Defendant Doft, in a letter, dated December 11, 2008, to ask that MDC explain possible goodwill impairments "[i]n light of the recent economic turmoil and the significant decrease in the price of your common shares[.]" In a follow-up letter

to Defendant Doft, dated January 30, 2009, SEC Corp Fin noted that "it appears to [the SEC staff] that there may be other significant events and circumstances, such as declining stock prices and worsening economic conditions, that would have triggered the requirement for you to test goodwill impairment at a later date" than October 1, 2008, when MDC claimed to have performed an annual goodwill evaluation. Defendant Doft responded on February 9, 2009, stating that MDC's goodwill testing was still being finalized and that the Company would discuss its goodwill impairment process in its next SEC Form 10-K.

7. SEC Corp Fin returned to the issue of MDC's goodwill on December 15, 2010, when it wrote the following to Defendant Doft:

> We note that goodwill accounted for approximately 50% of total assets at December 31, 2009. We also note that you experienced a net loss for the year ended December 31, 2009. If you are at risk of failing step one of the goodwill impairment test for your reporting units, you should disclose the following information:
>
> - The percentage by which fair value exceeded carrying value as of the date of the most recent test;
> - The amount of goodwill allocated to the reporting unit;
> - A description of the methods and key assumptions used and how the key assumptions were determined;
> - A discussion of the degree of uncertainty associated with the key assumptions. The discussion regarding uncertainty should provide specifics to the extent possible (e.g., the valuation model assumes recovery from a business downturn within a defined period of time); and
> - A description of potential events and/or changes in circumstances that could reasonably be expected to negatively affect the key assumptions

SEC Corp Fin further instructed MDC, on December 15, 2010, that otherwise, if true, MDC should disclose in its public filings that "none of your reporting units with significant goodwill are at risk of failing step one of the goodwill impairment test." Defendant Doft responded to SEC Corp Fin on January 20, 2011, stating that "as of October 1, 2009, there were no reporting units at risk of failing step one of the goodwill impairment tests[,]" and that the Company would include certain disclosures about its goodwill testing in future filings.

8. On November 27, 2012, SEC Corp Fin again raised the issue of goodwill in a letter to Defendant Doft. Among other things, SEC Corp Fin wrote, "[w]e note that your operating income is continuing to decline (negative for the nine months ended September 30, 2012) and you continue to incur net losses and working capital deficits." SEC Corp Fin asked for an explanation of how MDC "considered ASC 350-20-35-3C [accounting guidance setting forth examples of events triggering an evaluation of possible goodwill impairment] in concluding that it is more likely than not that the fair values of your reporting units are not less than their carrying amounts." On December 10, 2012, Defendant Doft responded, challenging the premise of SEC Corp Fin's comment and suggesting that certain large expense items indicated *positive* business performance at MDC, not impairment-triggering conditions. Defendant Doft stated that, for the first nine months of 2012, MDC's operating loss was the result of a $20.1 million charge for "purchase price adjustments" to acquisitions made in 2010 and 2011 "whose performance has exceeded all expectations[,]" and $23.8 million in stock-based compensation expenses. According to Defendant Doft, if these charges were excluded, MDC would have had $16.3 million in income (an increase of $0.9 million over the same period in the prior year), not the $12.2 million loss reported. Further, Defendant Doft stated that MDC believed that there were no events or circumstances suggesting possible goodwill impairments "based on the fact that the performance has exceeded expectations."

9. Given SEC Corp Fin's recurring queries and comments regarding MDC's goodwill, and other attention paid to this and related issues, investors understood that proper accounting for goodwill was an especially significant and sensitive issue that had material significance to the Company's financial condition and periodic financial results. Moreover, Defendant Doft's responses and the apparent acceptance of MDC's representations by SEC Corp Fin and the SEC

led investors to believe that MDC was properly accounting for goodwill and related items and making proper and complete disclosures regarding the value of goodwill and any necessary impairment charges.

**B. Defendants Falsely Portrayed MDC's True Financial Condition**

10. Defendants concealed MDC's true financial condition by understating the amount of its executive compensation expenses throughout the Class Period. Significantly, Defendants failed to disclose the true amount of compensation paid to Defendant Nadal, including the fact that Nadal received millions of dollars in inappropriately reimbursed personal expenses, above and beyond his salary, bonuses, stock awards, and a "perquisite allowance in respect of retirement benefits and employee health benefits." Defendants concealed the amount and/or nature of certain perquisites and payments taken by Nadal, including but not limited to the use of corporate aircraft for personal use, Nadal's use of a corporate apartment in New York City, and other "entertainment" expenses.

11. In addition, despite Defendant Doft's representations to SEC Corp Fin, prior to and during the Class Period, MDC materially overstated the value of its goodwill by failing to record goodwill impairments associated with certain subsidiaries whose poor post-acquisition performance definitely had *not* "exceeded all expectations" and, in at least one instance, ceased operations. MDC's failure to record required goodwill impairments also resulted in material overstatements of MDC's income and earnings during the Class Period, thereby concealing, at a minimum, tens of millions of dollars in GAAP net losses.

12. Moreover, during the Class Period, Defendants misled investors regarding MDC's financial condition by, among other things, touting earnings results in press releases based on a heavily manipulated version of the widely accepted non-GAAP financial metric known as EBITDA (earnings before interest, taxes, depreciation, and amortization). In addition, at certain

points during the Class Period, MDC further altered its modified definition of "EBITDA" to continuously paint a highly misleading picture of positive financial performance in the face of GAAP net losses. To further mislead investors regarding MDC's modified definition of EBITDA, in the SEC Forms 10-Q filed during the Class Period, MDC falsely stated that, in monitoring its financial performance, MDC used the industry standard definition of EBITDA: "earnings before interest, income taxes and depreciation and amortization ('EBITDA')." Investors were misled because MDC's financial performance reported in the Company's earnings press releases was, in fact, based on its highly modified definition of EBITDA, not the industry standard definition of EBITDA ("earnings before interest, income taxes and depreciation and amortization") touted in the Company's Forms 10-Q. Tellingly, MDC did not disclose any EBITDA numbers in the Company's Forms 10-Q, and instead referenced only MDC's use of the industry standard definition of EBITDA in assessing the Company's financial performance. Consequently, investors were misled to believe that MDC's financial performance reported in the Company's earnings press releases and Forms 10-Q, respectively, was based on the same EBITDA metric. However, as several charts below demonstrate, calculating MDC's EBITDA using the industry standard definition of EBITDA touted in the Company's Forms 10-Q, as opposed to MDC's highly modified definition of EBITDA noted in its earnings press releases, results in materially different numbers.

13. On April 27, 2015, after markets closed, MDC stunned the market with a series of announcements that started to reveal the truth about MDC's financial condition, including, among other things, inappropriate accounting for goodwill and other accounting practices, undisclosed compensation paid to Defendant Nadal, and deficient internal controls. Specifically, MDC revealed that:

- The Company had received a subpoena from the SEC more than six months earlier, on October 5, 2014, requesting documents relating to three matters: a) the reimbursement of Defendant Nadal's expenses, b) the Company's accounting for goodwill, and c) certain other accounting practices;

- In response to the SEC's investigation, the Company's Board of Directors had formed a Special Committee of independent directors to review "certain matters relating to the reimbursement of expenses incurred by the CEO" and conducted an extensive investigation of the perquisites and payments paid to, or on behalf of, Defendant Nadal from 2009 through 2014;

- Following the Special Committee's review of Defendant Nadal's expenses, Nadal agreed to reimburse the Company $8.6 million for inappropriate perquisites and other payments owed to the Company;

- The Company implemented a series of "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses," including adopting new policies on private aircraft usage and a new travel and entertainment policy, hiring two senior executives responsible for managing internal controls and compliance who will report to the Audit Committee and providing quarterly compliance reports to the Audit Committee;

- As a result of the SEC investigation – which was only at an "early stage" – the Company had incurred a staggering $5.8 million in legal fees and related expenses during the first three months of 2015; and

- Defendant Sabatino, MDC's Chief Accounting Officer ("CAO"), was relieved of his duties and "transitioned to a new role in the company" in which he would work on "special projects."

14. The next day, on April 28, 2015, MDC filed its annual Proxy Statement on Form DEF 14A ("Proxy"), in which MDC disclosed that, in 2014, Defendant Nadal had received more than $926,000 in "All Other Compensation" – nearly double the amount reported for this category in previous years. In addition to a $500,000 "perquisite allowance in respect of retirement benefits and employee health benefits" that comprised all or substantially all of Nadal's "All Other Compensation" in recent years, MDC revealed that, in 2014, Nadal also received: (i) $263,000 in legal fees in connection with a May 2014 secondary offering of Nadal's *personally held* shares of MDC stock – a sale that netted Nadal approximately $81 million, *with zero financial benefit to the Company*; (ii) more than $91,000 in personal use of Company aircraft; and (iii) nearly $72,000 for the use of a corporate apartment in New York City, including half of the rent and *all* of the utilities,

local phone, cable TV, and internet charges. MDC also restated the total amounts of Nadal's "All Other Compensation" for FY 2013 and FY 2012, increasing the 2013 amount by $54,172 (to $554,172) and the 2012 amount by $50,160 (to $608,503).

15. On the April 27-28, 2015 news, the price of MDC stock plummeted by $7.78 per share from its April 27, 2015 closing price of $27.98 per share, a drop of nearly 28%, to close at $20.20 per share on April 28, 2015.

16. On July 9, 2015, MDC announced that two of its Management Directors, Stephen Pustil and Lori Senecal, had resigned their positions on the MDC Board, effective July 1, 2015. MDC also announced that Defendants Michael J.L. Kirby ("Kirby") and Clare R. Copeland ("Copeland") would "retire" from the MDC Board, on or before the expiration of their current term, which ends in June 2016.

17. Less than two weeks later, on July 20, 2015, Defendant Nadal abruptly resigned from the Company he founded and led since its inception. In connection with his resignation, Nadal agreed to repay an additional $1.88 million in inappropriately reimbursed expenses (for a total of nearly $10.5 million) and repay $10.58 million in bonuses. Nadal also agreed to forfeit severance payments that could have amounted to $27.2 million. Thus, Defendant Nadal agreed to repay bonuses and inappropriately reimbursed expenses, and to forfeit severance payments, all of which totaled $48.28 million. Also on July 20, 2015, MDC announced that Defendant Sabatino had resigned his position with the Company and would repay $218,583 in bonuses he received from 2012 through 2014.

18. According to a July 24, 2015 article in *The GLOBE AND MAIL* (widely considered to be Canada's "newspaper of record"), the SEC's investigation of MDC was prompted by a February 2014 whistleblower complaint submitted by "one of Nadal's former business associates." *The*

*GLOBE AND MAIL* reported that the whistleblower had told the SEC that MDC "was allegedly masking its deteriorating financial condition" by, among other things, "improperly understating executive compensation costs, overstating the value of certain assets and compensating Mr. Nadal for personal expenses."

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

20. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act and 28 U.S.C. §1331.

21. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). MDC's principal executive offices are located at 745 Fifth Avenue, New York, New York 10151. Furthermore, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market ("NASDAQ"), a national securities exchange located in this District.

## III. PARTIES

### A. Lead Plaintiffs

23. Lead Plaintiff PCRA is the retirement system established in 1937 for the benefit of the employees of cities, towns, districts, and authorities within Plymouth County, Massachusetts. As of December 31, 2014, PCRA serves 3,588 retired members and 5,729 active members, and

has approximately $835 million in assets under management. As set forth in the certification submitted in support of its motion for appointment as Lead Plaintiff in this matter, Lead Plaintiff PCRA purchased MDC stock on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

24. North Collier is a public sector, defined benefit pension plan providing retirement, disability and death benefits to its members and their beneficiaries. Fund members are firefighters employed by the North Collier Fire Control & Rescue District, an independent fire district located in Collier County, Southwest Florida. North Collier serves 3 retired members, 109 active members and 2 vested deferred members. The size of the fund is $49,617,385. As set forth in the certification submitted in support of its motion for appointment as Lead Plaintiff in this matter, North Collier purchased MDC stock during the Class Period and suffered damages as a result of the misconduct alleged herein.

## B. Defendants

### 1. MDC Partners, Inc.

25. Defendant MDC is a holding company, incorporated under the laws of Canada and headquartered in New York, New York, that provides a range of marketing, activation, communications, and consulting services via its subsidiaries. MDC's subsidiaries, which the Company refers to as its "agency partners" on its website, provide services in the areas of advertising and consumer communications, media management and effectiveness, interactive and mobile marketing, direct marketing, database and customer relationship management, sales promotion, corporate communications, market research, data, analytics and insights, corporate identity, design and branding, social media, marketing, product and service innovation, ecommerce, and other related services. Per the MDC website, as of December 1, 2015, the

Company has fifty-one "agency partners" in its global network. MDC's common stock is listed and publicly traded on the NASDAQ exchange under the ticker symbol "MDCA."

**2. Individual Defendants**

26. Defendant Nadal was at all relevant times the Chairman, CEO, and President of MDC. Nadal provided his services to MDC through a management services contract between MDC and a shell entity called Nadal Management Limited (formerly known as Stallion Investments Limited), in which Nadal is the sole shareholder. Nadal is a Canadian national who resides primarily in Paradise Island, Bahamas, and also owns a home in West Palm Beach, Florida. Nadal, who founded MDC in 1980, led the Company until July 20, 2015, when he abruptly resigned amid an ongoing SEC investigation into his expenses and accounting improprieties at MDC. Defendant Nadal signed several of MDC's SEC filings that are alleged herein to contain materially false and misleading statements.

27. Defendant David B. Doft ("Doft") is, and at all relevant times was, the Chief Financial Officer ("CFO") of MDC, a position he has held since August 2007. On April 23, 2015, Defendant Doft assumed the additional role of MDC's Principal Accounting Officer ("PAO"). Prior to joining MDC, Doft spent fourteen years working on Wall Street, primarily as an investment analyst for a variety of financial institutions. Defendant Doft signed several of MDC's SEC filings that are alleged herein to contain materially false and misleading statements.

28. Defendant Michael C. Sabatino ("Sabatino") served as Senior Vice President and CAO of MDC from April 2005 through April 22, 2015. Effective April 23, 2015, Defendant Sabatino was re-assigned to work on "special projects" at the Company. On July 20, 2015, Defendant Sabatino resigned from the Company amid an ongoing investigation into Defendant Nadal's expenses and accounting improprieties at MDC. At all relevant times, Sabatino was licensed as a Certified Public Accountant in New York. Prior to joining MDC, Sabatino had been

an audit partner with the public accounting firm BDO Seidman, LLP (a predecessor of MDC's auditor, BDO USA, LLP) until approximately December 2001. Defendant Sabatino signed several of MDC's SEC filings that are alleged herein to contain materially false and misleading statements.

29. Defendant Mitchell Gendel ("Gendel") has served as MDC's General Counsel and Corporate Secretary since November 2004. Defendant Gendel signed several of MDC's SEC filings that are alleged herein to contain materially false and misleading statements.

30. Defendant Michael J. L. Kirby ("Kirby") has been a member of MDC's Board of Directors since April 22, 2004 and, at all relevant times, has served as the chairman of MDC's Audit Committee. Defendant Kirby also serves as a member of the MDC Board's Human Resources & Compensation Committee, and the Nominating & Corporate Governance Committee. From 1984 until 2006, Kirby served as a member of the Senate of Canada. Defendant Kirby is neither a certified public accountant nor a Canadian chartered accountant. On June 9, 2015, MDC announced that Defendant Kirby will retire from the MDC Board on or before the expiration of his current term in June 2016. Defendant Kirby signed several of MDC's SEC filings that are alleged herein to contain materially false and misleading statements.

31. Defendants Nadal, Doft, Sabatino, Gendel, and Kirby are referred to herein as the "Individual Defendants." Defendant MDC and the Individual Defendants are collectively referred to herein as the "MDC Defendants."

## IV. <u>BACKGROUND</u>

### A. Lead Plaintiffs' Investigation and Confidential Sources

#### 1. Confidential Witness 1

32. Confidential Witness 1 ("CW 1") is an SEC whistleblower who, according to the July 24, 2015 article in *The Globe and Mail*, is "one of Nadal's former business associates." In mid-2009, Defendant Nadal retained CW 1 to perform consulting services for MDC. Defendants

Nadal, Doft, Sabatino, and Gendel had extensive and direct contact with CW 1 during the course of CW 1's engagement and afterwards, and were directly involved in discussions of financial data regarding certain poorly performing MDC subsidiaries that were to have been used to assess CW 1's performance and eligibility for bonus compensation.

33. CW 1 was retained by MDC to examine and improve the performance of certain of MDC's "project-based" subsidiaries that were performing poorly. During CW 1's engagement with MDC, Defendant Doft personally provided CW 1 with access to financial data, business records, and other nonpublic information of the MDC subsidiaries that were within the scope of the engagement, including a marketing and strategy consulting firm that MDC acquired in 2005 called Zyman Group, LLC ("Zyman").

34. In the summer of 2009, as part of CW 1's initial work for MDC, CW 1 examined eight of MDC's poorly-performing business units: Accumark Partners, Inc., Bruce Mau Design, Inc., Northstar Research Partners, Inc., 656712 Ontario Limited (d/b/a "Onbrand"), Yammamoto Moss McKenzie, Inc., Zyman, Redscout LLC, and Source Marketing, LLC. CW 1's review determined that six of the businesses – Accumark, Bruce Mau Design, Northstar, Onbrand, Yammamoto Moss McKenzie, and Zyman – were "significantly under-managed" and accounted for combined losses of over $7 million on revenues of less than $30 million between June 2008 and June 2009. Because the amount of those losses was to serve as a baseline to assess CW 1's performance and determine a "success bonus" portion of CW 1's compensation, CW 1 discussed those losses and related financial details with Defendants Nadal, Doft, Sabatino, and Gendel. In doing so, CW 1 observed that all major financial decisions at MDC were discussed and rendered by Nadal, Doft, Sabatino, and Gendel.

35. On or about February 26, 2014, CW 1 submitted an SEC "Form TCR Tip, Complaint or Referral" to the SEC pursuant to the Dodd-Frank Whistleblower Program. 15 U.S.C. §78u-6 *et seq*. Shortly thereafter, CW 1 was contacted by the SEC for more information and has cooperated with the SEC's investigation by, among other things, providing supplemental whistleblower submissions on April 9, May 30, and July 1, 2014, and on June 3 and August 24, 2015. Information contained in those submissions and the materials submitted therewith is discussed in more detail below.

36. After the initial complaint in this action was filed, on July 31, 2015, CW 1 initiated contact with Lead Counsel Berman DeValerio to voluntarily provide information about CW 1's whistleblower submissions to the SEC and other information regarding Defendants' fraud as alleged herein.

**2. Confidential Witness 2**

37. Confidential Witness 2 ("CW 2") served in high level positions in both MDC's Treasury Operations and Corporate Treasury at MDC from 2011 through 2013. CW 2 "handled the cash" while serving as Vice President of Corporate Treasury, from 2011 to 2013. Part of CW 2's job entailed processing Nadal's expenses. CW 2 described how processing Nadal's expenses entailed receiving a "cover sheet" containing a total amount of Nadal's travel and entertainment expenses. CW 2 was only given the total amount of the expenses, "not any of the details." As far as CW 2 understood, all of Nadal's expenses were approved by MDC's Board of Directors or the Compensation Committee before CW 2 received the cover sheet. CW 2 would process Nadal's expenses only after approval. According to CW 2, Defendant Sabatino would provide the approval for Nadal's expenses "90 percent of the time." If, however, Defendant Sabatino was unavailable, CW 2 would obtain an approval signature from Defendant Doft. Once approval from Defendants

Sabatino or Doft was given, CW 2 would arrange payment to Nadal by wire transfer. After the payment was made, MDC's accounting department was responsible for booking the expense entries into the Company's financial records.

### 3. Confidential Witness 3

38. Confidential Witness 3 ("CW 3") was an accounting manager at MDC from March 2011 until May 2012, who worked on the accounting for all of MDC's subsidiary companies, including companies acquired by MDC. According to CW 3, MDC's accounting department in New York employed between eight and ten people. CW 3 used three internal software programs in CW 3's position: a program called "Media Bank" that "housed the general ledgers" of each subsidiary; a software system called "FDM" into which the general ledgers were uploaded; and a program called "Enterprise" where all of MDC's financial information was consolidated.

39. CW 3 reported to Christine La Placa ("La Placa"), a Senior Vice President for Accounting and Financial Reporting who worked with and reported to Defendant Sabatino. CW 3 is aware, based on CW 3's position at the Company, that La Placa and Defendant Sabatino worked on calculations for goodwill, and that Defendants Nadal and Doft oversaw the work performed on goodwill and "confirmed and approved" the final number. According to CW 3, MDC's legal department and mergers and acquisitions department were also involved in the accounting for goodwill. CW 3 did not personally work on goodwill accounting because it was reserved for "higher level" personnel only.

## B. Whistleblower Complaint and Ongoing SEC Investigation

40. On or about February 26, 2014, CW 1 made a confidential whistleblower submission to the SEC. CW 1's initial submission described three categories of misconduct by Defendants MDC and Nadal: (a) false and misleading statements in earnings releases touting financial results in terms of non-GAAP metrics, including purported "EBITDA" results for Q4

and FY 2012, and subsequent periods; (b) inflation of assets and accounting manipulation involving MDC's failure to write down the value of goodwill related to its Zyman subsidiary and other poor-performing business units (which CW 1 knew of based on his engagement with MDC); and (c) the "misappropriation of corporate assets" by Defendant Nadal. CW 1 also provided supplemental submissions and supporting documentation to the SEC on these and other topics on April 9, May 30, and July 1, 2014, and on June 3 and August 24, 2015. Collectively, CW 1's SEC whistleblower submissions are referred to herein as the "Whistleblower Complaint."

41. The SEC launched an investigation into Defendants MDC and Nadal shortly after receiving CW 1's initial whistleblower submission in February 2014. The SEC's investigation is the same one that MDC first disclosed on April 27, 2015, and that remains ongoing. As reported by *The Globe and Mail*, on July 27, 2015: "Not long after [CW 1's February 2014 whistleblower complaint], SEC staff began questioning MDC about the way it presented earnings and accounted for its profitability. That led to a subpoena from the SEC, questions about compensation, and pledges by Mr. Nadal to repay millions of dollars of his compensation."

**1. MDC's "Persistent Mischaracterization of EBITDA" and Other Metrics**

42. The Whistleblower Complaint describes how, based on an extensive analysis of MDC's historical SEC filings and nonpublic information in CW 1's possession, MDC used nonstandard definitions of otherwise commonly used non-GAAP metrics to mislead investors regarding MDC's financial performance.

43. Among other things, CW 1 informed the SEC that MDC misleadingly used the terms "free cash flow" and "organic" revenue growth in earnings releases. With respect to "organic" revenue growth, MDC used this term to suggest that the bulk of its increasing revenues was from improved operations. In reality, however, the vast majority of MDC's revenue growth

was, according to CW 1, the "direct result of MDC's over $500 million in acquisitions," from 2007 to 2013. According to CW 1, investors cannot confirm whether MDC's revenue growth was "organic" or acquisition driven because the Company "does not identify in its disclosures the amount of revenue added by each individual acquisition" and reports its operating unit results solely on an aggregated basis; there is no way for investors to "reverse engineer MDC's reported figures" to know how much growth is, in fact, "organic." By comparing MDC's public filings with nonpublic financial information in his possession, CW 1 reported to the SEC that MDC had substantially overstated its "organic" revenue growth compared to the amount generated by acquisitions. As an example, MDC generated a monthly report called the "Red/Green Analysis," which was a unit-by-unit comparison of revenue and EBITDA performance. CW 1 noted that, based on a nonpublic "Red/Green Analysis" comparing 2009 and 2010 performance of MDC business units, MDC had just $79,000 in "organic" revenue growth in 2010, a mere fraction of the $38.5 million in "organic" revenue growth that MDC had reported for that period. Among other things, CW 1's analysis indicated that MDC had improperly included revenues from then-recently acquired companies, including Attention and Communifix, within its "organic" revenue growth.

44. The Whistleblower Complaint discusses MDC's misleading non-GAAP "EBITDA" metric that Defendants invoke when describing MDC's financial results. As the Whistleblower Complaint states, SEC regulations describe EBITDA as an acronym standing for "Earnings Before Interest, Taxes, Depreciation and Amortization," with the term "Earnings" intended to mean "net income as presented in the statement of operations under GAAP." Those regulations also state that any measures calculated differently "should not be characterized as 'EBIT' or 'EBITDA.'" The Whistleblower Complaint states that MDC flagrantly violated the SEC's rules when using the term EBITDA in earnings releases in 2013 and 2014 because MDC's

use of the term "actually meant 'operating income (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments and profit distributions from affiliates.'" MDC's EBITDA calculation misled investors by starting with *operating income* (losses) – *not* GAAP net income as commonly understood and required by the SEC – and then applying "a number of seemingly arbitrary adjustments (not included in the recognized definition of EBIDTA) to arrive at its new metric." As the Whistleblower Complaint states, "this sleight of hand resulted in a very different (and far rosier) picture of MDC's financial performance." MDC's use of "operating income" as the starting point in calculating EBITDA, rather than the industry standard GAAP "net income," resulted in Defendants' materially overstating "EBITDA" as commonly understood by investors.

45. The Whistleblower Complaint describes a further level of deception regarding Defendants' use of purported EBITDA to describe MDC's financial results: MDC's constantly changing (nonstandard) definitions of EBITDA. Changes in the definition of EBITDA made Defendants' comparisons between different periods' quarterly and annual results, including representations of purported EBITDA growth, "entirely illusory" because "MDC was comparing two different things." For example, CW 1 noted in the Whistleblower Complaint that MDC used different definitions of EBITDA in press releases dated February 21, 2013 (announcing MDC's Q4 and FY 2012 results) and February 20, 2014 (announcing MDC's Q4 and FY 2013 results). The 2014 press release included a new "adjustment" to the prior year's EBITDA definition: a "one time incentive." Defendants then compared the 2014-defined "EBITDA" to MDC's quarterly and annual "EBITDA" from 2013 and 2012 without explaining that they were comparing different things. As CW 1's April 9, 2014 supplemental submission to the SEC states: "This is not simply semantics – had MDC not included the ill-defined new adjustment in its most recent 'EBITDA'

calculations, the 4Q2013 'EBITDA' metric would actually have declined significantly (20%) from 4Q2012, rather than the increased 2.2% as MDC claimed in the 2014 Press Release."

46. CW 1 also describes in the Whistleblower Complaint how MDC's reconciliation of EBITDA to "operating income" rather than GAAP "net income" violates SEC regulations and guidance concerning the use of non-GAAP metrics, and otherwise misleads investors. Among other things, SEC regulations specifically provide that operating income is *not* the most "directly comparable GAAP financial measure" to EBITDA because EBITDA "make[s] adjustments for items that are not included in operating income." Otherwise stated, a calculation of operating income or operating losses *already excludes* a number of items that are included in calculating GAAP net income or net losses. In the Whistleblower Complaint, CW 1 provided examples of how MDC's use of "operating loss" as a baseline for its "EBITDA," instead of net income, created "strikingly different" results compared to what MDC should have reported. Keeping all other adjustments the same, but using the industry standard GAAP net loss as a baseline instead of operating loss, the Whistleblower Complaint found that MDC's "EBITDA" would have been substantially lower than reported:

*(In millions)*

| **Period** | **GAAP Net Loss** | **MDC's Reported EBITDA** | **Industry Standard EBITDA** |
|---|---|---|---|
| YE 2012 | ($85.4) | $118.4 | $28.3 |
| YE 2013 | ($148.9) | $159.4 | ($50.7) |
| YE 2014 | ($24.1) | $179.4 | $118.5 |

### 2. MDC's Artificially Inflated Financial Results From the Failure to Record Goodwill Impairments

47. The Whistleblower Complaint describes how Defendants have failed to properly adjust the value of goodwill on MDC's balance sheet, artificially inflating the value of MDC's assets and materially misstating the Company's periodic financial results. According to the Whistleblower Complaint, a major reason for MDC's overstatement of goodwill relates to Defendants' failure to write-down "its largest acquisition [at the time], Zyman Group." As the Whistleblower Complaint states, MDC acquired a 61% interest in Zyman, on April 1, 2005, for approximately $63 million, and, in Q2 2005, recorded $65 million in goodwill and intangibles associated with the acquisition. As of April 1, 2005, this represented approximately one-third of the goodwill and other intangible assets reported by MDC.

48. As described in CW 1's initial whistleblower submission to the SEC, shortly after MDC's acquisition of Zyman, its earnings "declined dramatically." According to CW 1, based on his review of Zyman's financials during his engagement with MDC: "Immediately following the acquisition, revenues imploded, dropping from [approximately] $60 million to under $40 million. Revenues then continued to drop each year and were less than $300 thousand in 2013. Zyman has recorded significant losses in every year since its acquisition." Notwithstanding these dismal results, "[f]rom 2005, to date, no impairment to goodwill for Zyman Group has ever been reported by MDC," which resulted in the material misstatement of MDC's financial position and earnings performance.

49. The Whistleblower Complaint further describes other facts and circumstances surrounding MDC's failure to record a goodwill impairment related to Zyman. In his April 9, 2014 supplemental submission to the SEC, CW 1 stated that Zyman "has all but disappeared since MDC acquired it in 2005 for $65 million." In addition to the evaporation of Zyman's revenues

(from $40 million in 2005 to approximately $300,000 as of 2014), Zyman has "only one remaining employee." Further, in a fact "of particular importance to goodwill" that was confirmed by Defendant Nadal's deposition testimony, attached to the Whistleblower Complaint, Zyman's founder, Sergio Zyman, a legend in the advertising community, "left the firm." Certain operations were subsequently moved to an entity called Core Strategy Group ("Core Strategy"). In further submissions made as part of the Whistleblower Complaint, CW 1 reported, based on data derived from nonpublic internal MDC documents, that Zyman had losses before tax each year from 2008 through 2012, and declining revenues (net of direct costs) as follows:

| **Year** | **Zyman Income (Loss) Before Tax** | **Zyman Revenue (Net of Direct Costs)** |
|---|---|---|
| 2008 | ($4,205,000) | $14,772,000 |
| 2009 | ($5,851,000) | $2,921,000 |
| 2010 | ($2,833,000) | $2,709,000 |
| 2011 | ($1,697,000) | $267,000 |
| 2012 | ($454,000) | $209,000 |

50. On July 1, 2014, CW 1 made a supplemental submission to the SEC, following up on a June 27, 2014 call with SEC investigators. The July 1, 2014 supplemental submission described the process of how MDC terminated Zyman's operations. According to the July 1, 2014 supplemental submission, in 2008, MDC hired two executives of Core Strategy, Scott Miller ("Miller") and David Morey ("Morey"), to become the CEO and Vice Chairman of Zyman, respectively. In approximately September 2009, "MDC eliminated the Zyman name, choosing to do business under the 'Core Strategy' moniker." The business was then purportedly merged into another MDC subsidiary, Kirshenbaum Bond Senecal and Partners (also known as "KBS+"). As described in the July 1, 2014 submission, there were "no attempts at integration of the businesses

at the time of this 'merger' other than financial." Miller's and Morey's employment was terminated at the end of 2010 and, significantly, they were given rights to use the "Core Strategy" name and "any of the company's remaining clients." With the Zyman name no longer used, and Miller and Morey gone along with any Zyman/Core Strategy clients, "Zyman was a husk without operations." Further, the July 1, 2014 supplemental submission notes that as of 2012, Zyman had no presence on the Internet. However, when the issue of Zyman's goodwill arose in the context of litigation between CW 1 and MDC, "a hastily created webpage for the entity appeared," in late 2012, at www.zyman.com. The website was, and remains, rife with "rote content, is barely interactive, and identifies no officers, directors or service professionals," and while noting that Zyman "has offices in Atlanta and New York," indicates that its unnamed professionals are purportedly "usually found on the road." It appears that since it was created in late 2012, there have been no changes to the page since 2013.

51. CW 1 also submitted certain documents to the SEC in support of the Whistleblower Complaint, arising out of litigation between CW 1 and MDC, that further demonstrate how the $65 million in reported goodwill and other intangibles for the Zyman acquisition (approximately $45 million of which was goodwill) were impaired as of approximately late 2010 at the latest – yet remain on MDC's balance sheet at their full acquisition amount as an improperly unimpaired asset. Those documents include:

(a) Excerpts of sworn deposition testimony of Defendant Nadal, who testified, in response to a question about what had happened to Zyman's business after it was acquired by MDC: "I don't recall exactly. I think it grew for a period of time, and then it declined." Nadal further explained that Zyman relied significantly ("about 40 percent of our revenue") on one client, ConAgra, who terminated the relationship with Zyman/MDC to bring its marketing in-house.

When asked if this did "material damage to Zyman's business," Nadal replied: "Yes, it did." Moreover, when Nadal was asked if he knew if there ever had been a goodwill impairment of Zyman, he replied: "I don't, not to my knowledge, no." Nadal also testified that he does not calculate goodwill numbers including Zyman's goodwill and, when asked who does that, he testified: "The auditors."

(b) The sworn deposition testimony of Defendant Kirby, who testified that he believed that the following supplemental answer to an interrogatory provided by Defendant MDC was true:

> ***During the period from November 1, 2009 through October 31, 2010, Zyman significantly wound down its operations***. Therefore, appropriate adjustments for the shutdown of Zyman's business, including severance related to terminating contracts of Zyman, senior executives and the disposition of assets for nominal consideration were required, resulting in out-of-pocket costs and expenses that resulted in a $750,000.00 normalization.

(Emphasis added).

Defendant Kirby also testified that MDC's auditors, BDO USA, LLP ("BDO"), did not examine the validity of any financial metric related to Zyman Group from 2008 through 2012 ("A. To the best of my knowledge, that's true."). He also testified, "I do not believe that Zyman was audited by our outside auditors." Defendant Kirby further testified that BDO "do[es] examine the financial statements of the largest subsidiaries, but not most of the small ones, other than at a macro level." Kirby also confirmed that BDO does not examine the validity of financial metrics related to many of MDC's "smaller" subsidiaries, including six specific MDC subsidiaries: Accumark, Bruce Mau Design, Northstar, Onbrand, Yammamoto Moss McKenzie, and Zyman. These are the six poor-performing MDC subsidiaries that CW 1 had worked with during his engagement with the Company. When asked if he agreed with all of the decisions made by MDC and Zyman regarding whether to take goodwill impairment charges, Defendant Kirby testified: "I don't know. I have

no opinion because I have no knowledge, no information on which to base that opinion." Defendant Kirby further testified that he would "agree with the auditors" on whether impairments were necessary, and would assume that, "no impairment was taken because the auditors felt none was required."

(c) Excerpts of sworn deposition testimony of Christopher Mozolewski ("Mozolewski"), the subsidiary-level CFO of MDC subsidiary KBS+ (which had been Zyman's direct parent within the MDC structure), agreeing with Defendant MDC's initial answer to the interrogatory regarding the wind-down of Zyman's operations between November 1, 2009 and October 31, 2010. Most of MDC's initial answer was substantially identical to MDC's supplemental answer quoted in the Kirby transcript, although MDC's initial answer also stated that during the wind-down period, Zyman had "only one remaining full-time employee." Mozolewski clarified that Zyman still had one "employee member who's associated, who works more for MDC" and "has some outside business." Further, when asked, on April 25, 2013, if, as an accountant, and given his experience with Zyman, Mozolewski would expect that the value of Zyman's goodwill and intangibles "is less than $65 million right now," he answered, "… I would assume so … I said I would assume it would be, yeah." When pressed to estimate the current value of Zyman, Mozolewski testified that it would "[p]robably continue on a break-even basis." Mozolewski further conceded that he would "[p]otentially" tell a prospective purchaser of Zyman that the entity was "something on which you can make no money," and that if there was actually someone interested in buying Zyman, it would make sense for MDC to sell it because the Company would make more than nothing on the sale (compared to holding it on a break-even basis).

52. In addition to detailing the circumstances regarding the Zyman impairment, the Whistleblower Complaint states that MDC's reported financial results and goodwill assets were

further inflated due to Defendants' failure to take impairments related to other MDC subsidiaries. As stated in CW 1's initial submission to the SEC: "Overall MDC results, coupled with additional non-public information documenting unit by unit results [including, *inter alia*, the "Red/Green Analysis," "Hyperion" reports of subsidiaries' business operations, and other internal MDC documents CW 1 had reviewed], suggest that impairment charges should also have been taken." Further, as CW 1 added in his April 9, 2014 supplemental SEC submission, MDC's "fail[ure] to record an impairment to goodwill … is remarkable given that certain key acquisitions from which that goodwill purportedly derived have declined substantially in value."

53. CW 1's May 30, 2014 supplemental SEC submission also included, as Appendix D thereto, "a list of MDC subsidiaries that have been eliminated over the years from MDC's list of businesses owned in its 10-K filings," some of which "have been discontinued completely." To the extent that any of the subsidiaries had been merged into other MDC units, CW 1 noted that, at a minimum, "goodwill associated with the brand name [of the discontinued entities] should have been written off." There were twenty-four entities other than Zyman listed: Allard Johnson, Ambrose Carr Linton, Banjo, Bratskier, Chinnici Direct, Computer Composition, Fletcher Martin, Integrated Healthcare, Margeotes/Feritta, OnBrand, Pro-Image, Cliff Freeman, Zig (U.S. and Canada), Ashton Potter, Mercury, Metaca, Placard, ACLC, Company C, ITO Partners, Adrelina, Skinny, Hudson and Sunset, and Trend. A significant amount of the goodwill associated with these acquisitions should therefore have been written down, with related impairment charges taken to further reduce MDC's (already negative) net income.

### 3. Nadal's Misappropriation of Corporate Assets

54. CW 1's initial whistleblower submission states:

> MDC retains detailed records of Miles Nadal's travel and location to help support his avoidance of both US and Canadian income taxes. A review of those records and a comparison with his use of corporate apartments in

NYC and his use of private aircraft to fly between his various homes in Toronto, Palm Beach and the Bahamas will clearly demonstrate misappropriation of corporate assets.

**4. Other Evidence Supporting Allegations of Defendants' Fraud are Revealed in the Whistleblower Complaint and Documents Submitted in Support Thereof**

55. In addition to CW 1's written submissions and the information provided in interviews with SEC investigators, the Whistleblower Complaint is based on a number of nonpublic documents including, among other things, deposition transcripts of key MDC personnel, Defendants Nadal and Kirby, and KBS+ subsidiary-level CFO, Mozolewski. Those individuals testified regarding the following, in addition to the evidence described above:

1. CW 1's June 3, 2015 submission to the SEC indicates that Defendant Nadal testified, under oath, that he was responsible for all MDC financial and accounting decisions for amounts exceeding one hundred thousand dollars.

2. According to the excerpt of Defendant Nadal's deposition testimony submitted to the SEC, Nadal explained the difference between the information reflected in MDC's public filings (suggesting that Zyman was not impaired) and the Company's internal analyses used in connection with setting benchmarks for CW 1's engagement (showing that Zyman was in dire straits) by stating: "***There's a difference between operating performance and SEC reporting***." (Emphasis added). Nadal's testimony therefore admits that there was a fundamental disconnect between the information in MDC's public filings and its actual financial performance that rendered its financial statements fundamentally false and misleading. Worse, it may suggest that Defendants have perpetuated a far more

pervasive financial fraud in which the Company has been keeping two sets of books – one for internal/operational use, and one for public consumption.

3. Defendant Kirby testified that MDC's Board of Directors does little, if anything, to oversee the Company's operations, noting that the Board has six meetings a year, including "four of the meetings are -- require financial information, such as the approval of quarterly statements and that sort of stuff." Asked what else the MDC Board does other than having meetings, Kirby testified: "It does not do much in between -- if anything -- in between Board Meetings."

56. During MDC's Q3 2015 earnings call on October 28, 2015, the Company acknowledged that the SEC investigation remains ongoing, more than one year after MDC received its first subpoena on October 5, 2014. The Company also disclosed that it has spent a staggering $12.4 million in legal fees associated with the SEC investigation in the first nine months of 2015.

## C. Relevant Accounting Standards and Defendants' Violations of GAAP

### 1. Goodwill Impairments

57. The Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 350-10-20 *Intangible-Goodwill and Other*, defines goodwill as an "asset representing the future economic benefits arising from the other assets acquired in a business combination…." Under what is known as "step one" of a goodwill impairment test, ASC 350-20-35 allows a company to qualitatively assess whether it is more likely than not (based on a likelihood of more than 50%) that the fair value of a reporting unit is less than its carrying amount, including goodwill. For purposes of an ASC 350-20-35 assessment, the fair value of an entity is

essentially a proxy for its "market price," or the expected price that would be received from a sale of the entity in an orderly transaction between market participants at the measurement date.

58. If, after step one of the goodwill impairment test, a company determines that it is more likely than not that the fair value of a reporting unit is less than its carrying value, then the company is required to estimate the fair value of the reporting unit. The valuation technique should generally be based on multiples of earnings or revenue, although a similar performance measure may be used if the technique is consistent with the objective of measuring fair value.

59. ASC 350-20-35-28 requires companies to test goodwill for impairment on an annual basis, or if an event occurs or circumstances change that would make it more likely than not that the fair value of a reporting unit has been reduced below its carrying amount. Here, MDC claims to test its goodwill for impairment on an annual basis, on October 1 of each year.

60. ASC 350-20-35C provides detailed guidance of potential "triggering events" after which a company must reevaluate the value of goodwill, instead of simply waiting to perform annual goodwill impairment testing. According to ASC 350-20-35C, examples of such events and circumstances include the following:

a. Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

b. Industry and market considerations such as deterioration in the environment which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

d. ***Overall financial performance such as negative and declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant periods***;

e. ***Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers***; contemplation of bankruptcy; or litigation;

f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, ***a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit,*** the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit;

g. If applicable, a sustained decrease in share price (consider in both absolute terms and relative terms).

(Emphasis added).

61. MDC reported on page 51 of its FY 2014 10-K that the Company has ten reporting units and adheres to ASC 350 by qualitatively assessing whether it is more likely than not that the carrying amount of its reporting units exceeds their respective fair value, or proceeding directly to the two-step impairment test. To determine the operating units' fair value, MDC purports to use an income approach by discounting the cash flows of projected future income. This is commonly referred to as the discounted cash flow ("DCF") method. MDC's income approach purports to use estimates and assumptions which include revenue growth, operating margin, "EBITDA," tax rates, capital expenditures, weighted average cost of capital ("WACC"), discount rates, and expected long-term cash flow growth rates. The fair value of MDC's operating units is therefore based on each operating unit's future profitability or ability to generate income in the future.

62. MDC's balance sheet includes both goodwill and "other intangible assets," net of amortization. MDC indicates that the category of "other intangible assets" is subject to amortization in accordance with FASB requirements. MDC's FY 2014 10-K states, at p. 51, that as of December 31, 2014, and December 31, 2013, there were ***no*** impairments to goodwill and no reporting units were identified as at risk of failing the Company's annual impairment test.

63. MDC's approximate reported goodwill balances for fiscal years 2012, 2013, 2014 and, as of Q1 2015, were $720 million, $744 million, $851 million, and $839 million respectively. The Company's GAAP net losses for the same periods were approximately ($85.4 million), ($149

million), ($24 million), and ($32 million). The table below shows MDC's growing goodwill balance, in the face of persistent net losses, from the end of 2009 through Q1 2015:

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Q1 2015 |
|---|---|---|---|---|---|---|---|
| Net Loss (millions) | ($18.3) | ($15.4) | ($84.7) | ($85.4) | ($148.9) | ($24.1) | ($32.1) |
| Goodwill Balance (millions) | $301.6 | $514.5 | $605.2 | $720.1 | $744.3 | $851.4 | $838.9 |

64. MDC's net losses during and prior to the Class Period are reflected in the Company's shareholders' deficit (negative shareholders' equity), which was $399 million as of March 31, 2015. The shareholders' deficit means that MDC's liabilities exceed the value of its assets by $399 million.

65. Given MDC's history of net losses over the last six and a half years, Defendants have failed to adhere to ASC 350-20-35-24 by not properly performing goodwill impairment testing. Moreover, Defendants failed to take into consideration MDC's continued operating losses as evidence that there is insufficient support for the value of its goodwill balance.

66. It is not plausible for Defendants to derive fair values for its operating units that are greater than the carrying value of the Company as a whole, which has historically operated at losses totaling $376.8 million from fiscal years 2009 through 2014. This is particularly true given that MDC purports to value its subsidiaries based on expected earnings and/or using DCF or similar analysis that projects future earnings and discounts potential results to a present day value. ASC 350-20-35-24 provides guidance on how to determine fair value of a reporting unit:

> In estimating the fair value of a reporting unit, a valuation technique based on multiples of earnings or revenue or a similar performance measure may be used if that technique is consistent with the objective of measuring fair value. Use of multiples of earnings or revenue in determining the fair value of a reporting unit may be appropriate, for example, when the fair value of an entity that has comparable operations and economic characteristics is observable and the relevant multiples of the comparable entity are known. Conversely, use of multiples would not be appropriate in situations in which the operations or activities of an entity for

which the multiples are known are not of a comparable nature, scope, or size as the reporting unit for which fair value is being estimated.

67. Because MDC has operated at current and historical net losses, it is not plausible to use an honest DCF analysis or similar method to arrive at a large enough valuation to support the Company's growing goodwill balance and failure to record any goodwill impairments during the Class Period. Otherwise stated, a valuation based on expected earnings and/or DCF analysis for an entity with zero or negative net income would require implausible assumptions to result in a valuation above zero (or significantly greater than zero), let alone high enough to support MDC's reported goodwill. Among other things, this is consistent with the sworn testimony of the KBS+ subsidiary-level CFO, Mozolewski, described at ¶ 51(b). Mozolewski's testimony indicated that, if it could do so, it would make sense for MDC to sell Zyman – which he described as operating on a "break-even basis," and conceded that a hypothetical acquirer would potentially "make no money" from acquiring the entity – if MDC could make more than nothing on the sale since holding onto it would continue to be a "break-even" proposition.

### 2. Additional GAAP Violations Regarding Zyman and Goodwill

68. With respect to the particular case of Zyman, there are further ways in which Defendants failed to comply with GAAP, contrary to their representations in SEC filings that MDC's financial statements complied with GAAP, as discussed below at ¶¶ 104 and 113. On April 1, 2005, MDC acquired 61.6% of Zyman for a total acquisition cost of $64.6 million, and also agreed to pay an additional $12 million if Zyman achieved specific financial targets in 2006 and 2007. In connection with the transaction, in Q2 2015, MDC recorded $45.4 million in goodwill and $20.1 million in other intangible assets – a total of $65.1 million, which was approximately $900,000 more than the acquisition price.

69. The agreement by which MDC acquired its interest in Zyman included certain profit allocation provisions that, among other things, reduced MDC's profit allocation to amounts less than its proportionate ownership stake for the first five years (*i.e.*, MDC would receive returns of between 20%-30%, not 61.6% as its ownership percentage suggested). Based on that agreement, MDC was required to create separate financials for Zyman for at least five years. MDC needed to create stand-alone financials for Zyman to calculate the amount of earn-out payments for the sellers and determine the amounts of "excess margin payments" owed to MDC.

70. In accordance with the then-applicable GAAP standard in 2005, FASB Statement of Financial Accounting Standards No. 142 *Goodwill and Other Intangible Assets* ("FAS 142") (which was effective for fiscal years beginning after December 15, 2001), paragraph 30: "A reporting unit is an operating segment or one level below an operating segment (referred to as a component). A component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of the component." Thus, in accordance with then-applicable GAAP in 2005, Zyman, with its own financials and separate management, would have been classified as a reportable unit for MDC.

71. In accordance with FAS 142, paragraph 32, MDC was required to test Zyman's goodwill for impairment. Specifically, paragraph 32 states:

> For the purpose of testing goodwill for impairment, acquired assets and assumed liabilities shall be assigned to a reporting unit as of the acquisition date if both of the following criteria are met: (a) The assets will be employed in or the liability relates to the operations of a reporting unit. (b) The assets or liability will be considered in determining the fair value of the reporting unit.

72. MDC failed to properly record a goodwill impairment for Zyman even though Zyman *never* met its earnings targets that were necessary for MDC to receive its priority payments under the terms of the acquisition agreement. In fact, in its FY 2006 Form 10-K, MDC indicated

that Zyman had not met expected profit thresholds, stating: "Based on Zyman Group's results for 2006, the Company received less than its priority return from Zyman Group in 2006. In addition, based on Zyman Group's expected results for 2007, the Company does not expect to receive more than the sum of its priority return for 2007 and catch-up payments for 2006." While MDC's FY 2006 10-K includes a $6.0 million goodwill impairment for its Margeotes Fertitta Powell, LLC subsidiary due to significant losses of several clients at that firm, MDC did not record any goodwill impairment for Zyman even though MDC did not receive its full priority return in 2006. Similarly, in MDC's FY 2007, 2008, and 2009 10-Ks, the Company again reported that Zyman continued to miss its targets and that MDC received less than its full priority return from Zyman in 2007, 2008, and 2009, but failed to record a goodwill impairment for Zyman in any of those years.

73. By the time that MDC issued its FY 2010 financial statements, there was no mention of Zyman Group – it appears to have simply disappeared. In fact, as noted in ¶¶ 51(b) and 51(c), Zyman effectively ceased operations as of late 2010. However, $48.0 million in goodwill related to Zyman (including $45.4 million from the original acquisition and an additional $2.6 million from when Zyman acquired Core Strategy and an entity called DMG Inc.) appears to remain on MDC's books. MDC's financial statements do not indicate that MDC took *any* goodwill impairment charges associated with Zyman. Indeed, according to CW 1, Zyman's goodwill was "still on the books in 2015."

74. In MDC's FY 2012 10-K, MDC reported that "total accumulated impairment charges are $24,845[,000] through December 31, 2012." It appears that the bulk of the Company's "accumulated impairment charges" was taken in FY 2008 and in prior years. None of those prior impairments was described as involving Zyman. In its FY 2013 10-K, MDC reported total accumulated impairment charges of approximately $31.32 million, approximately $6.47 million

more than in 2012, likely attributable to an unspecified "discontinued operations" charge of a substantially similar amount (which was *not* identified as a goodwill impairment). None of the FY 2013 charges was identified as involving a goodwill impairment for Zyman, and, in any event, the amount was substantially less than the goodwill impairment amount than would have been required for Zyman.

75. Consequently, the $48 million in goodwill related to Zyman was still a part of MDC's goodwill balance of $744.3 million for FY 2013 and $851.4 million for FY 2014. Had the Company appropriately reduced the value of goodwill related to Zyman, pursuant to GAAP, the Company's reported net loss would have increased by $48 million in the year that goodwill was impaired. The table below details the impact of the Zyman goodwill write-down to the Company's net income had MDC appropriately reduced goodwill in 2013 or 2014:

*(in millions)*

| Year Ended | 2014 | 2013 |
|---|---|---|
| Net Loss (in millions) | ($24.1) | ($148.9) |
| Less Goodwill Impairment for Zyman (in millions) | ($48.0) | ($48.0) |
| Net Loss due to Recognition of Zyman Impairment (in millions) | ($72.1) | ($196.9) |
| Percentage of Net Loss Increase due to Zyman Impairment Charge | 199.2% | 32.2% |

76. In Q4 2014, while (unbeknownst to investors) the SEC investigation of MDC was ongoing and focused on MDC's goodwill accounting, the Company's FY 2014 10-K indicates that it recorded a total of $27.7 million in charges for goodwill impairments from discontinued operations; MDC termed this as a "reduction for disposition" or "reduction for discontinued operations." While the discussion of MDC's goodwill did not identify the entity or entities that contributed to the write-down, MDC's FY 2014 10-K otherwise noted a loss on a disposal of an entity called Accent Marketing ("Accent") that included nearly $15.6 million in goodwill write-

offs. It is unclear from MDC's FY 2014 10-K what made up the difference between the $15.6 million goodwill write-off attributable to Accent and the remainder of the $27.7 million in purported goodwill impairment charges. MDC subsequently sold Accent on June 1, 2015 to an entity called StarTek Inc. for $16 million in cash and additional "working capital adjustments" for a total of $18 million; the $15.6 million goodwill write-down likely indicates that MDC sold Accent at a nearly $16 million "loss" compared to what MDC paid to acquire it. The sale of a subsidiary (Accent) at a nearly $16 million loss was a further red flag to Defendants that should have indicated that the fair value of its subsidiaries was likely far less than their carrying value – like Accent, MDC's subsidiaries were likely not worth what the Company had paid for them, requiring adjustments to goodwill.

### 3. EBITDA

77. EBITDA is a commonly used accounting indicator of a company's financial performance. While EBITDA is not a GAAP-defined term, it is a generally used financial concept that can serve as a proxy for a company's current operating profitability, and as a quick measure of free cash flow.

78. EBITDA also may be used to compare profitability between companies within the same industry because it can "normalize" companies' earnings to discount certain company-specific effects. For example, it eliminates the impact of taxation in particular political/tax jurisdictions by ignoring the amount of taxes paid, and the impact of particular financing choices by eliminating the amount of interest paid. EBITA also eliminates the impact of having large amounts of acquired intangible assets on a company's books that would be subject to large amortization charges, and removes the impact of depreciation expenses for a company that has large amounts of fixed assets subject to depreciation expenses.

79. Valuation experts often attempt to further "normalize" EBITDA by removing discontinued operations or any other non-recurring, "one-time" events that would not likely occur year-over-year. For example, if a company does not often acquire many subsidiaries, discontinued operations should be removed from a further "normalized" EBITDA since those likely would be a one-time event and not expected to be normal concerning a company's future operations.

80. Typically, EBITDA is not difficult to calculate. One starts by taking net earnings (revenue minus expenses) and then adds back interest expenses, tax expenses or back-out tax benefits, and depreciation and amortization expenses. For most public companies, EBITDA calculations use the companies' GAAP financial results and are therefore transparent to investors.

81. Throughout the Class Period, MDC used alternative, nonstandard definitions of "EBITDA" and made adjustments to the Company's definition of "EBITDA" that were so extensive that the common term EBITDA should not have been used in the Company's public filings to describe the metric that the Company called "EBITDA." MDC never actually calculated "actual" EBITDA based on its GAAP financials; rather it created its own metric that is not even close to industry standard EBITDA.

82. For example, for FY 2012, Defendants used MDC's *operating loss* of $17.9 million as the starting point of its calculation for EBITDA, rather than starting with MDC's *loss from continuing operations* of $74 million, in accordance with industry standard – a significant initial distortion by using a loss number that was less than 25% of the larger loss, or a difference of $56.1 million. Defendants continued calculating "EBITDA" by adding $46.4 million for depreciation and amortization, *and then further increased* MDC's "EBITDA" by adding back stock-based compensation of $32.2 million, acquisition deal costs of $3.4 million, deferred acquisition consideration adjustments of $53.0 million, and profit distribution from affiliates of $1.3 million.

MDC therefore increased its so-called "EBITDA" by $89.9 million for adjustments that had *no relationship* to the industry standard EBITDA metric (interest, tax, depreciation, and amortization) set forth in MDC's SEC Form 10-Qs, as discussed in ¶ 107. MDC's tortured EBITDA metric for FY 2012 is contrasted with the industry standard EBITDA metric for FY 2012 in the charts below:

MDC's 2012 YE EBITDA *(in millions)*

| | |
|---|---|
| Net Operating Loss | ($17.9) |
| + Depreciation and Amortization | 46.4 |
| + Stock Based Compensation | 32.2 |
| + Acquisition Deal Costs | 3.4 |
| + Deferred Acquisition Consideration | 53.0 |
| + Profit Distribution from Affiliates | 1.3 |
| Total Adjustments | $136.3 |
| MDC's YE 2012 EBITDA | $118.4 |

MDC's 2012 YE Industry Standard *(in millions)*

| | |
|---|---|
| Loss From Continuing Operations | ($74.0) |
| + Interest Expense, Net of Income | 46.3 |
| + Income Tax Expense | 9.6 |
| + Depreciation and Amortization | 46.4 |
| MDC's YE 2012 Industry Standard EBITDA | $28.3 |

83. MDC issued an earnings release on February 21, 2013, touting the Company's "record results" based on its "EBITDA" number of $118.4 million. According to industry standard, however, the Company's EBITDA was closer to $28.3 million, by starting with MDC's $74 million loss from continuing operations and adding back the $55.9 million in interest and taxes, and $46.4 million in depreciation and amortization.

84. Moreover, because a substantial part of "MDC's business strategy includes ongoing efforts to engage in material acquisitions of ownership interest in entities in the marketing communications services industry" – as MDC stated in its FY 2012-2014 10-Ks – acquiring and

disposing of companies is an ordinary if not central aspect of MDC's business. Therefore, it would have been more appropriate for MDC to use the $85.4 million "net loss attributable to MDC Partners"—which is the industry standard used in calculating EBITDA—as the starting point when calculating FY 2012 EBITDA (and adding the same $55.9 million in interest and taxes, and $46.4 million in depreciation and amortization). Based on this change to the EBITDA calculation, MDC's actual EBITDA was even less, approximately $16.8 million. This is *more than $100 million less* than MDC's purported $118.4 million in "EBITDA."

85. Regardless of whether Defendants started the EBITDA calculation with MDC's loss from continuing operations or the loss attributable to MDC, industry standard EBITDA would have been a fraction of MDC's reported EBITDA. Moreover, because Defendants touted MDC's 2012 EBITDA "growth" of 27.2% – based on a purported increase in EBITDA of $25.3 million, from $93.1 million in FY 2011 to $118.4 million in FY 2012 – this was misleading because a more accurate, industry standard EBITDA calculation would have indicated a massive *reduction* in EBITDA from $93.1 million to either $16.9 million or $28.3 million. MDC's 2011 Form 8-K, filed on February 27, 2012, reported $90.7 million as the Company's 2011 EBITDA. When comparing MDC's EBITDA growth from 2011 to 2012, MDC's 2012 Form 8-K, filed on February 21, 2013, reported $93.1 million as 2011 EBITDA, rather than the $90.7 million as previously reported for EBITDA in the 2011 Form 8-K.

86. Defendants also presented a misleading picture of MDC's purported "EBITDA" results and "growth" in subsequent periods. The table below summarizes MDC's reported FY 2012, 2013, and 2014 "EBITDA" (using MDC's expansive, nonstandard definitions), the purported rate of EBITDA growth, EBITDA using the industry standard of loss from continuing operations, and EBITDA using the loss attributable to MDC (which is likely more appropriate for

a company that engages in a significant number of acquisitions and dispositions), and the calculation of EBITDA growth or decline using the more appropriate starting points for the EBITDA calculation.

| YE | MDC's Reported "EBITDA" Per the Company's Form 8-K filed in the fiscal year noted below | MDC's Reported "EBITDA" Growth | Industry Standard EBITDA (Gain or Loss From Continuing Operations) | Industry Standard EBITDA % Reduction Using Industry Standard EBITDA | EBITDA (Gain or Loss Attributable to MDC) | % EBITDA Reduction Using Gain or Loss Attributable to MDC |
|---|---|---|---|---|---|---|
| 2011 | $90.7 million | 2.6% | $48.2 million | (45.5%) | $39.1 million | (58.8%) |
| 2012 | $118.4 million | 27.2% | $28.3 million | (69.6%) | $16.8 million | (82.0%) |
| 2013 | $159.4 million | 33.1% | ($50.7 million) | (142.4%) | ($68.6 million) | (157.3%) |
| 2014 | $179.4 million | 17.0% | $118.5 million | (22.7%) | $90.4 million | (41.0%) |

87. MDC's FY 2014 earnings release, issued on February 23, 2015, stated that the Company had annual "Adjusted EBITDA" of $179.4 million, an apparent 17% increase from MDC's prior year "EBITDA" of $153.3 million (a number that MDC restated from the $159.4 million reported in the prior year's earnings release). For FY 2014, the Company began its calculation with the net loss attributable to MDC of $24.1 million and made adjustments to this number to arrive at an operating profit of $87.7 million, notwithstanding that GAAP income from continuing operations was only $4.1 million (a difference of $83.6 million). From the starting point of $87.7 million, MDC added back $47.2 million in depreciation and amortization, $17.7 million in stock based compensation, $6.1 million in acquisition deal costs, $16.5 million in deferred acquisition consideration adjustments, and $4.1 million in profit distributions from non-consolidated affiliates to arrive at an adjusted EBITDA of $179.4 million. MDC's tortured

EBITDA metric for FY 2014 is contrasted with the industry standard EBITDA metric for FY 2014 in the charts below:

MDC's 2014 YE EBITDA *(in millions)*

| | |
|---|---|
| Net Loss Attributable to MDC | ($24.1) |
| + Adjustments to Reconcile to operating profit | 111.8 |
| Operating profit | $87.7 |
| + Depreciation and Amortization | 47.2 |
| + Stock Based Compensation | 17.7 |
| + Acquisition Deal Costs | 6.1 |
| + Deferred Acquisition Consideration | 16.5 |
| + Profit Distribution from Affiliates | 4.1 |
| Total Adjustments | $91.6 |
| MDC's YE 2014 EBITDA | $179.4 |

MDC's 2014 YE Industry Standard EBITDA *(in millions)*

| | |
|---|---|
| Income From Continuing Operations | $4.1 |
| + Interest Expense, Net of Income | 54.8 |
| + Income Tax Expense | 12.4 |
| + Depreciation and Amortization | 47.2 |
| MDC's YE 2014 Industry Standard EBITDA | $118.5 |

88. Had MDC used the industry standard EBITDA calculation, MDC's 2014 EBITDA would have been $118.5 million ($60.9 million less than, or almost a third of, what MDC reported), based on the $4.1 million net income from continuing operations that MDC used in its reported EBITDA, plus $54.8 million for net interest, $12.4 million in income tax expense, and $47.2 million in depreciation and amortization.

89. In addition to MDC's use of a tortured, non-industry standard EBITDA metric to give investors the impression that the Company was consistently performing well—when, in fact, according to GAAP metrics, it was not—MDC, at certain points during the Class Period (in addition to the instance set forth by CW 1 in ¶ 45), altered the components of its EBITDA metric

to further inflate the Company's financial performance. For example, in its Q3 2014 Earnings press release, dated October 29, 2014, MDC added a category entitled "Other, net," in the amount of $8.9 million, to its calculation of operating profit, and, in turn, the Company's EBITDA for that quarter. That same category appears on MDC's Q4 2014 earnings press release, dated February 23, 2015, inflating the Company's EBITDA for the quarter by $17.8 million.

## V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED TO DISCLOSE MATERIAL INFORMATION DURING THE CLASS PERIOD

### A. MDC's Earnings Releases Issued During the Class Period

90. The Class Period begins on October 28, 2013. On that day, MDC issued a press release, listing Defendant Doft as the primary contact for inquiries, and announcing the Company's "RECORD" financial results for the three and nine months ended September 30, 2013 (the "Q3 2013 Earnings Release"). The press release was filed with the SEC that same day as an attachment to an SEC Form 8-K.

91. On February 20, 2014, MDC issued a press release announcing "RECORD" financial results for the three and twelve months ended December 31, 2013 (the "Q4 2013 Earnings Release"). The press release was filed with the SEC that same day as an attachment to a Form 8-K.

92. On April 24, 2014, MDC issued a press release announcing the Company's financial results for the three months ended March 31, 2014 (the "Q1 2014 Earnings Release"). The press release was filed with the SEC that same day as an attachment to a Form 8-K.

93. On July 24, 2014, MDC issued a press release announcing MDC's financial results for the three and six months ended June 30, 2014 (the "Q2 2014 Earnings Release"). MDC filed the press release with the SEC that same day as part of a Form 8-K.

94. On October 29, 2014, MDC issued a press release announcing the Company's financial results for the three and nine months ended September 30, 2014 (the "Q3 2014 Earnings Release"). MDC filed the press release with the SEC that same day as an attachment to a Form 8-K.

95. On February 23, 2015, MDC issued a press release announcing the Company's financial results for the three months and year ended December 31, 2014 (the "Q4 2014 Earnings Release"). The press release was filed with the SEC that same day as an attachment to a Form 8-K.

96. In reporting MDC's financial results, the Q3 2013 Earnings Release, Q4 2013 Earnings Release, Q1 2014 Earnings Release, Q2 2014 Earnings Release, Q3 2014 Earnings Release, and Q4 2014 Earnings Release (collective referred to as the "Class Period Earnings Releases") included MDC's consolidated balance sheets for those quarters, which state, respectively, that MDC's goodwill amounted to $711.3 million as of September 30, 2013, $744.3 million as of December 31, 2013, $873.9 million as of March 31, 2014, $882.7 million as of June 30, 2014, $928,209,000 as of September 30, 2014, and $851.4 million as of December 31, 2014.

97. The statements in the Class Period Earnings Releases that MDC's goodwill amounted to $711.3 million as of September 30, 2013, $744.3 million as of December 31, 2013, $873.9 million as of March 31, 2014, $882.7 million as of June 30, 2014, $928,209,000 as of September 30, 2014, and $851.4 million as of December 31, 2014 were materially false and misleading because, as described at ¶¶ 73 and 75, the Company failed to account for necessary goodwill impairments related to MDC's poor-performing subsidiaries including, at a minimum, a $48 million goodwill impairment for MDC's discontinued Zyman subsidiary.

98. The reported financial results in the Class Period Earnings Releases, including the $21.2 million net loss attributable to MDC as of September 30, 2013, $94.3 million net loss attributable to MDC as of December 31, 2013, $8.8 million net loss attributable to MDC as of March 31, 2014, $7.6 million net income attributable to MDC as of June 30, 2014, $4.9 million net loss attributable to MDC as of September 30, 2014, and $24.1 million net loss attributable to MDC as of December 31, 2014 were materially false and misleading. As described at ¶ 75, MDC's failure to record impairment charges resulted in an overstatement of the Company's period income, and understated the amount of its GAAP net loss, by a minimum of $48 million attributable to the impaired goodwill, and was further misstated as a result of MDC's failure to record similar impairments related to other poorly performing MDC subsidiaries.

**B. MDC's SEC Forms 10-Q Filed During the Class Period**

99. On November 5, 2013, MDC filed its Quarterly Report on SEC Form 10-Q, signed by Defendant Sabatino, for the period ended September 30, 2013 (the "Q3 2013 10-Q"). Among other things, the Q3 2013 10-Q reported the same net loss of $21.2 million attributable to MDC and goodwill of $711.3 million that was reported in MDC's October 28, 2013 earnings release.

100. On April 29, 2014, MDC filed its Quarterly Report on SEC Form 10-Q, signed by Defendant Sabatino, for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). Among other things, the Q1 2014 10-Q reported the same net loss attributable to MDC ($8.8 million) and goodwill, $873.9 million, that was reported in MDC's April 24, 2014 earnings release.

101. On August 11, 2014, MDC filed its Quarterly Report on SEC Form 10-Q, signed by Sabatino, for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). Among other things, the Q2 2014 10-Q reported the same net income attributable to MDC, $7.6 million, and goodwill, $882.7 million, that was reported in MDC's July 24, 2014 earnings release.

102. On November 6, 2014, MDC filed its Quarterly Report on SEC Form 10-Q, signed by Defendant Sabatino, for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). Among other things, and despite the recent investigation by the SEC into MDC's goodwill accounting practices, the Q3 2014 10-Q reported the same net loss attributable to MDC, ($4.9 million), and goodwill, $928,209,000, that was reported in MDC's October 29, 2014 earnings release.

103. With respect to MDC's accounting for goodwill, the Q3 2013 10-Q, Q1 2014 10-Q, Q2 2014 10-Q, and Q3 2014 10-Q (collectively referred to as the "Class Period 10-Qs") indicate that MDC's goodwill accounting is compliant with GAAP, stating, among other things: "[a] fair value approach is used in testing goodwill for impairment to determine if an other than temporary impairment has occurred."

104. MDC also stated that the financial statements in the Class Period 10-Qs were prepared in accordance with SEC rules and GAAP:

> MDC Partners Inc. (the "Company") has prepared the unaudited condensed consolidated interim financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP") of the United States of America ("US GAAP") have been condensed or omitted pursuant to these rules.
>
> The accompanying financial statements reflect all adjustments, consisting of normally recurring accruals, which in the opinion of management are necessary for a fair presentation, in all material respects, of the information contained therein. Results of operations for interim periods are not necessarily indicative of annual results.

105. The Class Period 10-Qs also state that the Company maintains adequate and appropriate disclosure controls and procedures:

> <u>We maintain disclosure controls and procedures designed to ensure that information required to be included in our SEC reports is recorded, processed, summarized and reported within the applicable time periods specified by the SEC's rules and forms, and that such information is accumulated and communicated to</u>

> our management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), who is our principal financial officer, as appropriate, to allow timely decisions regarding required disclosures. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. However, the Company's disclosure controls and procedures are designed to provide reasonable assurances of achieving the Company's control objectives.
>
> We conducted an evaluation, under the supervision and with the participation of our management, including our CEO, our CFO and our management Disclosure Committee, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a- 15(b) of the Exchange Act. Based on that evaluation, our CEO and CFO concluded that, as of September 30, 2013, our disclosure controls and procedures are effective to ensure that decisions can be made timely with respect to required disclosures, as well as ensuring that the recording, processing, summarization and reporting of information required to be included in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2013 is appropriate.

(Emphasis added).

106. Defendants Nadal and Doft each signed certifications, in the Class Period 10-Qs, stating the following:

> 1. I have reviewed this annual report on this Form 10-Q for the quarter ended [September 30, 2013, March 31, 2014, June 30, 2014, and September 30, 2014, respectively] of MDC Partners Inc.;
>
> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made***, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

(Emphasis added).

107. In Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A"), the Class Period 10-Qs state that MDC uses non-GAAP metrics to provide information about "the financial performance and financial condition of the Company."

Among MDC's "key" non-GAAP metrics is industry standard "EBITDA," which the Class Period 10-Qs specifically define as "earnings before interest, income taxes and depreciation and amortization."

108. The above statements set forth in ¶¶ 99 - 107 were false and misleading for the following reasons:

(a) The statement in the Class Period 10-Qs that the Company's goodwill amounted to $711.3 million, $873.9 million, $882.7 million and $928.2 million, respectively, and the repeated statement that MDC used a "fair value approach" to test for goodwill impairments were materially false and misleading because, as described at ¶¶ 73 and 75, the Company failed to account for necessary goodwill impairments related to MDC's poor-performing subsidiaries including, at a minimum, a $48 million goodwill impairment for MDC's discontinued Zyman subsidiary, and failed to account for the fact that the fair values of its poor-performing subsidiaries (including Zyman) were substantially lower than their carrying values.

(b) MDC's reported $21.2 million net loss attributable to MDC, in Q3 2013, $8.8 million net loss in Q1 2014, $7.6 million net income in Q2 2014 and $4.9 million net loss in Q3 2014, were materially false and misleading because, as described at ¶ 75, MDC's failure to record impairment charges resulted in an overstatement of the Company's period income, and understated the amount of its GAAP net loss, by a minimum of $48 million attributable to the impaired goodwill of Zyman, and were further misstated as a result of MDC's failure to record similar impairments related to other poorly performing MDC subsidiaries.

(c) The statement in the Class Period 10-Qs that MDC's financial statements were prepared in accordance with SEC Rules and GAAP was materially false and misleading because,

among other things, MDC failed to comply with GAAP with respect to its accounting for goodwill and the recording of impairment charges for the reasons described in ¶¶ 108(a) and (b) above.

(d) The statements regarding MDC's internal controls in the Class Period 10-Qs including in the certifications signed by Defendants Nadal and Doft, were materially false and misleading given that they failed to disclose – as MDC has since admitted in its April 27, 2015 disclosures – that the Company had substantial internal control deficiencies. Among other things, (i) Defendant Nadal has agreed to repay MDC nearly $10.5 million in inappropriately reimbursed personal expenses and abruptly resigned from the Company, as has Defendant Sabatino, the individual primarily responsible for approving payment of Nadal's expenses; (ii) the SEC is conducting a formal investigation into Defendant Nadal's inappropriately reimbursed expenses, accounting for goodwill, and other matters; (iii) and MDC failed to have appropriate personnel responsible for monitoring and assessing compliance with internal controls.

(e) The statement in the Class Period 10-Qs that MDC uses industry standard EBIDTA, defined as "earnings before interest, income taxes and depreciation and amortization," to monitor "the financial performance and financial condition of the Company," is materially false and misleading because, as described at ¶¶ 80-89, MDC instead uses an "EBITDA" metric that does not comport with the industry standard definition referenced in the Class Period 10-Qs, and that overstates MDC's period results.

(f) The certifications in the Class Period 10-Qs signed by Defendants Nadal and Doft that the Class Period 10-Qs "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, . . . not misleading" is materially false and misleading because the Class Period 10-Qs contain materially false and misleading statements and omits to disclose material facts, including those described in ¶¶ 108(a)-(e) above.

### C. MDC's Restatement of Certain FY 2012 Financial Data, FY 2013 10-K, and FY 2014 10-K

109. On November 12, 2013, MDC filed SEC Form 8-K revising and restating certain portions of the Company's FY 2012 Form 10-K (the "Restated 2012 10-K"). According to the November 12, 2013 8-K, MDC was updating certain previously reported items because, during the third quarter of 2013, "the Company discontinued an operating subsidiary and an operating division." Notwithstanding these (unspecified) discontinued operations, the revised financial statements attached to the 8-K reported goodwill for FY 2012 in the amount of $720.1 million, which was the same amount that the Company originally reported in MDC's FY 2012 10-K. MDC also reported a FY 2012 net loss attributable to MDC of $85.44 million, which was also the same amount originally reported in MDC's FY 2012 10-K.

110. On March 10, 2014, MDC filed SEC Form 10-K, signed by Defendants Nadal, Doft, Sabatino, and Gendel for FY 2013 (the "2013 10-K"). Like MDC's Q4 2013 Earnings Release, in the 2013 10-K, MDC stated that goodwill at the end of 2013 amounted to $744.3 million. MDC also reported a net loss attributable to MDC of $148.7 million.

111. On March 2, 2015, MDC filed with the SEC its Form 10-K, signed by Defendants Nadal, Doft, Gendel, and Sabatino, for FY 2014 (the "2014 10-K"). Like MDC's Q4 2014 Earnings Release, in the 2014 10-K, and despite the SEC investigation into MDC's goodwill accounting practices, MDC stated that goodwill at the end of 2014 amounted to $851.4 million. MDC also reported a net loss attributable to MDC of $24.1 million.

112. The Restated 2012 10-K, 2013 10-K, and 2014 10-K discuss MDC's goodwill accounting from FY 2012, FY 2013, and FY 2014, respectively, stating, among other things that (i) goodwill is tested for impairment annually or more frequently; and (ii) at the end of 2012 and

2011 (in the Restated 2012 10-K), at the end of 2013 and 2012 (in the 2013 10-K) and at the end of 2014 and 2013 (in the 2014 10-K), there was no impairment of goodwill or risk thereof:

> In accordance with the FASB Accounting Standards Codification topic, Goodwill and Other Intangible Assets, goodwill and indefinite life intangible assets (trademarks) acquired as a result of a business combination which are not subject to amortization are ***tested for impairment annually, and more frequently if events and circumstances indicate that the asset might be impaired***. ***An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.*** For goodwill, this determination is made at the reporting unit level and consists of two steps. First, ***the Company determines the fair value of a reporting unit and compares it to its carrying amount. Fair value is determined based on earnings multiples of each subsidiary.*** Second, ***if the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill. The implied fair value of goodwill is determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation, in accordance with the FASB Accounting Standards Codification topic, Business Combinations.*** The residual fair value after this allocation is the implied fair value of the reporting unit goodwill.
>
> ***
>
> Impairment losses, where applicable, will be charged to operating profit. . . . As of December 31, 2012 and 2011 [in the Restated 2012 10-K, December 31, 2013 and 2012 in the 2013 10-K and December 31, 2014 and 2013 in the 2014 10-K], ***there was no impairment of goodwill and no reporting units were at risk of failing step one of [the] annual test***.

(Emphasis added).

113. In the Restated 2012 10-K, 2013 10-K, and 2014 10-K, MDC also stated that it "has prepared the consolidated financial statements included herein pursuant to the rules and regulations of the United States Securities and Exchange Commission (the 'SEC') and in accordance with generally accepted accounting principles ('GAAP') of the United States of America ('US GAAP')."

114. The 2014 10-K also belatedly disclosed a related party transaction, consummated at an unspecified time in 2014, pursuant to which MDC, in effect, reimbursed Nadal-controlled entities for Nadal's business-related aircraft use:

> Beginning in 2014, MDC has chartered for business purposes an airplane and helicopter (together, the "Aircraft") owned by entities controlled by Mr. Nadal and leased to an independent corporate aircraft management company. Entities controlled by Mr. Nadal paid for the purchases of the Aircraft and are legally responsible and have paid for all operating, personnel and maintenance costs associated with the Aircraft's operations. Payments by third parties to charter the Aircraft from the corporate aircraft management company will offset a portion of the costs. Payments by MDC for the business use of the Aircraft by Mr. Nadal and other Executive employees of MDC are made to the corporate aircraft management company at a fixed hourly rate set forth in the aircraft service agreement between the aircraft management company and entities controlled by Mr. Nadal. In 2014, MDC paid a total of $1.6 million for the business use of the Aircraft.

Notably, this arrangement was not disclosed by MDC at any point in 2014 or before the filing of the 2014 10-K.

115. The 2013 10-K and 2014 10-K further state that the Company maintains adequate and effective disclosure controls and procedures:

> <u>We maintain disclosure controls and procedures designed to ensure that information required to be included in our SEC reports is recorded, processed, summarized and reported within the applicable time periods specified by the SEC's rules and forms</u>, and that such information is accumulated and communicated to our management, including our Chief Executive Officer (CEO) and our Chief Financial Officer (CFO), who is our principal financial officer, as appropriate, to allow timely decisions regarding required disclosures.
>
> ***
>
> We conducted an evaluation, under the supervision and with the participation of our management, including our CEO, our CFO and our management Disclosure Committee, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15(b) of the Exchange Act. <u>Based on that evaluation, the Company has concluded that its disclosure controls and procedures were effective."</u>

(Emphasis added).

116. In the 2013 10-K and 2014 10-K, Defendants Nadal and Doft each signed certifications stating the following:

> 1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2013 [in the 2013 10-K and December 31, 2014 in the 2014 10-K] of MDC Partners Inc.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made***, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

> a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and
>
> b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

(Emphasis added).

117. The above statements were materially false and misleading for the following reasons:

(a) The statement that the Company's goodwill amounted to $720.1 million in FY 2012, $744.3 million in FY 2013, and $851.4 million in FY 2014, and statements regarding MDC's testing for goodwill impairments, including MDC's use of "fair value" testing, were materially false and misleading because the Company failed to account for necessary goodwill impairments related to MDC's poor-performing subsidiaries including, at a minimum, a $48 million goodwill impairment for MDC's discontinued Zyman subsidiary, and failed to account for the fact that the fair values of its poor-performing subsidiaries (including Zyman) were substantially lower than their carrying values.

(b) MDC's reported $85.44 million net loss attributable to MDC for FY 2012, $148.7 million net loss attributable to MDC for FY 2013, and $24.1 million net loss attributable to MDC for FY 2014 were materially false and misleading because MDC's failure to record impairment charges resulted in an overstatement of the Company's period income, and understated the amount of its GAAP net loss, by a minimum of $48 million attributable to the impaired goodwill of Zyman, and was further misstated as a result of MDC's failure to record similar impairments related to other poorly performing MDC subsidiaries

(c) The statements in the Restated 2012 10-K, 2013 10-K, and 2014 10-K that MDC's financial statements were prepared in accordance with SEC Rules and GAAP were materially false and misleading because, among other things, MDC had failed to comply with GAAP with respect to its accounting for goodwill and the recording of impairment charges for the reasons described in ¶¶ 117(a) and (b) above.

(d) The statements regarding MDC's internal controls in the 2013 10-K and 2014 10-K, including in the certifications signed by Defendants Nadal and Doft, were materially false and misleading given that they failed to disclose – as MDC has since admitted in its April 27, 2015 disclosures – that the Company had substantial internal control deficiencies. Among other things, (i) Defendant Nadal has agreed to repay MDC nearly $10.5 million in inappropriately reimbursed personal expenses and abruptly resigned from the Company, as has Defendant Sabatino, the individual primarily responsible for approving payment of Defendant Nadal's expenses; (ii) the SEC is conducting a formal investigation into Defendant Nadal's inappropriately reimbursed expenses, accounting for goodwill, and other matters; and (iii) MDC failed to have appropriate personnel responsible for monitoring and assessing compliance with internal controls.

(f) The certifications in the 2013 10-K and 2014 10-K, signed by Defendants Nadal and Doft, stating that the 2013 10-K and 2014 10-K, respectively, "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, . . . not misleading" are materially false and misleading because the 2013 10-K and 2014 10-K contain materially false and misleading statements and omits material facts, including those described in ¶¶ 117(a)-(e) above.

**D. MDC's 2014 Definitive Proxy Statement**

118. On April 25, 2014, MDC filed with the SEC its 2014 Definitive Proxy Statement (the "2014 Proxy"), which is incorporated by reference into MDC's 2013 Form 10-K and signed by Defendants Nadal, Doft, Gendel, Sabatino, and Kirby. The 2014 Proxy contains the following Summary Compensation Table for all of MDC's executives, including Defendants Nadal, Doft, Sabatino, and Gendel:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($): Stock Awards ($) | Stock Awards ($): EVARs ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Miles S. Nadal, | 2013 | 1,750,000 | 14,242,342 | 4,186,920 | 0 | 0 | 0 | 500,000 | 20,679,263 |
| Chairman Chief | 2012 | 1,500,000 | 1,260,735 | 5,958,343 | 0 | 0 | 0 | 558,343 | 9,277,422 |
| Executive Officer and President | 2011 | 1,500,000 | 213,068 | 13,092,218 | 8,433,000 | 0 | 0 | 559,138 | 23,797,424 |
| David B. Doft, | 2013 | 412,500 | 323,947 | 226,721 | 0 | 0 | 0 | 53,084 | 1,016,252 |
| Chief Financial | 2012 | 375,000 | 120,074 | 168,489 | 0 | 0 | 0 | 50,581 | 714,144 |
| Officer | 2011 | 368,750 | 148,565 | 680,907 | 421,650 | 0 | 0 | 49,372 | 1,669,243 |
| Stephen Pustil, | 2013 | 388,312 | 229,991 | 227,521 | 0 | 0 | 0 | 32,696 | 878,520 |
| Vice Chairman | 2012 | 400,240 | 142,071 | 266,520 | 0 | 0 | 0 | 34,757 | 843,588 |
| Mitchell Gendel, | 2013 | 412,500 | 309,775 | 225,083 | 0 | 0 | 0 | 48,084 | 995,442 |
| General Counsel | 2012 | 375,000 | 140,248 | 249,399 | 0 | 0 | 0 | 45,581 | 810,228 |
| and Corporate Secretary | 2011 | 368,750 | 86,187 | 638,612 | 421,650 | 0 | 0 | 44,372 | 1,559,571 |
| Michael Sabatino | 2013 | 412,500 | 420,622 | 226,721 | 0 | 0 | 0 | 46,272 | 1,106,816 |
| Chief Accounting | 2012 | 375,000 | 127,053 | 277,247 | 0 | 0 | 0 | 46,822 | 826,122 |
| Officer | 2011 | 368,750 | 81,502 | 691,345 | 421,650 | 0 | 0 | 45,540 | 1,608,787 |

119. The Summary Compensation Table indicates that Defendant Nadal received $500,000 in "Other Compensation" and $20,679,263 in total compensation for FY 2013. Moreover, Footnote 4 to the Summary Compensation Table provides a breakdown of Defendant Nadal's "Other Compensation," which "is comprised of the following perquisites, personal benefits and other items":

> [F]or Mr. Nadal, a $500,000 perquisite allowance in respect of retirement benefits and employee health benefits. In addition to the amounts set forth in the table, on limited occasions, while Mr. Nadal is traveling on business, a member of his family has accompanied him on the corporate aircraft. There is no incremental cost to the Company for this use of the aircraft by Mr. Nadal's family member. For business

> purposes during travel from outside of New York City, Mr. Nadal and certain of the Company's executive officers have the use of a corporate apartment located near the Company's offices in New York City. Mr. Nadal personally paid for all furnishings in this corporate apartment, and also pays for 50% of the leasehold cost. The Company believes that such arrangement is more cost effective than the alternative costs of a hotel in New York City.

(Emphasis added).

120. MDC's statements in the 2014 Proxy (i) that Defendant Nadal's "All Other Compensation" in 2013 was $500,000; and (ii) providing a breakdown of Nadal's "All Other Compensation" in Footnote 4 to the Summary Compensation Table are false and misleading because they, at a minimum, omit amounts for Nadal's use of MDC's corporate aircraft and corporate apartment in New York City that were later revealed in MDC's 2015 Definitive Proxy Statement, as described in ¶¶ 123-124. In turn, MDC's statement that Nadal's total compensation in 2013 was $20,679,263 is false and misleading for the same reason.

## VI. THE TRUTH IS REVEALED

121. On April 27, 2015 after the close of trading on the NASDAQ, MDC issued an Earnings Release for Q1 2015. In that earnings release, and a conference call held shortly thereafter, Defendants shocked the market with several revelations concerning MDC's improper accounting for goodwill, its use of non-GAAP metrics and other accounting issues, improper excess executive compensation paid to Defendant Nadal, and MDC's inadequate internal controls. Specifically, nearly seven months after the fact, MDC disclosed that, "[s]ince October 5, 2014, the Company has been actively cooperating with the production of documents for review by the Securities and Exchange Commission (the 'SEC') pursuant to a Subpoena. In connection with this production of documents, the Company formed a Special Committee of independent directors to review certain matters relating to the reimbursement of expenses incurred by the CEO." MDC further disclosed that:

a. "The Special Committee completed an extensive review of perquisites and payments made by the Company to or on behalf of Miles Nadal and Nadal Management Limited during the six-year period from 2009 through 2014. The review included a detailed analysis of the available back-up documentation supporting such payments, as well as consideration of the Management Services Agreement among Mr. Nadal, Nadal Management Limited and the Company and certain historical practices. These payments included, among other things, travel and commutation expenses, charitable donations, medical expenses, and certain expenses for which the information was incomplete."

b. "Following the review, Mr. Nadal agreed to reimburse the Company for perquisites and payments for which the Company sought reimbursement, in the aggregate amount of $8.6 million."

c. "In addition to this reimbursement, the Special Committee recommended, the Audit Committee has adopted, and the Company has adopted and implemented, a series of remedial steps to improve and strengthen the Company's internal controls and procedures regarding travel, entertainment and related expenses."

d. "The Subpoena received from the SEC also requested production of documents relating to the Company's goodwill and certain other accounting practices, as well as information relating to trading in the Company's securities by third parties. The Company has been fully cooperating with the SEC and believes that the inquiries are at an early stage."

e. "Effective as of April 23, 2015, the Company's prior Chief Accounting Officer, Michael Sabatino, transitioned to a new role in the company, in which he will work on special projects."

(Emphasis added).

122. Further, MDC revealed, on April 27, 2015, that, in the first quarter of 2015 alone, the Company incurred a staggering $5.8 million in "legal fees and other related expenses relating to the SEC inquiry," which was still "at an early stage."

123. On April 28, 2015, MDC filed its 2015 Proxy, which disclosed that, in addition to the $500,000 perquisite allowance that Nadal received, in 2014 in purportedly "All Other Compensation" —as he had received in prior years—MDC paid Nadal:

a. $91,038 for Nadal's "personal use of company aircraft" to "travel . . . from his residences in the Bahamas and West Palm Beach, Florida to and from the Company's corporate office in New York, N.Y., as well as the incremental increase

in cost for Mr. Nadal to travel to business events from his residence in the Bahamas as opposed to traveling from the Company's corporate office in New York"; and

b. $71,967 "for Mr. Nadal's personal use of a corporate apartment when he is in New York City. The Company pays for 50% of the lease and 100% of the utilities, local phone charges, cable and internet charges of the apartment, which the Company believes is more cost effective than providing Mr. Nadal with a hotel when he is in New York on Company business.

c. $263,000 in "[f]ees incurred by the Company in connection with the secondary offering and sale of 3.5 million Class A shares by Mr. Nadal in 2014."

(Emphasis added).

124. The 2015 Proxy also provided a corrective disclosure regarding expenses for Nadal's use of MDC's corporate apartment in New York City in 2012 and 2013, stating that "[t]he Company also paid for 50% of the lease and 100% of the utilities, local phone charges, cable and internet charges of the apartment in an amount equal to $54,172 in respect of 2013, and $50,160 in respect of 2012."

125. In contrast, MDC's 2014 Proxy generally notes Mr. Nadal's personal use of MDC's aircraft and corporate apartment in New York City, but fails to disclose any related expenditures, which, in 2014, resulted in a nearly one-third increase in Nadal's "All Other Compensation."

126. The 2015 Proxy Statement also disclosed that, "[e]ffective in February 2015, the Company has adopted and implemented a new Aircraft Usage Policy, pursuant to which Mr. Nadal is required to reimburse the Company for the allocated cost of the corporate aircraft for travel by any of his family members at a rate that is the greater of the Standard Industry Fare Level (SIFL) rate published by the U.S. Department of Transportation or the incremental cost to the Company of such personal use subject to FAA cap."

127. As a result of these disclosures, MDC shares fell 27.8%, or $7.78 per share, from $27.98 per share on April 27, 2015, to close at $20.20 per share on April 28, 2015.

## VII. SUBSEQUENT REVELATIONS EVIDENCING DEFENDANTS' FRAUD

128. In MDC's Q1 2015 earnings release, MDC again changed its EBITDA definition, defining Adjusted EBITDA as "operating profit (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments, profit distributions from affiliates, and other non-recurring items," including "ongoing legal fees and other related expenses related to the SEC inquiry." (Emphasis added).

129. On July 20, 2015, in a press release to its investors, MDC abruptly announced that Nadal had resigned as CEO and "from his position on the Board of Directors as Chairman." MDC also revealed that, "[i]n connection with the ongoing SEC investigation," Nadal had agreed to reimburse the Company for "all expenses that were requested to be repaid by the Special Committee of the Board of Directors, including an additional $1.88 million that was recently identified. In connection with his retirement, Mr. Nadal is required under the Company's Incentive/Retention agreements to repay $10.58 million in retention amounts received between 2012 and 2015. In addition, Mr. Nadal is not eligible for any compensation payments or severance."

130. The same press release announced that Sabatino, "formerly Chief Accounting Officer of MDC Partners, has resigned," and that he had "agreed to repay the Company $208,535 in cash bonus payments received between 2012 and 2014."

131. In its Second Quarter 2015 Earnings Results press release, filed on August 6, 2015, MDC yet again changed its definition of Adjusted EBITDA from "operating profit (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments, profit distributions from affiliates, and other non-recurring items," including "ongoing legal fees and other related expenses related to the SEC inquiry," to

"operating profit (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments, profit distributions from affiliates, and other items," including "both (i) one-time gains related to the former CEO's repayment to the Company for certain perquisites and expenses ($8.6 million) and (ii) legal fees and other expenses relating to the ongoing SEC investigation ($9.7 million)." (Emphasis added).

132. In its Third Quarter 2015 Earnings Results press release, filed on October 28, 2015, MDC again changed its definition of Adjusted EBITDA from "operating profit (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments, profit distributions from affiliates, and other items," including "both (i) one-time gains related to the former CEO's repayment to the Company for certain perquisites and expenses ($8.6 million) and (ii) legal fees and other expenses relating to the ongoing SEC investigation ($9.7 million), to "operating profit (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments, profit distributions from affiliates, and other non-recurring items," including "(i) one-time gains related to the former CEO's repayment to the Company for certain perquisites and expenses ($1.9 million), (ii) legal fees and related expenses relating to the ongoing SEC investigation ($2.7 million) and (iii) one-time charge for the balance of prior cash bonus award amounts paid to the former CEO and CAO ($5.8 million) that will not be recovered; and (iv) write-off of certain assets related to the CEO and CAO termination ($1.1 million)." (Emphasis added).

133. In stark contrast to how MDC defined EBITDA in these earnings releases, MDC continued to use the widely accepted definition of EBITDA ("earnings before interest, income taxes and depreciation and amortization") in its Form 10-Q for the First Quarter of 2015, filed on

April 30, 2015, the Second Quarter of 2015, filed on August 7, 2015, and the Third Quarter of 2015, filed on November 3, 2015.

## VIII. SCIENTER ALLEGATIONS

134. Numerous facts give rise to a compelling inference that, throughout the Class Period, Defendants MDC, Nadal, Doft, Gendel, Sabatino, and Kirby knew or recklessly disregarded that their statements and omissions set forth herein were materially false and misleading when made. Specifically, in light of the preceding allegations and those that follow, Defendants Nadal, Doft, Gendel, Sabatino, and Kirby each knew or recklessly disregarded the following facts prior to and during the Class Period: (1) MDC improperly reimbursed Nadal for approximately $10.5 million in personal expenses; (2) MDC understated the true amount of Nadal's annual executive compensation; (3) MDC overstated the amount of MDC's goodwill; (4) MDC overstated its earnings and understated the amount of its GAAP net loss by failing to record goodwill impairments; and (5) MDC employed a highly misleading EBITDA metric to mislead investors regarding MDC's financial results.

### A. Insider Trading Generally

135. During the Class Period, the Individual Defendants collectively sold 6,475,305 shares of MDC stock, amounting to proceeds of $163,600,046. In contrast, from April 29, 2012 to October 27, 2013 (the "Pre-Class Period"), the Individual Defendants sold 52,050 shares, a small fraction (.08%) of the amount sold during the Class Period. Further, the Individual Defendants' proceeds from insider trading during the Class Period were *over 200 times* greater than their proceeds from insider trading during the Pre-Class Period. The following chart contrasts the Individual Defendants' trading patterns during the Class Period ("CP") and the Pre Class Period ("PCP"):

| Insider | Total CP Shares Sold (10/28/2013-04/27/2015) [546 days] | Total CP Gross Proceeds (10/28/2013-04/27/2015) [546 days] | Total PCP Shares Sold (04/29/2012-10/27/2013) [546 days] | Total PCP Gross Proceeds (04/29/2012-10/27/2013) [546 days] |
|---|---|---|---|---|
| Doft, David B. (Chief Financial Officer) | 193,883 | $ 5,503,995.63 | 13,838 | $ 118,783.10 |
| Mic, Mitchell (Gen. Counsel & Corp. Secretary) | 209,960 | $ 5,883,582.17 | 17,801 | $ 203,212.70 |
| Kirby, Michael J. L. (Chairman of MDC's Audit Committee) | 10,000 | $ 312,800.00 | 5,000 | $ 52,333.60 |
| Nadal, Miles S. (Chairman of the Board, CEO and President) | 5,864,127 | $ 146,156,656.24 | 0 | $ 0.00 |
| Sabatino, Michael C. (SVP & Chief Accounting Officer) | 197,335 | $ 5,743,011.72 | 15,411 | $ 195,719.70 |
| **Totals:** | **6,475,305** | **163,600,046** | **52,050** | **570,049** |

## B. Defendant Nadal

### 1. Defendant Nadal Engaged in Substantial and Suspicious Insider Trading

136. On November 5, 2013, Nadal sold over 2.08 million of his MDC shares (25.1%) at the artificially inflated price of $31.28 per share, yielding more than $65 million in proceeds. Nadal continued to dump his MDC shares before the truth regarding MDC's fraud was revealed to the market. On May 16, 2014, Defendant Nadal sold 3.5 million shares (nearly 38%) of his MDC holdings, in a secondary public offering, at the artificially inflated price of $23.14 per share, yielding nearly $81 million in proceeds. Significantly, Defendant Nadal sold these shares after the SEC had begun its investigation into MDC, and hot on the heels of the SEC's May 9, 2014 inquiry into MDC's misleading use of EBITDA and other non-GAAP metrics in its quarterly earnings statements that reported "record results" in the face of substantial GAAP losses. In sum, Defendant

Nadal sold nearly half of his shares in MDC during the Class Period. Nadal did not sell any shares before the Class Period.

137. Defendant Nadal has continued to dump his MDC shares. On October 29, 2015, while the SEC's investigation was still ongoing, Nadal sold 1.842 million shares (approximately 48% of his MDC holdings) at a price of $20.50 per share, yielding more than $37.76 million in proceeds. The following chart illustrates Defendant Nadal's selling of MDC stock during the Class Period:

| Nadal, Miles S. (Chairman of the Board, CEO and President) | | | | | |
|---|---|---|---|---|---|
| **Security** | **Trade Date** | **Number of Shares** | **Price** | **Gross Proceeds** | **Shares Owned Following Transaction** |
| Class A Shares | 12/23/2014 | 30,340 | $ - | $ - | 5,662,043 |
| Class A Shares | 5/16/2014 | 3,500,000 | $ 23.14 | $ 80,990,000.00 | 5,692,383 |
| Class A Shares | 12/2/2013 | 250,454 | $ - | $ - | 9,070,573 |
| Class A Shares | 11/5/2013 | 2,083,333 | $ 31.28 | $ 65,166,656.24 | 6,214,011 |
| **CP Totals:** | | **5,864,127** | | **$ 146,156,656.24** | |

### 2. MDC's Internal Investigation Found that Defendant Nadal Owes the Company Over Ten Million Dollars in Improper Expense Payments

138. As the Company revealed in its April 27, 2015 disclosures, MDC's own internal investigation reviewed various expense payments that the Company issued to Defendant Nadal between 2009 and 2014, and found, thus far, that Defendant Nadal owes MDC a total of $10.48 million in expense payments that lacked proper documentation. As of July 20, 2015, Defendant Nadal has agreed to repay those expenses.

### 3. Defendant Nadal Abruptly Resigned During the SEC Investigation and MDC's Own Internal Investigation

139. On July 20, 2015, while the SEC investigation into Defendant Nadal's compensation and MDC's accounting practices as well as MDC's internal investigation were both ongoing, Defendant Nadal abruptly resigned from MDC. Moreover, in doing so, Defendant Nadal

agreed to repay $10.58 million in incentive payments received between 2012 and 2015, and was required to forego any severance package, which was worth approximately $27.2 million to Defendant Nadal. All told, Defendant Nadal has thus far agreed to repay or forfeit a total of over $48 million as a result of the SEC investigation and MDC's internal investigation.

140. According to a December 4, 2015 *The GLOBE AND MAIL* story, "the Company agreed to a payment plan in which Mr. Nadal pays $1 million by September 30, and another $1.5 million by December 31 of this year, leaving more than $8 million owed. Of that, Nadal must pay $2 million by December 31, 2016, $4 million by June 3, 2017, and the final $2,081,605 by December 31, 2017. If the amounts contain any interest for what is, effectively, a loan, that's unclear from MDC Partners' disclosures."

141. The December 4, 2015 *GLOBE AND MAIL* story continued that "the company's review of potentially improper expense payments went from 2009 through 2014, the amount of bonuses Mr. Nadal agreed to pay back – under $10.6 million – is less than the $11.74 million in bonuses MDC Partners paid him in 2014. Mr. Nadal received just over $30 million in performance bonuses from 2009 to 2014, with almost $26 million of that coming in 2013 and 2014."

#### 4. Defendant Nadal's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA Calculation

142. Defendant Nadal had a clear motive to approve and encourage the use of MDC's highly misleading EBITDA metric, in the face of GAAP losses, because, throughout the Class Period, Defendant Nadal's compensation was directly tied to MDC's EBITDA calculation. MDC's 2014 and 2015 Proxy Statements clearly state that, "[i]n determining Mr. Nadal's compensation" for the year, "the Compensation Committee took into account the Company's strong financial performance," which was measured in large part by MDC's highly misleading EBITDA metric.

143. Moreover, MDC's 2014 and 2015 Proxy Statements make clear that Defendant Nadal had influence over MDC's annual EBITDA target that, in turn, determined his annual compensation:

> The Compensation Committee considers input from senior management in making determinations regarding the overall executive compensation program and the individual compensation of the named executive officers. As part of the Company's annual planning process, the CEO, CFO and Vice Chairman develop targets for the Company's incentive compensation programs and present them to the Compensation Committee. These targets are reviewed by the Compensation Committee to ensure alignment with the Company's strategic and annual operating plans, taking into account the targeted year-over-year improvement as well as identified opportunities and risks.

(Emphasis added).

**5. As Chairman of the Board, Defendant Nadal Could Influence Appointments to MDC's Audit and Compensation Committees**

144. As MDC's Chairman of the Board, as well as its CEO, Defendant Nadal had the ability to influence appointments to both MDC's Audit Committee and Compensation Committee. Indeed, pursuant to MDC's own Corporate Governance Guidelines, Nadal, as the Chairman of the Board, "will recommend committee assignments to the Nominating and Corporate Governance Committee" for review. "After review of the recommendations, the Nominating and Corporate Governance Committee will submit the proposed assignments to the full Board for approval. The Board will make committee assignments following the annual shareholders meeting."

**6. Defendant Nadal Was Personally Involved at the Highest Level Concerning MDC's Financial Accounting and Reporting**

145. As CEO, Defendant Nadal was heavily involved in MDC's financial reporting. As discussed herein, throughout the Class Period, Nadal signed each of MDC's SEC Forms 10-K and Definitive Proxy Statements filed during the Class Period. Further, in MDC's SEC Forms 10-K and 10-Q, Defendant Nadal certified that (1) he had reviewed the form; (2) "this report does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (3) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of MDC.

146. In addition, throughout the Class Period, Defendant Nadal personally announced MDC's financial results in MDC's press releases detailing the Company's quarterly earnings results and participated in subsequent earnings calls to discuss those results. Moreover, as alleged at ¶¶ 32 and 34, according to the whistleblower, CW 1, Defendant Nadal was directly involved in discussions of financial data regarding poorly performing MDC subsidiaries, as well as all of MDC's major financial decisions.

## C. Defendant Doft

### 1. Defendant Doft Engaged in Substantial and Suspicious Insider Trading

147. On November 5, 2013, Defendant Doft sold 128,205 of his MDC shares (47%) at the artificially inflated price of $31.28 per share, yielding more than $4 million in proceeds. Defendant Doft continued to dump his MDC shares before the truth regarding MDC's fraud was revealed to the market. On December 30, 2013, Defendant Doft sold 44,381 (20%) of his MDC shares at the artificially inflated price of $24.99, yielding more than $1,109,081.19. Defendant Doft sold again, on February 20, 2014, dumping 12,050 (6.9%) of his MDC shares at the artificially inflated price of $25.41, yielding $306,190.50. Doft then diposed of 3,087 (1.9%) of his MDC shares at the artificially inflated price of $25.42, yielding $78,471.54. In contrast, during the Pre-Class Period, Defendant Doft only sold 13,838 of his MDC shares (7% of the 193,883 shares that he sold during the Class Period). The following chart illustrates Defendant Doft's selling of MDC stock during both the Class Period and Pre-Class Period:

**Doft, David B. (Chief Financial Officer)**

| Security | Trade Date | Number of Shares | Price | Gross Proceeds | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| Class A Shares | 2/23/2015 | 3,087 | $ 25.42 | $ 78,471.54 | 156,119 |
| Class A Shares | 8/15/2014 | 2,913 | $ - | $ - | 159,206 |
| Class A Shares | 2/20/2014 | 12,050 | $ 25.41 | $ 306,190.50 | 161,119 |
| Class A Shares | 12/30/2013 | 44,381 | $ 24.99 | $ 1,109,081.19 | 172,761 |
| Class A Shares | 11/22/2013 | 3,247 | $ - | $ - | 167,519 |
| Class A Shares | 11/5/2013 | 128,205 | $ 31.28 | $ 4,010,252.40 | 144,761 |
| **CP Totals:** | | **193,883** | | **$ 5,503,995.63** | |
| Class A Shares | 5/8/2013 | 1,995 | $ - | $ - | 170,766 |
| Class A Shares | 2/14/2013 | 9,353 | $ 12.70 | $ 118,783.10 | 95,278 |
| Class A Shares | 5/11/2012 | 2,490 | $ - | $ - | 97,325 |
| **PCP Totals:** | | **13,838** | | **$ 118,783.10** | |

### 2. Defendant Doft Knew of or Was Reckless in Not Knowing Facts Indicating that Zyman's Goodwill Was Impaired

148. Defendant Doft personally provided CW 1 with subsidiary-level financial information, including Zyman's financial information and discussed those materials with CW 1 during his engagement with the Company. As described in the Whistleblower Complaint (as discussed at ¶¶ 48 – 51(c)), the MDC internal financial information and other nonpublic documents provided to CW 1 and known to Defendant Doft show that Zyman's operations had substantially declined following MDC's acquisition of Zyman in 2005 – and that Zyman had effectively ceased operations as of late 2010.

### 3. Defendant Doft Approved Nadal's Personal Expenses on Various Occasions

149. According to CW 2, Defendant Doft, on certain occasions, provided signatory approval of Nadal's entertainment and travel expenses for subsequent processing and reimbursement via wire transfer. In doing so, Defendant Doft would review and sign off on a "cover sheet" merely indicating the total amount of Nadal's expenses, but "not any of the details."

### 4. Defendant Doft's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA metric

150. Like Nadal, Defendant Doft had a clear motive to approve and encourage the use of MDC's highly misleading EBITDA metric, in the face of GAAP losses, because, throughout the Class Period, Defendant Doft's annual compensation was directly tied to MDC's EBITDA calculation. Indeed, MDC's 2014 and 2015 Proxy Statement clearly indicate that MDC's executive officer compensation was tied to EBITDA:

a) MDC's 2014 Proxy Statement states that "the Company's 2013 financial performance <u>of EBITDA ($159.4 million as reported) significantly exceeded the Company's baseline EBITDA target</u> of $118.4 million and stretch EBITDA target of $127.9. Further, <u>the Company's 2013 EBITDA margin increased 260 basis points to 13.9%, as compared to 11.3% in 2012 and 9.8% in 2011</u>. <u>This exceptional financial performance was the basis for the Compensation Committee's executive compensation decisions in 2013, rather than any discretionary factors</u>."

b) The 2015 Proxy Statement states that "[t]he Company's overall financial performance for 2014 significantly exceeded the financial targets established by the Compensation Committee. Specifically<u>, the Company's 2014 financial performance of Adjusted EBITDA ($179.4 million as reported) significantly exceeded the Company's baseline Adjusted EBITDA target of $171.1 million</u>. Further, the Company's <u>2014 Adjusted EBITDA margin increased 30 basis points to 14.7%, as compared to 14.4% in 2013 and 11.7% in 2012</u>. . . . <u>This exceptional financial performance was the basis for the Compensation Committee's executive compensation decisions in 2014, rather than any subjective factors</u>.

(Emphasis added).

151. MDC's 2014 and 2015 Proxy Statements make clear that, like Defendant Nadal, Defendant Doft had influence over MDC's annual EBITDA target that, in turn, determined his annual compensation.

### 5. As MDC's CFO, Doft Was Personally Involved in the Highest Levels of MDC's Financial Reporting

152. Throughout the Class Period, Defendant Doft signed each of MDC's Form 10-K and Definitive Proxy Statements filed during the Class Period. Further, in each of MDC's SEC Forms 10-K and 10-Q filed during the Class Period, Defendant Doft, like Defendant Nadal, certified that (1) he had reviewed the form; (2) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (3) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of MDC. Moreover, throughout the Class Period, Defendant Doft, along with Defendant Nadal, personally announced MDC's financial results in MDC's press releases detailing the Company's quarterly earnings results and EBITDA margins and participated in subsequent earnings calls to discuss those results.

153. Furthermore, according to CW1, Defendant Doft, like Defendant Nadal, oversaw MDC's financial accounting, including the accounting for goodwill, and was involved in all major financial decisions at the Company.

## D. Defendant Sabatino

### 1. Defendant Sabatino Engaged in Substantial and Suspicious Insider Trading

154. On November 5, 2013, Defendant Sabatino sold 128,205 of his MDC shares (42.4%) at the artificially inflated price of $31.28 per share, yielding more than $4 million in proceeds. Sabatino continued to dump his MDC shares on December 30, 2013, when he sold

56,798 of his MDC shares (21.7%) at the artificially inflated price of $24.99, yielding $1,419,382.02 in proceeds. On February 20, 2014 Sabatino sold 10,214 of his MDC shares (4.8%) at the artificially inflated price of $25.41, yielding $259,537.74 in proceeds. Sabatino then sold 2,118 (1.0%) of his MDC shares, on February 23, 2015, at the artificially inflated price of $25.42, yielding $53,839.56 in proceeds. In contrast, Sabatino sold a mere 15,411 of his MDC shares during the Pre-Class Period (7.8% of the 197,335 that he sold during the Class Period). The following chart illustrates Defendant Sabatino's insider trading during both the Class Period and Pre-Class Period:

**Sabatino, Michael C. (SVP & Chief Accounting Officer)**

| Security | Trade Date | Number of Shares | Price | Gross Proceeds | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| Class A Shares | 2/23/2015 | 2,118 | $ 25.42 | $ 53,839.56 | 208,096 |
| Class A Shares | 2/20/2014 | 10,214 | $ 25.41 | $ 259,537.74 | 200,214 |
| Class A Shares | 12/30/2013 | 56,798 | $ 24.99 | $ 1,419,382.02 | 204,778 |
| Class A Shares | 11/5/2013 | 128,205 | $ 31.28 | $ 4,010,252.40 | 174,384 |
| **CP Totals:** | | **197,335** | | **$ 5,743,011.72** | |
| Class A Shares | 2/14/2013 | 15,411 | $ 12.70 | $ 195,719.70 | 124,181 |
| **PCP Totals:** | | **15,411** | | **$ 195,719.70** | |

### 2. Defendant Sabatino Approved Nadal's Personal Expenses

155. According to CW 2, approximately 90% of the time, Defendant Sabatino provided signatory approval of Defendant Nadal's travel and entertainment expenses for subsequent processing and reimbursement via wire transfer. In doing so, Defendant Sabatino, like Defendant

Doft, would review and sign off on a "cover sheet" merely indicating the total amount of Defendant Nadal's expenses, but "not any of the details."

**3. Defendant Sabatino Was Reassigned and Subsequently Resigned Abruptly During the SEC Investigation and MDC's Own Internal Investigation**

156. On April 23, 2015, during the course of MDC's internal investigation, and while the SEC investigation of MDC was still in its earliest stages, Defendant Sabatino was relieved of his position as Chief Accounting Officer and reassigned to "work on special projects." Shortly thereafter, on July 20, 2015, Defendant Sabatino abruptly resigned from MDC and "agreed to repay the Company $208,535 in cash bonus payments received between 2012 and 2014."

**4. Defendant Sabatino's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA metric**

157. Like Defendants Nadal and Doft, Defendant Sabatino had a clear motive to approve and encourage the use of MDC's highly misleading EBITDA metric, in the face of GAAP losses because, throughout the Class Period, his compensation was tied to MDC's EBITDA calculation. Indeed, as described above, MDC's 2014 and 2015 Proxy Statements clearly indicate that MDC's executive officer compensation was tied to EBITDA.

**5. As Chief Accounting Officer, Sabatino Was Personally Involved in MDC's Financial Accounting and Reporting**

158. As MDC's Chief Accounting Officer, Sabatino was directly involved in MDC's financial accounting and reporting throughout the Class Period. Indeed, Sabatino signed each SEC Form 10-K, Definitive Proxy Statement, and Form 10-Q filed by MDC during the Class period. Moreover, according to CW 3, Sabatino rendered all final decisions over MDC's financial reporting, and, according to CW 1 was involved in all major financial decisions at the Company.

## E. Defendant Gendel

### 1. Defendant Gendel Engaged in Substantial and Suspicious Insider Trading

159. On November 5, 2013, Defendant Gendel sold 125,940 of his MDC shares (46.5%) at the artificially inflated price of $31.28 per share, yielding nearly $4 million in proceeds. On December 30, 2013, Gendel sold 61,044 (28.1%) of his MDC shares at the artificially inflated price of $24.99, yielding $1,525,489.56 in proceeds. Gendel continued selling his MDC stock, on February 20, 2014, dumping 13,051 (8.8%) of shares at the artificially inflated price of $25.41, yielding $331,625.91 in proceeds. Gendel then disposed of 3,425 (2.4%) of his MDC shares, on February 23, 2015, yielding $87,063.50 in proceeds. In contrast, Gendel sold a mere 17,801 of his MDC shares during the Pre-Class Period (8.4% of the 209,960 shares that he sold during the class period). The following chart illustrates Defendant Gendel's insider trading during both the Pre-Class Period and the Class Period:

**Gendel, Mitchell (Gen. Counsel & Corp. Secretary)**

| | Trade Date | Number of Shares | Price | Gross Proceeds | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| Class A Shares | 2/23/2015 | 3,425 | $ 25.42 | $ 87,063.50 | 138,668 |
| Class A Shares | 8/1/2014 | 6,500 | $ - | $ - | 142,093 |
| Class A Shares | 2/20/2014 | 13,051 | $ 25.41 | $ 331,625.91 | 147,593 |
| Class A Shares | 12/30/2013 | 61,044 | $ 24.99 | $ 1,525,489.56 | 155,894 |
| Class A | 11/5/2013 | 125,940 | $ 31.28 | $ 3,939,403.20 | 144,625 |
| **CP Totals:** | | **209,960** | | **$ 5,883,582.17** | |
| Class A | 10/21/2013 | 800 | $ - | $ - | 155,094 |
| Class A Shares | 2/14/2013 | 16,00 | $ 12.70 | $ 203,212.70 | 95,142 |
| Class A | 5/10/2012 | 1,000 | $ - | $ - | 103,966 |
| **PCP Totals:** | | **17,801** | | **$ 203,212.70** | |

#### 2. Defendant Gendel's Compensation Was Directly Tied to MDC's Highly Misleading EBITDA Metric

160. Like Defendants Nadal, Doft, and Sabatino, Defendant Gendel had a clear motive to approve and encourage the use of MDC's highly misleading EBITDA metric, in the face of GAAP losses, because, throughout the Class Period, Defendant Gendel's annual compensation was directly tied to MDC's EBITDA calculation. Indeed, as described above, MDC's 2014 and 2015 Proxy Statements clearly indicate that MDC's executive officer compensation was tied to EBITDA.

#### 3. Defendant Gendel Was Personally Involved in MDC's Financial Accounting and Reporting

161. Defendant Gendel was directly involved in MDC's financial accounting and reporting throughout the Class Period. Indeed, Defendant Gendel signed each SEC Form 10-K and Definitive Proxy Statement filed by MDC during the Class Period. Moreover, according to CW 1, Defendant Gendel, along with Defendants Nadal, Doft, and Sabatino, was involved in all major financial decisions at MDC.

### F. Defendant Kirby

#### 1. Defendant Kirby Engaged in Substantial and Suspicious Insider Trading

162. On November 5, 2013, Defendant Kirby sold 10,000 of his MDC shares (19.4%) at the artificially inflated price of $31.28 per share, yielding $312,800 in proceeds. This amounts to double the shares that he sold during the Pre-Class Period. The following chart illustrates Defendant Kirby's insider trading during both the Class Period and Pre-Class Period:

Kirby, Michael J. L. (Chairman of MDC's Audit Committee)

| Security | Trade Date | Number of Shares | Price | Gross Proceeds | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| Class A Shares | 11/5/2013 | 10,000 | $ 31.28 | $ 312,800.00 | 41,304 |
| **CP Totals:** | | **10,000** | | **$ 312,800.00** | |
| Restricted Stock Units (Class A Shares) | 11/9/2012 | 5,000 | $ 10.47 | $ 52,333.60 | 34,734 |
| **PCP Totals:** | | **5,000** | | **$ 52,333.60** | |

**2. As Chairman of MDC's Audit Committee, Defendant Kirby Had Broad Oversight of MDC's Accounting Policies, Financial Disclosures, Related Party Transactions, and Internal Controls**

163. According to MDC's Audit Committee Charter, which is attached as Exhibit A to MDC's annual Definitive Proxy Statement, the Audit Committee is required, among other things, to:

(1) "Review and approve the annual audit plan of the Corporation's independent auditor, including the audit and non-audit services that the auditor is providing for the Corporation and its subsidiaries, the level of responsibility assumed by the auditor under generally accepted auditing standards and a summary of the audit approach";

(2) "Review and discuss with management the quarterly financial statements. Discuss with the independent auditor the results of its procedures on the statements";

(3) "Prior to any disclosure, review and recommend to the Board for approval (i) the annual financial statements and related documents, (ii) the quarterly financial reports and related documents, and (iii) other disclosure documents containing financial information that would likely be material to either the quarterly or annual financial statements";

(4) "Review and recommend to the Board for approval all financial information of the Corporation contained in . . . any earnings press release to be issued in conjunction with the annual and quarterly results";

(5) "Annually or more frequently as required, discuss with management the types of financial and operational information and earnings guidance to be disclosed to analysts or shareholders";

(6) "Review with management and the independent auditor the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures," and "[r]eview with management its compliance with prescribed policies";

(7) "Review with management and the independent auditor any reportable conditions and material weaknesses affecting internal control";

(8) "Review with management major financial and asset related risks and the steps taken to monitor and control such risks";

(9) "Review and approve all related party transactions with any director or nominee, executive officer, holder of more than 5% of any class of the Corporations voting securities or any family member of the foregoing persons."

(Emphasis added).

164. MDC's 2014 and 2015 Proxy Statements further state that, "[i]n overseeing the preparation of MDC Partners' financial statements, the Audit Committee met with both management and MDC Partners' outside auditors to review and discuss all financial statements prior to their issuance and to discuss significant accounting issues." Moreover, in deposition testimony attached to the Whistleblower Complaint, Kirby testified that, during his tenure as an MDC board member and Chairman of the Audit Committee, he "approve[d] [both MDC's] Quarterly Statements and Yearly Statements"; "review[ed] them carefully; and sign[ed]-off on them as accurate and fair."

165. In light of the foregoing, at all relevant times, Defendant Kirby had broad and critical oversight responsibilities over MDC's financial disclosures in the aforementioned SEC Forms 10-K and 10-Q, quarterly earnings results, and related party transactions.

### 3. Defendant Kirby Recklessly Abdicated His Duties as Chairman of MDC's Audit Committee and Lacks the Requisite Expertise To Execute Those Duties

166. Despite the foregoing, Defendant Kirby recklessly abdicated his critical and broad-based financial oversight obligations. Specifically, in deposition testimony attached to the Whistleblower Complaint, Kirby admitted that, in reviewing MDC's SEC Forms 10-K and 10-Q described herein, he (1) had no idea whether MDC's outside auditors "reviewed and tested"

Zyman's goodwill or "propose[d] any adjustment" based on an impairment; and (2) "would rely totally on the outside auditors . . . on the audit questions," under "the assumption that [they were] treated appropriately because the accounting firm is a good accounting firm," instead of performing any independent analysis.

167. Furthermore, Defendant Kirby recklessly lacks the requisite financial expertise to serve on MDC's Audit Committee, much less serve as its Chairman. Indeed, in the aforementioned deposition testimony, Defendant Kirby admitted that:

a. He is unable to say whether he would be surprised or concerned if "MDC [were] carrying $65,000,000.00 of Goodwill" for "a business that exists no more" because he is "not an accountant."

b. He had "never looked at the cumulative total" of MDC's profits and losses over years.

c. He did not even have "a general idea" of MDC's "net gains or losses . . . over the past several years."

d. He had no idea and was surprised to hear that (i) "over the past 7 years MDC has lost $263,000,000.00"; (ii) MDC's "profits before taxes" were "negative 6 of the past 7 years; and getting increasingly worse from 2008 to 2012"; and (iii) MDC's "current liabilities exceed the current assets by approximately $200,000,000.00."

**4. As a Member of MDC's Human Resources & Compensation Committee, Defendant Kirby Was Reckless in Overseeing Nadal's and Other MDC Executives' Compensation**

168. Pursuant to MDC's 2014 and 2015 Proxy Statements, Defendant Kirby, as a member of MDC's Human Resources & Compensation Committee "makes recommendations to the Board on, among other things, the compensation of senior executives," including grants and awards under MDC's stock incentive plan. In addition "[s]alary, bonus or other payments for the benefit of senior management are reviewed and approved by the Human Resources & Compensation Committee." Consequently, having approved (1) millions of dollars in expense payments to Defendant Nadal; and (2) a highly misleading EBITDA metric to serve as a critical

component of MDC's executive compensation, Defendant Kirby was reckless in his duties as a member of MDC's Human Resources & Compensation Committee.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

169. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of MDC's stock and operated as a fraud or deceit on investors who purchased or acquired MDC's stock. As alleged herein, Defendants made materially false and misleading statements and omitted to disclose material information about MDC's executive compensation, related party transactions, Goodwill accounting, and EBITDA metrics. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of MDC's business, the value of its assets including goodwill, its internal controls, and its true financial condition, and therefore artificially inflated and maintained the price of MDC's common stock at levels that reflected investor confidence in the integrity of the Company. Were Defendants truthful about their deceitful campaign, MDC stock would have traded at a substantially lower price. Lead Plaintiffs and other Class members purchased MDC's stock at artificially inflated prices, causing them to suffer the damages complained of herein when the truth was revealed.

170. The truth about MDC's financial condition was revealed to the market after the market closed on April 27, 2015 and on April 28, 2015, when the Company disclosed that:

- The Company had been under formal investigation by the SEC, since October 5, 2014, concerning reimbursement of Defendant Nadal's expenses, the Company's accounting for goodwill, and certain other accounting practices;

- In response to the SEC's investigation, the Company's Board of Directors had formed a Special Committee of independent directors that conducted an extensive investigation of the perquisites and payments paid to, or on behalf of, Defendant Nadal, from 2009 through 2014;

- Following the Special Committee's review of Defendant Nadal's expenses, Nadal agreed to reimburse the Company $8.6 million for inappropriate perquisites and other payments owed to the Company;

- In 2014 alone, Nadal received more than $926,000 in "perquisites and reimbursed expenses" – nearly double the amount reported for this category in previous years—including (i) a $500,000 perquisite allowance; (ii) $263,000 in legal fees in connection with the May 2014 secondary offering of Nadal's personally held shares of MDC stock; (iii) more than $91,000 in personal use of Company aircraft; and (iv) nearly $72,000 for the use of a corporate apartment in New York City;

- The Company restated Nadal's perquisites and reimbursed expenses in FY 2013 and FY 2012 for use of the corporate apartment, increasing the 2013 total amount by $54,172 (to $554,172) and the 2012 total amount by $50,160 (to $608,503);

- The Company implemented a series of "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses," including adopting new policies on private aircraft usage and a new travel and entertainment policy, hiring two senior executives responsible for managing internal controls and compliance who will report to the Audit Committee and providing quarterly compliance reports to the Audit Committee;

- As a result of the SEC investigation – which was only at an "early stage" – the Company had incurred a staggering $5.8 million in legal fees and related expenses during just the first three months of 2015; and

- Defendant Sabatino was relieved of his duties as CAO and "transitioned to a new role in the company" in which he would work on "special projects."

171. Based on these disclosures, MDC shares fell $7.78 per share to close at $20.20 per share on April 28, 2015, a 27.8% decline from the prior day's closing price of $27.98 per share.

172. Financial reporters reacted harshly to this news. For example, *The Globe and Mail*, Canada's Newspaper of Record, published an article on the eve of April 28, 2015 stating that MDC's April 27, 2015 corrective disclosures are:

> <u>[T]he latest in a string of controversies linked to MDC's governance and the exorbitant pay for its chief executive and founder, who has never been shy about his opulent lifestyle</u> (his former 80-foot yacht, Dare to Dream, even had its own website). Two directors left the board in the early 2000s after raising concerns about his pay, which typically amounted to millions of dollars each year even as the company posted wildly uneven results and poor returns as it switched in and out of strategies.

***

> While Mr. Nadal and fellow directors promised a decade ago to clean up the company's corporate governance record, changes announced by the company this week stemming from the SEC investigation suggest internal controls have gone wanting.

(Emphasis added).

*The Globe and Mail* article further states that Nadal's total annual compensation, even when understated, made him "among the highest paid Canadian CEOs despite the fact his company earned $179-million in adjusted operating earnings on revenues of $1.2-billion last year," in contrast to peer companies that perform significantly better and whose CEOs are paid substantially less.

173. Similarly, an April 28, 2015 article in *The Wall Street Journal* notes that, while MDC is "a smaller player among the ad holding companies," Nadal's "base salary in 2014 was $1.85 million, higher than the base salaries of the chief executives of much bigger rivals Omnicom and Interpublic," and that, "[f]or 2014, MDC generated revenue of $1.22 billion and a loss of $24.1 million. In comparison, Omnicom posted revenue of $15.3 billion and a profit of roughly $1.1 billion for the year and Interpublic generated revenue of $7.5 billion and earnings of $477.1 million."

174. Major market financial analysts reacted similarly. For example, an April 27, 2015 Company Note issued by Jeffries states that the "SEC investigation is disappointing," and that "it will take time for investors to regain confidence in management." Likewise, Gabelli & Company issued an analyst report, on April 29, 2015, stating that the SEC investigation revealed "what appeared to be much weaker-than-needed corporate governance."

## X. CLASS ACTION ALLEGATIONS

175. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased MDC common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the Company's officers and directors, members of their immediate families and their legal representatives, heirs, successors and assigns, and any entity in which any of the Defendants have or had a controlling interest.

176. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the common stock of MDC was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MDC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

1. Whether the federal securities laws were violated by Defendants' acts as alleged herein;
2. Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of MDC;

3. Whether the Individual Defendants caused MDC to issue materially false and misleading statements during the Class Period;

4. Whether Defendants acted knowingly or recklessly in issuing materially false and misleading statements;

5. Whether the price of MDC common stock was artificially inflated during the Class Period; and

6. Whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

178. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

179. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

180. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

181. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

1. Defendants made misrepresentations and/or failed to disclose material facts during the Class Period;

2. MDC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

3. Defendants made available periodic reports about MDC's financial results and condition;

4. Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the press and other similar reporting services.

5. MDC was followed by securities analysts employed by major brokerage and financial firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of those reports was publicly available and entered the marketplace.

6. The materially false and misleading statements and material omissions alleged herein would tend to induce a reasonable investor to misjudge the value of MDC's securities; and

7. Lead Plaintiffs and members of the Class purchased their stock between the time that Defendants made the materially false and misleading statements and material omissions alleged herein and the time that the true facts were disclosed, without knowledge of any of the undisclosed or omitted facts.

182. Based upon the foregoing, Lead Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for MDC's stock.

183. Further, to the extent that Defendants concealed or improperly failed to disclose material facts regarding MDC and its subsidiaries, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

184. As a result of the foregoing, the market for MDC's stock promptly digested current information regarding MDC from all publicly available sources, and reflected such information in the price of MDC's stock. Under those circumstances, all purchasers of MDC's stock during the Class Period suffered similar injury through their purchases of MDC stock at artificially inflated prices, and a presumption of reliance applies.

## XI. NO SAFE HARBOR

185. The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false

or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of MDC who knew that those statements were false or misleading, or omitted necessary information when they were made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

186. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

188. During the Class Period, Defendants engaged in a plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did, throughout the Class Period, (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MDC securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire MDC securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

189. By virtue of their positions at MDC, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein

and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

190. Information showing that Defendants acted knowingly or with reckless disregard for the truth is also peculiarly within Defendants' knowledge and control. As the senior executives at MDC, the Individual Defendants had knowledge of the details of MDC's internal affairs.

191. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MDC. As senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MDC's businesses, operations, financial accounting, related party transactions, and executive compensation. As a result of the dissemination of the aforementioned materially false and misleading reports, press releases, and public statements, the market price for MDC's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning MDC's business and financial condition, related party transactions, and executive compensation, which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired MDC securities at artificially inflated prices and relied upon the price of the securities, the integrity

of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

192. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated, directly or indirectly, in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MDC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MDC's financial accounting, executive compensation, and related party transactions described herein.

193. During the Class Period, MDC securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MDC securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of MDC securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of MDC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and the Class members.

194. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

195. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading statements about MDC's executive compensation, related party transactions, and financial accounting to the investing public.

## COUNT II

### Violation of §20(a) of the Exchange Act Against the Individual Defendants

196. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

197. During the Class Period, the Individual Defendants participated in the operation and management of MDC, and conducted and participated, directly and indirectly, in the conduct of MDC's business affairs. Because of their senior positions and access to internal information about the Company, they knew the adverse non-public information regarding executive compensation, related party transactions, and financial accounting.

198. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MDC's executive compensation, related party transactions, and financial accounting, and to correct promptly any public statements issued by MDC that were or had become materially false or misleading.

199. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that MDC disseminated into the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MDC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MDC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of MDC securities.

200. Each of the Individual Defendants, therefore, acted as a controlling person of MDC. By reason of their senior management positions, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MDC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of MDC and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

201. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MDC.

## PRAYER FOR RELIEF

WHEREFORE**,** Lead Plaintiffs, on their own behalf and on behalf of the Class, demand judgment against Defendants as follows:

(a) Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as class representatives;

(b) Requiring Defendants to pay compensatory damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein

(c) Awarding Lead Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Lead Plaintiffs' attorneys and experts; and

(d) Granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

Dated: December 11, 2015

BERMAN DEVALERIO

/s/ Kathleen M. Donovan-Maher
Kathleen M. Donovan-Maher (*pro hac vice)*
Steven J. Buttacavoli (*pro hac vice*)
Steven L. Groopman (SG2482)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Fax: (617) 542-1194
Email: kdonovanmaher@bermandevalerio.com

Joseph J. Tabacco, Jr. (JJT-1994)
1 California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermandevalerio.com

ROBBINS GELLER RUDMAN & DOWD LLP

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs Plymouth County Retirement Association and North Collier Fire Control and Rescue District Firefighter Pension Plan.*