# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

No. 15 Civ. 6034 (RJS)

———————————

NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTER PENSION PLAN
AND PLYMOUTH COUNTY RETIREMENT ASSOCIATION,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

MDC PARTNERS, INC., MILES S. NADAL, DAVID B. DOFT,
MICHAEL C. SABATINO, MITCHELL GENDEL, AND MICHAEL J. L. KIRBY,

Defendants.

———————————

OPINION AND ORDER
September 30, 2016

———————————

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs North Collier Fire Control and Rescue District Firefighter Pension Plan ("North Collier Fire") and Plymouth County Retirement Association ("Plymouth County" and, collectively with North Collier Fire, "Plaintiffs") bring this putative class action lawsuit against MDC Partners, Inc. ("MDC") and four of MDC's current and former officers and directors. Plaintiffs allege that, throughout the period from October 28, 2013 through April 27, 2015 (the "Class Period"), MDC overstated goodwill associated with certain poorly performing or defunct subsidiaries; reported earnings using a misleading version of EBITDA (earnings before interest, taxes, depreciation, and amortization); failed to disclose all of the compensation paid to MDC's then-CEO, president, and chairman; and falsely reported that its internal controls over financial reporting were adequate. Plaintiffs assert that their reliance on these four categories of false or misleading statements caused injury to them and to all other persons who acquired MDC's Class A subordinate voting shares during the Class Period, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Now before the Court is Defendants' motion to dismiss Plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 54.) For the reasons set forth below, Defendants' motion is granted.

## I. Background[1]

### A.  The Parties

Plaintiffs North Collier Fire and Plymouth County are a public sector pension plan and a retirement association, respectively, that allege they purchased MDC stock during the Class Period and suffered damages as a result of false or misleading statements made by Defendants during the Class Period. (Compl. ¶¶ 23–24.)

Defendant MDC is a holding company incorporated under the laws of Canada and headquartered in New York, New York, that provides a range of marketing, activation, communications, and consulting services via its subsidiaries. (*Id.* ¶ 25.) After dropping out of college, Defendant Miles Nadal founded MDC in 1980 when he was twenty-two years old, using a $500 credit card advance. (*Id.* ¶ 3.) Though MDC began as a photography and marketing services business, it quickly became through a series of acquisitions in its first few years one of

Canada's largest printing companies, specializing in secure documents such as checks, airline and event tickets, and postage stamps. (*Id.*) In October 1987, MDC became a NASDAQ-traded public company, and by the late 1990s, Nadal had divested MDC's printing businesses and pivoted the company toward marketing, advertising, and public relations, while increasing MDC's presence in the United States. (*Id.*) After acquiring several advertising and public relations firms, MDC's breakthrough came in 2001, when it acquired a 49% stake in a prominent, Miami-based advertising firm. (*Id.*) The acquisition gave MDC a firm foothold in the advertising industry and launched MDC's "partnership" model, through which it typically purchases a less-than-100% interest in the agencies it acquires. (*Id.*) MDC continued to expand through acquisitions, growing from a collection of nineteen small-to-midsize marketing firms in 2004 to a network of fifty-one "agency partners" in 2015. (*Id.*) By 2015, MDC was one of the ten largest advertising agency holding companies in the world. (*Id.* ¶ 4.)

The remaining defendants (the "Individual Defendants") include current and former MDC senior officers and directors. Nadal was MDC's chairman, CEO, and president during the Class Period. (*Id.* ¶ 26.) Nadal led MDC until July 20, 2015, when he resigned amid an ongoing SEC investigation into MDC's reimbursement of certain of his expenses and into MDC's accounting practices. (*Id.*) Defendant Michael Sabatino was MDC's chief accounting officer from April 2005 through April 22, 2015. (*Id.* ¶ 28.) Effective April 23, 2015, Sabatino was reassigned to work on "special projects" at MDC. (*Id.*) On July 20, 2015, Sabatino resigned from MDC amid the aforementioned SEC investigation. (*Id.*) Defendant David Doft is MDC's current

---

[1] The Court takes the facts below from Plaintiffs' amended complaint (Doc. No. 46 ("Compl.")), statements or documents incorporated into the amended complaint by reference, legally required public disclosure documents filed with the SEC, and documents upon which Plaintiffs relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 55 ("Def. Mem.")), Plaintiffs' opposition (Doc. No. 57 ("Pl. Opp'n")), Defendants' reply (Doc. No. 59 ("Def. Reply")), and the declarations and exhibits submitted with those briefs.

chief financial officer and has held that position since August 2007. (*Id.* ¶ 27.) On April 23, 2015, following Sabatino's reassignment, Doft assumed the additional role of MDC's principal accounting officer. (*Id.*) Defendant Mitchell Gendel has served as MDC's general counsel and corporate secretary since November 2004. (*Id.* ¶ 29.) Defendant Michael Kirby joined MDC's board of directors on April 22, 2004 and, at all relevant times, served as chairman of the board's audit committee and as a member of the board's human resources and compensation committee and the board's nominating and corporate governance committee. (*Id.* ¶ 30.) On June 9, 2015, MDC announced that Kirby would retire from the MDC board on or before the expiration of his then-current term in June 2016. (*Id.*)

### B. The Alleged Fraud

Plaintiffs allege that, beginning on October 28, 2013 with the release of MDC's third quarter 2013 earnings and continuing throughout the Class Period, MDC (1) overstated goodwill associated with certain poorly performing or now-defunct subsidiaries, (2) reported earnings using a misleading version of EBITDA, (3) failed to report all compensation paid to Nadal, and (4) falsely reported that it maintained adequate internal controls over financial reporting. (*Id.* ¶¶ 2, 10–14.)

#### 1. Confidential Witness's SEC Whistleblower Complaint Against MDC

Plaintiffs largely base their amended complaint on assertions from a confidential Dodd-Frank whistleblower submission made to the SEC by a "confidential witness" ("CW 1") not named in Plaintiffs' pleading. (*See id.* ¶¶ 32–36 (describing CW 1); *id.* ¶¶ 40–56 (describing the whistleblower submission).) Plaintiffs allege that MDC

retained CW 1, a "former business associate[]" of Nadal's, in mid-2009 to perform consulting services in connection with certain underperforming MDC subsidiaries. (*Id.* ¶¶ 32–33.) In the summer of 2009, CW 1 reviewed nonpublic financial information from eight MDC subsidiaries, six of which had, between June 2008 and June 2009, accounted for combined losses of over $7 million on revenues of less than $30 million. (*Id.* ¶¶ 33–34.) Because these past losses were to serve as a baseline for determining CW 1's compensation, CW 1 discussed the losses with MDC management, including Nadal, Doft, Sabatino, and Gendel. (*Id.* ¶ 34.)

In July 2012, after his business relationship with MDC had ended, CW 1 filed a lawsuit against MDC regarding a dispute as to CW 1's compensation. *See KJ Roberts & Co. Inc. v. MDC Partners Inc.*, No. 12-cv-5779 (LGS), 2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014), *aff'd*, 605 F. App'x 6 (2d Cir. 2015). The lawsuit was dismissed on summary judgment. *Id.* Nevertheless, on or about February 26, 2014, shortly before the summary judgment decision was issued, CW 1 made his whistleblower submission to the SEC, attaching certain discovery from the litigation such as excerpts of deposition testimony from Nadal, Kirby, and the chief financial officer of one of MDC's subsidiaries. (Compl. ¶¶ 35, 51.) After the SEC contacted CW 1 for more information, CW 1 provided supplemental submissions on April 9, May 30, and July 1, 2014, and on June 3 and August 24, 2015. (*Id.* ¶ 35.) In general, CW 1's whistleblower submissions described MDC's alleged failure to properly account for goodwill (*id.* ¶¶ 47–53) and its alleged use of nonstandard metrics to report earnings to investors (*id.* ¶¶ 42–46).

### 2. MDC's Growing Goodwill

The primary focus of Plaintiffs' amended complaint is MDC's accounting for "goodwill," which is an intangible asset generated by the acquisition of a business for a price greater than the value of the business's net identifiable assets (e.g., cash, investments, buildings, equipment, inventory, accounts receivable, and certain identifiable intangible assets). (*Id.* ¶ 5.) As it grew through acquisitions, MDC recorded an increasingly large amount of goodwill, which rose steadily in the years leading up to the Class Period. For the years relevant here – 2010, 2011, 2012, and 2013 – MDC reported goodwill of $514.5 million, $605.2 million, $720.1 million, and $744.3 million, respectively. (*Id.*) During the Class Period, goodwill was MDC's single largest asset, constituting more than half of MDC's total assets. (*Id.*) In its annual report for 2014, MDC reported goodwill of nearly $851.4 million – approximately 52% of MDC's total assets of $1.649 billion (*id.*) – and for the first quarter of 2015, the last reporting period within the Class Period, MDC reported goodwill of $838.9 million (*id.* ¶ 63).

MDC's growing goodwill was the subject of comment letters from the SEC to MDC's chief financial officer, Doft, dated December 11, 2008, January 30, 2009, December 15, 2010, and November 27, 2012. (*Id.* ¶¶ 6–8.) Generally speaking, the SEC's letters sought, and Doft's responses provided, explanations of MDC's reasoning for its goodwill accounting in light of falling stock prices, worsening economic conditions, and (at least in the SEC's view) MDC's declining financial performance. (*Id.*) Plaintiffs assert that, because of this publicly filed correspondence between the SEC and MDC, "investors understood that proper accounting for goodwill was an especially significant and sensitive issue that

had material significance to [MDC's] financial condition and periodic financial results." (*Id.* ¶ 9.) Plaintiffs also assert that "Doft's responses and the apparent acceptance of MDC's representations by . . . the SEC led investors to believe that MDC was properly accounting for goodwill and related items and making proper and complete disclosures regarding the value of goodwill and any necessary impairment charges." (*Id.*)

Plaintiffs allege that, despite increased scrutiny from the SEC, MDC failed to record required goodwill impairments for "certain subsidiaries" reviewed by CW 1 that had performed poorly or ceased operations after MDC acquired them. (*Id.* ¶¶ 11, 33–34.) While the amended complaint refers broadly to accounting problems with "MDC's poor-performing subsidiaries" (*id.* ¶ 97), the only subsidiary it discusses with specificity is Zyman Group, a marketing and strategy consulting firm that MDC acquired in 2005 (*id.* ¶¶ 33, 68–76).[2] MDC acquired 61.6% of Zyman Group on April 1, 2005, for a total acquisition cost of $64.6 million, and agreed to pay an additional $12 million if Zyman Group achieved specific financial targets in 2006 and 2007. (*Id.* ¶ 68.) In connection with the transaction, for the second quarter of 2005, MDC recorded $45.4 million in goodwill related to Zyman Group. (*Id.*) Furthermore, MDC agreed to provide the sellers of Zyman Group with certain "earn-out" payments based on Zyman Group's financial performance over the first five years after the transaction. (*Id.* ¶ 69.) From these facts, Plaintiffs infer that, "for at least five years," MDC needed to "create stand-alone financials for Zyman [Group] to calculate the amount of earn-out payments," which in

---

[2] Plaintiffs' opposition brief similarly focuses on Zyman Group. (*See* Pl. Opp'n at 24–27.)

turn required MDC, under Generally Accepted Accounting Principles ("GAAP"), to conduct goodwill impairment testing at the Zyman Group level. (*Id.* ¶¶ 69–71.)

Plaintiffs allege that a number of factors arising in the years following MDC's acquisition of Zyman Group should have triggered a write-down of goodwill. First and foremost, Plaintiffs assert that, based on internal MDC documents reviewed by CW 1, Zyman Group's revenues dropped continuously following its acquisition by MDC, from $40 million in 2005 to approximately $300,000 as of 2014. (*Id.* ¶ 49.) Plaintiffs further allege that, as disclosed in MDC's annual reports for the years 2006 through 2009, Zyman Group never reached the revenue levels at which MDC would have made earn-out payments under the acquisition agreement. (*Id.* ¶¶ 72–73; *see also id.* ¶¶ 47–48 (CW 1's whistleblower complaint cited declining revenues as "a major reason for MDC's overstatement of goodwill").) Second, Plaintiffs allege that Zyman Group's founder and namesake, Sergio Zyman, whom Plaintiffs call "a legend in the advertising community," left the firm in 2008. (*Id.* ¶ 49.)[3] Third, Plaintiffs contend that at some point not specified in the amended complaint, a significant client terminated its relationship with Zyman Group. (*Id.* ¶ 51(a).) Fourth and finally, Plaintiffs allege that Zyman Group effectively ceased operations in late 2010. (*Id.* ¶¶ 50–51, 73.) The events culminating in the end of Zyman Group began in 2008 when, following Sergio Zyman's departure, MDC hired two executives from a company

called Core Strategy to become the CEO and vice chairman of Zyman Group. (*Id.* ¶ 50.) Around September 2009, MDC changed Zyman Group's name to "Core Strategy" and merged Core Strategy into another MDC subsidiary called KBS+. (*Id.*; *see also id.* ¶ 73 (noting that MDC's annual reports did not mention Zyman Group after 2009).) In late 2010, MDC terminated the Core Strategy executives, gave them the rights to use the "Core Strategy" name and any of Core Strategy's remaining clients, and wound down Core Strategy's operations, leaving the company formerly known as Zyman Group as "a husk without operations." (*Id.* ¶¶ 49–50.)

Nevertheless, "according to CW 1, Zyman Group's goodwill was 'still on the books in 2015.'" (*Id.* ¶ 73.) And according to Plaintiffs, $48.0 million in goodwill related to Zyman Group (comprising $45.4 million from the original acquisition and an additional $2.6 million from Zyman Group's acquisition of two other companies) "appears to remain on MDC's books" – an assumption Plaintiffs base on the fact that, although MDC recorded impairment charges in 2012, 2013, and 2014, it did not attribute any of those charges to a write-down of Zyman Group's goodwill. (*See id.* ¶¶ 73–76.)

### 3. Nadal's Growing Compensation

Plaintiffs also allege that, although MDC's revenue in the years leading up to the Class Period was lower than that of MDC's largest competitors, Nadal's compensation as CEO rivaled or exceeded CEO compensation at those companies. (*Id.* ¶ 4.) For 2011, MDC reported nearly $24 million of compensation for Nadal, as a result of which *Business Insider* ranked Nadal number two on a list of the "33 Richest People in Advertising, Ranked by Income." (*Id.*) In 2012, that total dropped

---

[3] Those outside of the advertising community may know Mr. Zyman best as the marketing executive behind New Coke. *See* Keith McArthur, *Man Who Authored New Coke Debacle Has No Regrets*, Globe & Mail, Apr. 18, 2005, http://fw.to/yTTpKgT (last visited Sept. 30, 2016).

to just over $9 million, but rose again in 2013 to over $20 million. *See* MDC Partners Inc., Definitive Proxy Statement at 25 (Sched. 14A) (Apr. 25, 2014) ("2014 Proxy"). Finally, for 2014, MDC reported $16.8 million in compensation for Nadal, which, according to a *New York Times* article, made Nadal the 109th highest-paid CEO in America across all industries. (Compl. ¶ 4.)

Notwithstanding the media's coverage of the significant compensation disclosed for Nadal, Plaintiffs assert that MDC failed to disclose "the true amount of compensation paid" to Nadal because its filings "omit[ted] amounts for Nadal's use of MDC's corporate aircraft and corporate apartment in New York City." (*Id.* ¶¶ 10, 120.) As in previous years, Nadal's $20,679,263 in disclosed compensation for 2013 included a category of compensation called "All Other Compensation," in the amount of $500,000. (*Id.* ¶ 118–19.) A footnote to the 2014 Proxy's "Summary Compensation Table" defined "All Other Compensation" to include "a $500,000 perquisite allowance in respect of retirement benefits and employee health benefits" and further provided that,

> [i]n addition to the amounts set forth in the table, on limited occasions, while Mr. Nadal is traveling on business, a member of his family has accompanied him on the corporate aircraft. There is no incremental cost to [MDC] for this use of the aircraft by Mr. Nadal's family member. For business purposes during travel from outside of New York City, Mr. Nadal and certain of [MDC]'s executive officers have the use of a corporate apartment located near [MDC]'s offices in New York City. Mr. Nadal personally paid for all furnishings in this corporate apartment, and also pays for 50% of

the leasehold cost. [MDC] believes that such arrangement is more cost effective than the alternative costs of a hotel in New York City.

(*Id.* ¶ 119 (emphasis altered).) As the italicized language above indicates, Nadal received some compensation or benefit beyond the reported $500,000, but the 2014 Proxy did not specify the amount of that compensation or benefit. MDC's definitive proxy statement the following year would disclose the specific amount: $54,172. (*Id.* ¶ 124.)

Plaintiffs also generally allege that MDC failed to disclose "the fact that Nadal received millions of dollars in inappropriately reimbursed personal expenses, above and beyond" his reported compensation. (*Id.* ¶ 10.) As discussed further below, Plaintiffs base this allegation on MDC's disclosures at the end of the Class Period and in the ensuing months that Nadal had agreed to repay approximately $10.5 million of expense reimbursements that MDC had paid to him improperly over the period from 2009 through 2014. (*Id.* ¶¶ 13, 17, 121(a)–(b), 129, 138.)

## C. MDC Discloses SEC Investigation and Formation of Special Committee

At the end of the Class Period, after the markets had closed on April 27, 2015, MDC issued its first quarter 2015 earnings release, which disclosed, among other things, that since October 2014, MDC had been cooperating with an SEC investigation into Nadal's expense reimbursements and MDC's accounting practices. (*Id.* ¶ 121.) Plaintiffs allege that the following statements from that earnings release "stunned the market" and "reveal[ed] the truth" about MDC's alleged fraudulent scheme (*id.* ¶ 13):

- "[S]ince October 5, 2014, [MDC] has been actively cooperating with the production of documents for review by the [SEC] pursuant to a [s]ubpoena.  In connection with this production of documents, [MDC] formed a [s]pecial [c]ommittee of independent directors to review certain matters relating to the reimbursement of expenses incurred by the CEO [Nadal]."

- "The [s]pecial [c]ommittee completed an extensive review of perquisites and payments made by [MDC] to or on behalf of Miles Nadal and Nadal Management Limited [a company wholly owned by Nadal] during the six-year period from 2009 through 2014.  The review included a detailed analysis of the available back-up documentation supporting such payments, as well as consideration of [a] [m]anagement [s]ervices [a]greement among Mr. Nadal, Nadal Management Limited and [MDC] and certain historical practices.  These payments included, among other things, travel and commutation expenses, charitable donations, medical expenses, and certain expenses for which the information was incomplete."

- "Following the review, Mr. Nadal agreed to reimburse [MDC] for perquisites and payments for which [MDC] sought reimbursement, in the aggregate amount of $8.6 million."

- "In addition to this reimbursement, the [s]pecial [c]ommittee recommended, the [a]udit [c]ommittee has adopted, and [MDC] has adopted and implemented, a series of remedial steps to improve and strengthen [MDC]'s internal controls and procedures regarding travel, entertainment and related expenses."

- "The [s]ubpoena received from the SEC also requested production of documents relating to [MDC]'s goodwill and certain other accounting practices, as well as information relating to trading in [MDC]'s securities by third parties. [MDC] has been fully cooperating with the SEC and believes that the inquiries are at an early stage."

- "Effective as of April 23, 2015, [MDC]'s prior [c]hief [a]ccounting [o]fficer, Michael Sabatino, transitioned to a new role in [MDC], in which he will work on special projects."

(*Id.* ¶ 121 (emphasis removed).)

The next day, on April 28, 2015, MDC filed its definitive proxy statement for 2015, which disclosed $16,832,355 of compensation for Nadal in 2014.  Definitive Proxy Statement at 27 (Sched. 14A) (Apr. 28, 2015) ("2015 Proxy").  In addition, like the 2014 Proxy, the 2015 Proxy included a category of compensation for Nadal called "All Other Compensation," this time in the amount of $926,005.  *See id.* at 28.  Unlike the 2014 Proxy, however, the 2015 Proxy included a table breaking down "All Other Compensation," which included a sub-category of compensation called "Other Perquisites." *Id.*  And while the 2015 Proxy, like the 2014 Proxy, disclosed that MDC had paid for "50% of the lease and 100% of the utilities, local phone charges, cable and internet charges" of the New York City apartment, *id.* at 28; (*cf.* Compl. ¶ 119 ("Mr. Nadal personally paid for . . . 50% of the leasehold cost" of the apartment)), the 2015

Proxy departed from the 2014 Proxy and disclosed the specific amount of these expenses – $71,967, 2015 Proxy at 28. The 2015 Proxy further disclosed the specific amounts of the New York City apartment expenses for 2013 and 2012: $54,172 and $50,160, respectively. *Id.* MDC had not previously disclosed these amounts (Compl. ¶ 124) – it had only generally disclosed MDC's splitting of the New York City apartment leasehold cost with Nadal. These newly disclosed amounts raised Nadal's "All Other Compensation" from $500,000 to $554,172 for 2013 and from $558,343 to $608,503 for 2012. (*Id.* ¶ 14.)

Following these disclosures at the end of the Class Period, MDC's stock price fell from $27.98 per share on April 27, 2015 to a closing price of $20.20 per share on April 28, 2015 – a drop of $7.78 per share or 27.8%. (*Id.* ¶ 127.)

### D.  Post–Class Period Resignations and Additional Repayment of Reimbursements

Plaintiffs also rely on certain post–Class Period disclosures as "evidenc[e] [of] Defendants' fraud." (*Id.* at 61 (capitalization removed).) In a press release issued July 9, 2015, MDC announced that two of its management directors, Stephen Pustil and Lori Senecal, had resigned from MDC's board, and that two of MDC's outside, non-management directors – Audit Committee Chairman Michael Kirby (who is a defendant) and Clare Copeland (who is not) – would retire from the MDC board on or before the expiration of their current terms, which ended in June 2016. (*Id.* ¶ 16.)

In a press release issued two weeks later, on July 20, 2015, MDC announced that Nadal had resigned as CEO and as chairman of the board of directors. (*Id.* ¶ 129.) That press release also disclosed that, in connection with the SEC's ongoing investigation, Nadal had agreed to repay an additional $1.88 million in inappropriately reimbursed expenses (bringing the total to approximately $10.5 million). (*Id.*) Moreover, the press release explained that Nadal was "required under [MDC's] [i]ncentive-/[r]etention agreements to repay $10.58 million in retention amounts received between 2012 and 2015." (*Id.*) Finally, the July 20 press release announced that Sabatino, who in April 2015 had transitioned from chief accounting officer to a "new role" at MDC working on "special projects" (*id.* ¶ 121 (emphasis removed)), had resigned and "agreed to repay [MDC] $208,535 in cash bonus payments received between 2012 and 2014" (*id.* ¶ 130).

### E.  Procedural History

North Collier Fire initiated this action by filing a complaint on July 31, 2015. (Doc. No. 1.) On October 6, 2015, the Court issued an order appointing North Collier Fire and Plymouth County as lead plaintiffs and the law firms Robbins Geller Rudman & Dowd LLP and Berman DeValerio as co-lead counsel. (Doc. No. 33.)

Plaintiffs filed the operative, amended complaint on December 15, 2015. (Doc. No. 46.) Like the initial complaint, the amended complaint asserts violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants (Count I) and a violation of Section 20(a) of the Exchange Act against the Individual Defendants (Count II). The amended complaint alleges that, in various filings with the SEC during the Class period, Defendants misled investors by (1) overstating MDC's goodwill, particularly by failing to record a goodwill impairment for Zyman Group, (2) claiming to monitor MDC's financial performance using EBITDA, when in fact they used a misleadingly modified version of EBITDA,

(3) underreporting Nadal's compensation, and (4) reporting that MDC maintained adequate internal financial controls, despite MDC's inappropriate reimbursement of $10.5 million of Nadal's expenses. Plaintiffs allege that these misrepresentations were "revealed" on April 27 and 28, 2015, when MDC disclosed, among other things, Nadal's repayment of certain expense reimbursements and an ongoing SEC investigation into that subject and MDC's goodwill accounting.

On February 9, 2016, Defendants filed a motion to dismiss Plaintiffs' amended complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 54), on the grounds that Plaintiffs have failed to plead any material misstatements or omissions, failed to plead scienter, failed to plead loss causation, and relied inappropriately on confidential witnesses and a confidential whistleblower submission to the SEC (Doc. No. 55). The motion was fully briefed as of May 9, 2016. (Doc. No. 59.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98. Specifically, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

Moreover, securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). *ATSI Commc'ns*, 493 F.3d at 99. To satisfy Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99. And to satisfy the PSLRA, Plaintiffs must "'specify' each misleading statement," "set forth the facts 'on which [a] belief' that a statement is misleading was 'formed,'" and "'state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (emphasis added) (quoting 15 U.S.C. § 78u-4(b)).

A "strong" inference is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This standard thus requires courts to "consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from

all the facts alleged, taken collectively." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Tellabs*). Accordingly, while courts "'normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving'" a defendant's state of mind. *Id.* at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

### III. DISCUSSION

### A. Alleged Violations of Exchange Act Section 10(b) and SEC Rule 10b-5

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 304–05 (2d Cir. 2015) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b-5 implements this provision of the Exchange Act and explicitly prohibits 'mak[ing] any untrue statement of a material fact'" in connection with the purchase or sale of a security. *Id.* at 305 (quoting 17 C.F.R. § 240.10b-5(b)). "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105. Defendants here argue that, in the first instance, Plaintiffs' allegations based on CW 1's

whistleblower submissions must be categorically rejected, and that in any event Plaintiffs have failed to plead a material misstatement or omission, scienter, and loss causation.

With respect to CW 1's allegations, the Court rejects Defendants' argument that it cannot consider them. (Def. Mem. at 43.) While it is true that courts generally do not consider averments "taken directly from uncorroborated allegations embedded in a complaint in another action" or "parroted allegations for which counsel has not conducted independent investigation," *see In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), here Plaintiffs allege that CW 1 contacted their counsel after the initial complaint was filed, and that CW 1 shared information from his whistleblower submissions and other information based on his knowledge of MDC (Compl. ¶ 36). Plaintiffs' reliance on a confidential witness with whom they personally communicated is distinguishable from a lawyer's cribbing "uncorroborated allegations" that he makes no effort to verify from a "complaint in another action." *UBS AG*, 2012 WL 4471265, at *17 n.17.

Nevertheless, even accepting the confidential witness allegations contained in the amended complaint, the Court still finds as discussed below, that Plaintiffs have failed to plead a material misstatement or omission and failed to plead scienter. Because dismissal is appropriate on either of these grounds, the Court need not address Defendants' remaining argument that Plaintiffs have failed to plead loss causation.

1.  Material Misstatement or Omission

Under the PSLRA, a plaintiff "must, at the pleading stage, 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,'" the plaintiff must plead "'with particularity all facts on which that belief is formed.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235–36 (2d Cir. 2014) (quoting 15 U.S.C. § 78u-4(b)(1)). "Thus, plaintiffs asserting claims under Rule 10b-5 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Id.* at 236 (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). Moreover, a misstatement is not actionable unless it was false at the time it was made. *See In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("[A]t the time these statements were made they were neither false nor misleading."); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs allege no circumstances to support their allegation that the allegedly false statements . . . were false at the time made.").

With respect to omissions, they are only actionable under Section 10(b) if "the defendant [is] . . . subject to an underlying duty to disclose." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)); *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) ("'[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.'" (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011))). A duty to disclose "may arise when there is [1] a corporate insider trading on confidential information, [2] a statute or regulation requiring disclosure, or [3] a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (brackets and internal quotation marks omitted). Accordingly, "'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5,'" *id.* at 100–01 (quoting *Basic*, 485 U.S. at 239 n.17), and "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor," *Kleinman*, 706 F.3d at 152–53.

Finally, any misstatement or omission must be "material," which requires the court to "engage in a fact-specific inquiry." *ECA*, 553 F.3d at 197. "The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *Id.* (internal quotation marks omitted) (quoting *Basic*, 485 U.S. at 240, and *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (internal quotation marks omitted) (quoting *Basic* and *TSC Industries*). "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed" on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted).

The Court now turns to the alleged misstatements.

a. MDC's Reporting of Goodwill

Plaintiffs allege that MDC materially overstated the value of its goodwill in the quarterly earnings releases (*id.* ¶¶ 97–98), quarterly reports (*id.* ¶ 108(a)–(c)), and annual reports (*id.* ¶ 117(a)–(c)) it filed with the SEC during the Class Period. As explained above, Plaintiffs focus on MDC's alleged failure to write down the $48.0 million in goodwill associated with Zyman Group, which MDC acquired in April 2005. (*Id.* ¶¶ 33, 68–76). Plaintiffs allege that, although Zyman Group performed poorly from 2005 through 2009 before ceasing operations in 2010 (*id.* ¶¶ 49–51, 73), MDC never wrote down the $48.0 million in goodwill associated with the Zyman Group acquisition and thereby overstated its goodwill balance and earnings during its Class Period financial disclosures in violation of GAAP (Generally Accepted Accounting Principles) (*id.* ¶¶ 73, 75, 97–98, 108(a)–(c), 117(a)–(c)). Importantly, Plaintiffs challenge the *overall* goodwill balances MDC reported during the Class Period, which ranged from $711.3 million to $928.2 million (*id.* ¶ 97) – not a specific amount reported for Zyman Group.[4]

---

[4] Plaintiffs' opposition brief argues for the first time that MDC misrepresented how it tests its goodwill for potential impairments, since "Nadal admitted in sworn deposition testimony that MDC did not perform its goodwill impairment testing," but rather "[MDC's] outside auditor did." (Pl. Opp'n at 28 (citing Compl. ¶ 51(a)).) The Court questions what inference of fraud could possibly be drawn from a company's general statement that it tests its goodwill for impairment and its subsequent delegation of such testing to an outside, independent auditor – at least in the absence of an allegation that the company withheld information from the auditor. In any event, the theory appears nowhere in the amended complaint, and the Court accordingly disregards it. *See Kleinman*, 706 F.3d at 153 ("a party may not

"It is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.'" *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("Because . . . 'GAAP is not a lucid or encyclopedic set of pre-existing rules . . . and is far from a single-source accounting rulebook,' reasonable disagreements and deference to business judgment [are] permissible." (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995)). Thus, the law in the Second Circuit is clear that "[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," and "[o]nly where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *ECA*, 553 F.3d at 200; *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("accounting irregularities and overly optimistic disclosures, by themselves, . . . amount to allegations of 'fraud by hindsight,' which th[e] [Second Circuit] has rejected as a basis for a securities fraud complaint" (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978))).

Plaintiffs' assertion that MDC's Class Period goodwill balance reflected $48.0 million from Zyman Group is based on two allegations. The first is CW 1's assertion that "Zyman Group's goodwill was 'still on the books in 2015.'" (Compl. ¶ 73.) But

---

amend pleadings through a brief" (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998))).

according to Plaintiffs, CW 1 worked with MDC in 2009 (*id.* ¶¶ 32–33), and though CW 1 may know how MDC accounted for Zyman Group or other subsidiaries in 2009, nothing in the amended complaint suggests that CW 1 possessed similar knowledge with respect to MDC's Class Period financials and whether Zyman Group was "still on the books in 2015," years after CW 1's relationship with MDC had terminated and ended in litigation.   A securities fraud complaint may rely on information from confidential witnesses only if "'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"   *Blanford*, 794 F.3d at 305 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).   CW 1's alleged assertion regarding nonpublic information that postdates his tenure at MDC by a number of years falls well short of that requirement.   *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580–81 (S.D.N.Y. 2014) (confidential witness's allegations regarding product testing in the spring of 2012 rejected because they "sa[id] nothing about" what testing the company was conducting in March 2013), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 142 (D. Conn. 2007) ("substantial" information from confidential witnesses who were never employed at defendant company or employed there before the start of the class period was "inadequate substantively to support an inference of scienter"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).   Thus, CW 1's statement does not establish the misreporting of MDC's goodwill.

The second basis for the allegation that MDC never wrote down its Zyman-related goodwill is Plaintiffs' assertion, independent of CW 1's similar contention, that that goodwill "appears to remain on MDC's books" (Compl. ¶ 73), a conclusion Plaintiffs seemingly base on the fact that MDC never specifically disclosed an impairment related to Zyman Group, and Plaintiffs were unable to deduce whether the impairment charges that MDC *did* take in 2012, 2013, and 2014 were related to Zyman Group.   (*See id.* ¶¶ 74–76.)   To begin with, Plaintiffs may not simply speculate that wrongdoing occurred based on their inability to discern whether any of the impairment charges MDC took were associated with Zyman Group.   *See Harris*, 135 F. Supp. 3d at 171 ("The fact that [l]ead [p]laintiff c[ould not] tick and tie the loss and loss adjustment expense reported in [defendant's] consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, d[id] not plausibly allege a misstatement.").   Moreover, Plaintiffs' conclusion ignores the fact that MDC merged Zyman Group into another MDC subsidiary in 2009 (*see* Compl. ¶¶ 49–50) and had not referenced Zyman Group in its financial statements for several years before the Class Period even began (*see id.* ¶ 73). And although Plaintiffs conclude that, because MDC owed earn-out payments to the previous owners of Zyman Group for "at least five years" following the 2005 acquisition (*id.* ¶ 69), MDC was therefore required to perform goodwill impairment testing at the Zyman Group level (*id.* ¶ 70–71), Plaintiffs fail to explain how that held true after Zyman Group became Core Strategy and merged with KBS+ in 2009 (*id.* ¶¶ 49–50), let alone held true through the Class Period.

In addition to these two allegations, Plaintiffs assert in a footnote in their opposition brief that, "in sworn deposition testimony, Defendants Nadal and Kirby confirmed that MDC never took a goodwill impairment on account of Zyman[ Group]'s decline."   (Pl. Opp'n at 25 (citing Compl.

13

¶ 51(a)–(b)).)      Plaintiffs' assertion mischaracterizes the amended complaint, which merely alleges that Nadal and Kirby testified that they did not know whether MDC had written down the goodwill associated with Zyman Group. (*See* Compl. ¶ 51(a)–(b).)   Accordingly, the amended complaint provides no basis for inferring that MDC's Class Period goodwill balance included $48.0 million from Zyman Group.

Moreover, even if the amended complaint did permit that inference, it is well-settled in the Second Circuit that goodwill estimates are opinion statements because they "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact" and "will vary depending on the particular methodology and assumptions used." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011), *modified on other grounds*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *see also Harris*, 135 F. Supp. 3d at 173 ("[A]ctuarial or accounting assumptions . . . are, by definition, not statements of fact." (citing *Fait*)).[5]   For a statement of belief or

opinion to be actionable under Section 10(b), a plaintiff must allege that (1) "'the speaker did not hold the belief she professed,'" (2) "'the supporting fact[s] she supplied were untrue,'" or (3) the stated opinion, "though sincerely held and otherwise true as a matter of fact," "omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1327).  If a plaintiff alleges falsity on the third ground, he "'must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'"  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332).   "[M]eeting the standard under *Omnicare* 'is no small task for an investor,'" since reasonable investors – although they rightly do not expect opinions stated in filings with the SEC "'to reflect baseless, off-the-cuff judgments'" – "'understand that opinions sometimes rest on a weighing of competing facts,'" "'do[] not expect that *every* fact known to an issuer supports its opinion statement,'" "'read[] each statement within [an SEC filing] . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information,'" and "'take[] into account the

---

[5] Plaintiffs cite *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012), and *City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co.*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009), for the proposition that the goodwill balances MDC reported were not opinion statements, but rather misstatements of fact because "Defendants did nothing at all to determine whether MDC's goodwill was impaired and failed to take any necessary impairment charges." (Pl. Opp'n at 28.)  But those cases provide no support for Plaintiffs' assertion. Rather, *CBS* held that, "even if" plaintiffs had pled "that defendants were aware of facts that should have led them to begin" testing goodwill "earlier," plaintiffs would still have to meet the pleading standard for opinion statements.  *CBS*, 679 F.3d at 68. And *Vodafone* simply observed that, "if pleaded with particularity and based on allegations that a defendant disregarded clear and unmistakable loss,

the failure to take impairment charges may provide a viable basis for a securities fraud claim." *Vodafone*, 655 F. Supp. 2d at 269.  *Vodafone* was decided before the Second Circuit held in *Fait* that goodwill estimates are opinion statements; regardless, the allegations *Vodafone* describes presumably would satisfy both the Second Circuit's standard for recklessness, *see Novak*, 216 F.3d at 308 (recklessness includes "fail[ing] to review or check information that [defendants] had a duty to monitor, or ignor[ing] obvious signs of fraud"), and the standard for false opinion statements set forth below.

customs and practices of the relevant industry.'" *Id.* at 210 (quoting *Omnicare*, 135 S. Ct. at 1328, 1329, 1330, 1332). Accordingly, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

The amended complaint does not satisfy these pleading requirements. Plaintiffs' assertion that MDC failed to record a "necessary" $48.0 million goodwill impairment for Zyman Group (Compl. ¶¶ 97, 108(a), 117(a)) after Zyman Group's revenues declined or fell below targets (*id.* ¶¶ 47, 49, 72–73) and Sergio Zyman and one of the firm's significant clients departed (*id.* ¶¶ 49, 51(a)) alleges nothing more than disagreement with MDC's accounting judgments, which cannot support a fraud claim. *See Harris*, 135 F. Supp. 3d at 172 ("In the absence of a restatement or allegations pointing to objective facts that [d]efendants' accounting methods violated GAAP, carping about [d]efendants' application of GAAP amounts . . . d[id] not permit the [c]ourt to infer that the [d]efendants committed accounting fraud."); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) (declining to "intervene in a business and accounting judgment simply because . . . accountants reached different conclusions" about how defendant should have exercised its judgment), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *Can. Imperial Bank*, 694 F. Supp. 2d at 303 ("allegations regarding [a company's] write-downs amount[ed] to fundamental disagreements with [d]efendants' business judgments in a

tumultuous economic downturn – claims that are not actionable under Section 10(b) and Rule 10b-5").

Plaintiffs also allege that MDC was required to write down goodwill "related to MDC's [other] poor-performing subsidiaries" (Compl. ¶¶ 97, 108(a), 117(a)), but the amended complaint offers nothing but Plaintiffs' own, generalized opinion as to why an impairment was "necessary." (*See, e.g., id.* ¶ 63 (alleging that MDC experienced "persistent net losses[] from the end of 2009 through Q1 2015," yet reported growing goodwill balances over that period); *id.* ¶ 67 (arguing that, "[b]ecause MDC has operated at current and historical net losses, it is not plausible to use an honest DCF [discounted cash flow] analysis or similar method to arrive at a large enough valuation to support [MDC's] growing goodwill balance and failure to record any goodwill impairments during the Class Period").) To these assertions, Plaintiffs add those of a third confidential witness, whom Plaintiffs describe as an "accounting manager" who worked two reporting levels below Sabatino over a year before the Class Period began, and who "did not personally work on goodwill accounting because it was reserved for 'higher level' personnel," but "is aware" that Sabatino, Nadal, and Doft "worked on," "oversaw," or "confirmed and approved" MDC's goodwill calculations. (*Id.* ¶¶ 38–39.) Such allegations do not approach those necessary to plead the falsity of an opinion under *Omnicare* and *Tongue*, much less suggest securities fraud. Accordingly, Plaintiffs have failed to plead that Defendants' made any false or misleading statements in connection with MDC's goodwill reporting.

b.  MDC's Use of the Term "EBITDA"

Plaintiffs next allege that MDC's Forms 10-Q filed during the Class Period

misleadingly stated that MDC's management monitored MDC's "'financial performance and financial condition'" using "*industry standard* 'EBITDA,' which the Class Period 10-Qs specifically define as 'earnings before interest, income taxes and depreciation and amortization.'" (*Id.* ¶ 107 (emphasis added).)[6] While Plaintiffs acknowledge that the 10-Qs themselves did not report any earnings results using EBITDA (*id.* ¶ 12), they argue that the 10-Qs nevertheless misled investors because the EBITDA metric reported in MDC's quarterly earnings releases "d[id] not comport with the industry standard definition referenced in the Class Period 10-Qs" (*id.* ¶ 108(e)). (*See also id.* ¶ 12 ("Investors were misled" because the "highly modified" version of EBITDA reported in MDC's earnings releases did not match "the industry standard definition . . . touted in [MDC's] Forms 10-Q.").)

Specifically, relying on CW 1's whistleblower complaint, Plaintiffs allege that the "EBITDA" reported in MDC's earnings releases "actually meant 'operating income (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments and profit distributions from affiliates.'" (*Id.* ¶ 44.) This was a problem, CW 1 and Plaintiffs say, because the calculation should have started with "GAAP net income," not "operating income," and because the adjustments MDC applied were "seemingly arbitrary." (*Id.*) Since these adjustments "were so extensive," and the resulting definition of EBITDA so "heavily

manipulated," "constantly changing," "nonstandard," and "tortured," Plaintiffs argue that "the common term EBITDA should not have been used in [MDC's] public filings." (*Id.* ¶¶ 12, 45, 81, 82.)

However, Plaintiffs' ambitious claims in this regard ignore what MDC actually disclosed. To begin with, the challenged statements from MDC's 10-Qs read as follows: "MDC manages the business by monitoring several financial and non-financial performance indicators. The key indicators that we review focus on the areas of revenues and operating expenses, which results in earnings before interest, income taxes and depreciation and amortization ('EBITDA') and capital expenditures." *See, e.g.*, Quarterly Report at 28 (Form 10-Q) (Nov. 5, 2013). These sentences neither "tout" (nor use) the phrase "industry standard," nor do they contain actual financial disclosures, and Plaintiffs allege no facts suggesting that MDC management did not actually monitor the company's revenues and operating expenses such that the general statements above would have been untrue.

Plaintiffs nevertheless argue that these sentences in the 10-Qs led investors to believe that MDC's Class-Period earnings releases, which actually did report "EBITDA" results, followed an "industry standard" definition of that term, when in fact the earnings releases employed a "highly modified definition of EBITDA." (Compl. ¶ 12.) But this assertion also ignores MDC's filings, since the earnings releases specifically explained how MDC had calculated the "EBITDA" amounts reported in those releases. *See* Current Report Ex. 99.1, scheds. 2–3 (Form 8-K) (Oct. 28, 2013); Current Report Ex. 99.1, scheds. 2–3 (Form 8-K) (Feb. 20, 2014); Current Report Ex. 99.1, scheds. 2–5 (Form 8-K) (July 24, 2014); Current Report Ex.

---

[6] These include MDC's Forms 10-Q for the third quarter of 2013, filed November 5, 2013; the first quarter of 2014, filed April 29, 2014; the second quarter of 2014, filed August 11, 2014; and the third quarter of 2014, filed November 6, 2014. (Compl. ¶¶ 99–102.)

99.1, scheds. 2–5 (Form 8-K) (Oct. 29, 2014); Current Report Ex. 99.1, scheds. 2–5 (Form 8-K) (Feb. 23, 2015). In addition, under a section titled "Non-GAAP Financial Measures," MDC explained that it "has included in this earnings release certain financial results that the [SEC] defines as 'non-GAAP financial measures,'" which "[m]anagement believes . . . can provide useful supplemental information for investors" analyzing MDC's results when the non-GAAP numbers are "read in conjunction with [MDC's] reported results." *See, e.g.*, Current Report Ex. 99.1 (Form 8-K) (Oct. 28, 2013). The releases note that the non-GAAP numbers include "EBITDA and EBITDA margin (*as defined*)." *See, e.g.*, *id.* (emphasis added). No reasonable investor would ignore these definitions, much less assume that the reported EBITDA is governed by a definition set forth in a generic statement in another document, as Plaintiffs suggest.

Plaintiffs separately argue that MDC misled investors by changing its "nonstandard" calculation of EBITDA from quarter to quarter. (Compl. ¶¶ 45, 89.) But this argument also misses the mark. EBITDA is a non-GAAP metric "for which there is no 'right' formula because, unlike GAAP metrics, they have no uniform definition." *Ironworkers Local 580 – Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014). The fact that a plaintiff may "take issue with the way [a company] ch[ooses] to calculate these metrics . . . is of no moment," because "[i]t is not fraudulent for a reporting entity to calculate metrics that," like EBITDA, "are not defined under GAAP," nor is it fraudulent for the company to "tak[e] (or not tak[e]) into account whatever factors the reporting entity thinks appropriate – as long as the public is told exactly what the company is doing." *Id.* Unless Plaintiffs can show that MDC somehow misled

investors about how it actually calculated EBITDA, which they have not, there can be no claim for fraud. *See id.* (dismissing complaint where plaintiffs were "unable to identify a single instance in which [defendant's] disclosures of how it calculated" the challenged non-GAAP metrics "were incorrect"); *In re One Commc'ns Corp.*, No. 07-cv-3905 (LTS), 2009 WL 857535, at *10 (S.D.N.Y. Mar. 31, 2009) (dismissing complaint where plaintiff merely alleged that defendant's EBITDA was artificially inflated without "explain[ing] how the EBITDA was incorrectly calculated" and "how this representation might be misleading").

Plaintiffs' allegation that MDC "altered the components of its EBITDA metric to further inflate [its] financial performance" (Compl. ¶ 89) is similarly deficient. The allegation is conclusory, and in any event, "[t]here is nothing inherently improper . . . about reporting a positive EBITDA while simultaneously reporting a [GAAP] net loss" because "[t]he two are entirely different measures." *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008). Indeed, the fact that MDC included a reconciliation of adjusted EBITDA to GAAP metrics in each of its earnings releases, *see, e.g.*, Current Report Ex. 99.1, scheds. 2–5 (Form 8-K) (Feb. 23, 2015), belies Plaintiffs' conclusory assertion that MDC used adjusted EBITDA to mask GAAP losses. Accordingly, the Court finds that Plaintiffs have failed to plead that Defendants made any false or misleading statements in connection with MDC's disclosures relating to EBITDA.

17

### c.  MDC's Disclosures of Nadal's Compensation

Plaintiffs next contend that MDC failed to disclose "the true amount of compensation paid" to Nadal, both by underreporting Nadal's perquisites and by improperly reimbursing $10.5 million of Nadal's expenses.  (Compl. ¶ 10.)  The Court will address each in turn.

### i.  Underreported Perquisites

Plaintiffs allege that although the 2014 Proxy disclosed the fact that MDC split fifty-fifty with Nadal the leasehold for a New York City corporate apartment used by Nadal and other MDC officers (*id.* ¶ 119), it nevertheless concealed the fact that the cost of MDC's share was $54,172, which included "50% of the [New York City apartment] lease and 100% of the utilities, local phone charges, cable and internet charges of the apartment" (*id.* ¶ 124). Because this amount was not included in the $500,000 disclosed as other compensation for Nadal for 2013, Plaintiffs argue that the 2014 Proxy's disclosure of $20,679,263 in total 2013 compensation for Nadal was false and misleading because the actual total, with the $54,172 included, was $20,733,435.  (*Id.* ¶¶ 118–20.)  Plaintiffs also allege that the 2014 Proxy "omit[ted] amounts for Nadal's use of MDC's corporate aircraft," which supposedly were also "revealed in MDC's 2015 [d]efinitive [p]roxy [s]tatement."  (*Id.* ¶ 120 (citing *id.* ¶¶ 123–24).)

With respect to compensation related to Nadal's use of MDC's aircraft in 2013, the 2015 Proxy does not appear to disclose any such amounts, and Plaintiffs do not identify any such disclosure.  Paragraphs 123 and 124 of the amended complaint, which Plaintiffs cite in paragraph 120 for the assertion that aircraft-related compensation was "revealed" in the 2015 Proxy, merely discuss the revelation of the amounts paid for the New York City apartment.  (*See id.* ¶¶ 123, 124.)  Accordingly, Plaintiffs' allegation regarding undisclosed aircraft-related compensation does not plead a false or misleading statement.

With respect to the New York City apartment, there can be no dispute that the 2013 compensation originally disclosed for Nadal was "false" in the sense that the total compensation reported for Nadal ($20,679,263) did not include the $54,172 MDC paid for Nadal's use of the apartment.  (*Id.* ¶ 124.)  Defendants argue, however, that the undisclosed amount is not material.  (Def. Mem. at 27–28.)  Materiality is a "fact-specific inquiry," and courts may not dismiss securities fraud claims on materiality grounds unless the facts at issue "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197.  However, the Second Circuit has made clear that courts may evaluate materiality at the pleading stage, and if they do so "must consider," in an "integrative matter," "both 'quantitative' and 'qualitative' factors."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011); *ECA*, 553 F.3d at 198; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162–63 (2d Cir. 2000).  In aid of this analysis, the Second Circuit has held that a "five percent numerical threshold" – i.e., at least a five percent difference between an inaccurate versus accurate financial disclosure – is a "good starting place for assessing the materiality of the alleged misstatement," and that useful "qualitative factors" include "(1) concealment of an unlawful transaction, (2) significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement will result

in a significant market reaction." *ECA*, 553 F.3d at 198.

The parties focus here on the five percent threshold and disagree as to which item in MDC's financial statements the $54,172 should be measured against. (*See* Def. Mem. at 27–28; Pl. Opp'n at 15–18.) Perhaps not surprisingly, Plaintiffs argue that it should be measured as a percentage of Nadal's "All Other Compensation" for 2013 ($500,000) (Pl. Opp'n at 16–17), which just happens to be the smallest subcategory of expenses in which the expense could fall in the 2014 Proxy and the only way to even approach the Second Circuit's 5% threshold. But while Plaintiffs correctly note that "the items in issue should be compared to like items on the corporate financial statement," *Ganino*, 228 F.3d at 165, Plaintiffs offer no justification, and the Court can think of none, for comparing the $54,172 in undisclosed benefits to any category lower than Nadal's total compensation for 2013 ($20,679,263), and arguably the more appropriate comparison is MDC's total expenses for 2013, which exceeded $1.1 billion, *see* Current Report Ex. 99.1, sched. 1 (Form 8-K) (Feb. 20, 2014).  And since $54,172 is a mere 0.26% of Nadal's total 2013 compensation, it is well below the Second Circuit's 5% threshold.  Moreover, the fact that the 2014 Proxy actually identified the existence of compensation beyond the numbers reported in Nadal's compensation table – by disclosing the New York City apartment perquisite, albeit without including the precise dollar value (*see* Compl. ¶ 119) – further weighs against a conclusion that the disclosure of the dollar amount, in the mind of a reasonable investor, would have "significantly altered the total mix of information made available," *ECA*, 553 F.3d at 197 (internal quotation marks omitted).  Accordingly, in light of its minuscule impact on Nadal's overall compensation and given Plaintiffs'

failure to identify any qualitative factors that would otherwise support materiality, the Court finds that Nadal's 2013 compensation was not materially misstated.[7]

ii.  Undisclosed Improper Reimbursements

Plaintiffs also allege that MDC inappropriately reimbursed $10.5 million of Nadal's expenses over the period 2009 through 2014.  (Compl. ¶¶ 13, 17, 121(a)–(b), 129, 138.)  However, the amended complaint does not identify specific statements that were false when made in light of these improper expense reimbursements; indeed, its "Materially False and Misleading Statements" section mentions the $10.5 million only to establish that MDC's internal controls were inadequate.  (*See id.* ¶¶ 108(d), 117(d).) Similarly, in explaining why Nadal's compensation was understated in the 2014 Proxy, the amended complaint cites only MDC's failure to specify the amounts paid for Nadal's use of company aircraft and the New York City apartment.  (*See id.* ¶ 120.) Moreover, Plaintiffs allege no facts supporting the inference that MDC's financial statements improperly characterized the reimbursements as something other than expenses, so as to "conceal[] MDC's true financial condition by understating the amount of its executive compensation expenses."  (*Id.* ¶ 10.) Nevertheless, Plaintiffs' opposition brief argues, for the first time, that the improper reimbursements were not just an internal

---

[7] The amended complaint also alleges that the 2015 Proxy revealed, like its disclosure with respect to Nadal's 2013 compensation, the specific amount of Nadal's New York City apartment compensation for *2012*.  (Compl. ¶ 124.)  While the amended complaint does not specifically allege that the $9,277,422 in compensation disclosed for Nadal for 2012 was thus understated (*see id.* ¶ 118), if it had made that allegation, it would have failed on the same materiality ground as set forth above.

controls issue, but also a separate ground for the assertion that MDC underreported Nadal's compensation. (*See* Pl. Opp'n at 15 (arguing that "Defendants misled MDC's investors in two respects," including by underreporting Nadal's perquisites and failing to report improperly reimbursed expenses).) With some guesswork and speculation, the amended complaint's allegations could be read as supporting, however vaguely and inarticulately, a contention that, for each year from 2009 through 2014, MDC should have characterized about $2.10 million (one fifth of the $10.5 million for the total period) as compensation paid to Nadal, rather than some other type of expense – such that MDC underreported Nadal's compensation despite accurately reporting its overall expenses.

This is not a *pro se* action, however, and the Court is not required to construe Plaintiffs' pleading "liberally to raise the strongest arguments it suggests." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014). Rather, the PSLRA imposes – "[a]s a check against abusive litigation by private parties" – "[e]xacting pleading requirements" with respect to "the facts constituting the alleged violation," *Tellabs*, 551 U.S. at 313, mandating that courts dismiss a complaint that fails to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), (3). The general allegation that "Defendants failed to disclose the true amount of compensation paid to Defendant Nadal, including the fact that Nadal received" $10.5 million "in inappropriately reimbursed personal expenses" over the period from 2009 through 2014 (Compl. ¶¶ 10, 13, 17), does not "specify [a] statement alleged to have been misleading" or "the reason or reasons why th[at] statement is misleading."

Accordingly the PSLRA compels the Court to reject the allegation.

However, even if Plaintiffs had pled the theory the Court has identified from the amended complaint's unspecific allegations, that theory would still fail to plead a material misstatement. While MDC obviously would have understated the 2013 compensation reported for Nadal during the Class Period if it had failed to report $2.10 million of additional compensation in the form of reimbursements, the question remains whether the misstatement would have been material. Arguably, as with Nadal's undisclosed perquisites, the proper comparison for materiality purposes is with MDC's total 2013 expenses ($1,180,873,000), against which another $2.10 million would amount to a paltry 0.18% – well below the Second Circuit's 5% threshold and clearly immaterial. When compared to Nadal's $20,679,263 in 2013 compensation, however, the percentage lands above the threshold at 10.2%.

But even assuming that is the correct comparison, the Court's analysis does not end there, as it must also consider "'qualitative' factors" of materiality. *Litwin*, 634 F.3d at 717. On this point, Plaintiffs argue that "'management's expectation that the misstatement will result in a significant market reaction,'" *ECA*, 553 F.3d at 198, is a factor supporting qualitative materiality, and they cite negative media coverage following MDC's disclosures at the end of the Class Period. (*See* Compl. ¶¶ 172–74.) But this media coverage actually cuts *against* qualitative materiality, since none of the cited news reports express the view that MDC's disclosures revealed Nadal's pay to be materially higher than previously thought, or revealed it to be excessive whereas before it was considered reasonable. To the contrary, the reports suggest that investors already knew Nadal

was paid like a sultan. (*See id.* ¶ 172 (*Globe and Mail* article noting Nadal's history of exorbitant pay and ranking him among the highest-paid executives in Canada despite MDC's uneven financial results and the fact that its competitors perform better and pay their CEOs less)); *see also* Nathalie Tadena, *MDC Partners' Stock Takes a Hit on SEC Investigation*, Wall St. J., Apr. 28, 2015, http://on.wsj.com/1ENtdWe (last visited Sept. 30, 2016) (noting that Nadal's $16.8 million in 2014 compensation was "down from $20.7 million a year earlier" but still exceeded that of CEOs at "much bigger" and better-performing rivals), *cited in* Compl. ¶ 173. The compensation rankings cited by Plaintiffs in the amended complaint further demonstrate that Nadal's excessive compensation was widely known, ranking Nadal as the second-highest paid advertising executive in 2011. (Compl. ¶ 4.) Similarly, the *New York Times* published an article during the Class Period listing Nadal as the 58th highest-paid CEO of any American company in 2013. Karl Russell, *The Pay at the Top*, N.Y. Times, June 7, 2014, http://nyti.ms/1kI4p6h (last visited Sept. 30, 2016). An additional $2.10 million in either of those years would not have earned Nadal the number one spot among advertising executives, *see* Jim Edwards, *The 33 Richest People in Advertising, Ranked by Income*, Bus. Insider, May 19, 2012, http://www.businessinsider.com/business-insiders-advertising-rich-list-2012-2012-5 (last visited Sept. 30, 2016), and it would have bumped him only from 58th to 45th on the list of all executives, *see* Russell, *supra*.

Thus, setting aside for the moment whether the $10.5 million in improper reimbursements shows inadequate controls, when this figure is considered solely as a misstatement of Nadal's compensation, $2.10 million per year hardly registers. In that context, it is simply not "substantial[ly] likel[y]" that a reasonable shareholder

would," in deciding whether to purchase MDC securities, "consider it important" to know that Nadal was marginally closer to being the highest-paid advertising CEO, instead of the second-highest-paid, or that he was not the 58th highest-paid CEO in American business, but rather the 45th. *ECA*, 553 F.3d at 197; *see also Kleinman*, 706 F.3d at 152–53 ("[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor"). Stated differently, the revelation that Nadal's notoriously excessive compensation was in fact 10.2% higher than previously disclosed would not, as a matter of law, be viewed by a reasonable investor as "*significantly alter[ing]* the 'total mix' of information made available." *ECA*, 553 F.3d at 197 (emphasis added). Accordingly, the Court concludes that MDC's failure to disclose the $10.5 million in improper expense reimbursements, even if considered as an undisclosed form of compensation and compared against Nadal's 2013 pay, was not a material misstatement.[8]

### d.   Management's Statement that MDC's Internal Controls Were Adequate

Plaintiffs also allege that MDC, in its quarterly and annual reports filed during the Class Period, misled investors by affirming that it maintained adequate internal controls over its financial reporting (*id.* ¶¶ 105, 106, 115–16), when in fact MDC "had substantial

---

[8]  The Court expresses no view on whether the services Nadal provided to MDC, a seemingly underperforming advertising firm holding company, justified paying him more than the CEOs of Verizon Communications, Dow Chemical, Goldman Sachs, General Electric, Coca-Cola, Pfizer, Starbucks, Lockheed Martin, Nike, and IBM. *See* Russell, *supra*. In any event, allegations of excessive compensation (Compl. ¶¶ 4, 172–73) belong in a corporate waste complaint; they do not establish securities fraud. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

internal control deficiencies" that caused MDC to inappropriately reimburse $10.5 million of Nadal's expenses (*id.* ¶¶ 108(d), 117(d)).  While a closer call than Plaintiffs' undisclosed compensation argument, this argument also fails as a matter of law.

First, the mere fact that MDC's internal controls failed to catch these improper reimbursements does not demonstrate the falsity of MDC's statements that its controls were adequate.  *See Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 400 (S.D.N.Y. 2001) ("'The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made.'" (quoting *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00-cv-4115 (SAS), 2000 WL 1752848, at *7 (S.D.N.Y. Nov. 28, 2000) (citing *San Leandro*, 75 F.3d at 812))); *see also, e.g.*, *In re Royal Bank of Scot. Grp. plc Sec. Litig.*, No. 09-cv-300 (DAB), 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) ("Pointing to the subsequent subprime market collapse and alleging that [defendant] must therefore have failed to follow its internal control procedures is not sufficient."), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013).  Plaintiffs must instead allege "why or how" MDC's internal controls "were materially deficient at the time" of the challenged statements.  *See Janbay v. Can. Solar, Inc.*, No. 10-cv-4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) (dismissing Section 10(b) claim where "[t]he [c]omplaint [did] not allege any facts explaining why or how [the company's] internal controls were materially deficient at the time [the company] made any of the challenged statements"); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (dismissing Section 10(b) claim where the complaint "d[id] not claim that [defendant] failed to evaluate its internal controls or

disclose any weaknesses to its auditors" or "make any allegation as to how or why [defendant's] internal controls were inadequate"), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-cv-2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (dismissing Section 10(b) claim because "plaintiffs have not alleged any facts pertaining to the [c]ompany's internal structure for financial reporting, much less that [the company] lacked adequate internal controls").

Here, the only specific allegations in the amended complaint regarding the controls and processes in place at MDC come from a second confidential witness ("CW 2"), who offers no information regarding the adequacy of MDC's controls.  Specifically, Plaintiffs allege that CW 2, who was a vice president in MDC's treasury from 2011 through 2013 and processed Nadal's expenses as part of that job, would receive a "cover sheet" containing a total amount (but not any of the details) of Nadal's travel and entertainment expenses.  (*Id.* ¶ 37.)  Before CW 2 received the cover sheet, however, all of Nadal's expenses were first approved by MDC's board of directors or the board's compensation committee.  (*Id.*)  Moreover, CW 2 would only process Nadal's expenses after obtaining an approval signature from Sabatino or, if Sabatino was unavailable, Doft.  (*Id.*)  After receiving that approval, CW 2 would then arrange payment to Nadal by wire transfer, and MDC's accounting department would book the reimbursements in MDC's financial records.  (*Id.*)  These allegations do not identify a failure to evaluate controls, to follow procedures, to report a weakness to auditors, or any other basis from which the Court could infer that MDC's controls were inadequate during the Class Period.

Nor can Plaintiffs simply rely on the fact that, upon disclosing in 2015 that Nadal had received $10.5 million in inappropriate reimbursements, MDC announced that it would be implementing "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses." (*Id.* ¶ 121(c).)   In fact, the law is clear that remedial efforts are "a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *see also Stevelman*, 174 F.3d at 84 (rejecting argument that a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

\*          \*          \*

For the foregoing reasons, the Court concludes that Plaintiffs have not pled a material misstatement or omission, which alone warrants dismissal of the amended complaint.   The Court nevertheless turns to scienter, which provides an alternate basis for dismissal.

### 2. Scienter

Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2) (emphasis added).   "The requisite state of mind . . . is an intent 'to deceive, manipulate, or defraud.'"   *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313).   To be "strong," an inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."   *Tellabs*, 551 U.S. at 314.   In making this determination, the question is not whether "any individual allegation, scrutinized in isolation, meets th[e] standard"; rather, courts must "collectively" evaluate "all of the facts alleged."   *Id.* at 323.

In the Second Circuit, the requisite strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."   *ECA*, 553 F.3d at 198; *accord ATSI Commc'ns*, 493 F.3d at 99.   It is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), and so securities fraud allegations typically focus, as they do here, on officer defendants' motives, rather than their opportunity, to commit fraud.

#### a. Motive to Commit Fraud

To raise a strong inference of scienter by pleading motive to defraud, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud."   *ECA*, 553 F.3d at 198.   However, "it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive

compensation." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded" solely on the basis that "defendants were motivated to defraud the public because an inflated stock price would increase their compensation," then "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."). Here, Plaintiffs allege that the Individual Defendants' insider stock sales and compensation structure during the Class Period demonstrate that they had a motive to commit fraud. The Court will address each of these allegations in turn.

### i. Insider Trading

A plaintiff may plead motive by alleging facts showing that "corporate insiders misrepresent[ed] material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *see also ECA*, 553 F.3d at 198 ("[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."). Here, the amended complaint alleges that the Individual Defendants collectively sold 6,475,305 shares of MDC stock during the eighteen-month Class Period, for combined gross proceeds of $163,600,046, while selling only 52,050 shares for $570,049 over the same length of time immediately prior to the Class Period. (*Id.* ¶ 135; *see also id.* ¶¶ 136–37, 147, 154, 159, 162 (discussing each of the Individual Defendants' sales).)

"'However, the mere fact that insider stock sales occurred does not suffice.'" *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (quoting *In re Gildan*

*Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)). Instead, to demonstrate motive, "'plaintiffs must establish that the sales were 'unusual' or 'suspicious'" at the time they were made. *Id.* (brackets omitted) (quoting *Gildan Activewear*, 636 F. Supp. 2d at 270). "Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser*, 772 F. Supp. 2d at 587 (collecting cases).

To start, the allegation that the Individual Defendants collectively sold far more shares for far greater proceeds during the Class Period than they did over the eighteen-month period preceding the Class Period (Compl. ¶ 135) fails to support a strong inference of scienter because the totals are based on a time period with no apparent connection to the alleged fraud. While Plaintiffs' reason for selecting April 27, 2015 – the date MDC disclosed the SEC investigation – as the conclusion of the Class Period is clear, Plaintiffs have not explained why October 28, 2013 – a date on which MDC simply announced its third quarter 2013 earnings – holds any significance as the opening date of the Class Period. To be sure, Plaintiffs allege that that earnings release contained fraudulent statements (*see id.* ¶¶ 90, 96–98), but the bases for that allegation are that MDC had continuously failed to write down goodwill associated with Zyman Group since 2006 (*see id.* ¶¶ 72–73), that MDC had reported

non-"industry standard" EBITDA since 2012 (*id.* ¶¶ 46, 82), and that Nadal had received improper expense reimbursements since 2009 (*id.* ¶ 138).

A more logical beginning date for assessing the Individual Defendants' trades is October 5, 2014, the date MDC received a subpoena from the SEC. (*Id.* ¶¶ 13, 56, 170.) After this date, based on Plaintiffs' allegations, the Individual Defendants presumably would have realized that the unraveling of the alleged fraud was imminent and would have had motive to dump their shares before the stock price inevitably dropped. But when the alleged stock sales are reviewed from this date through the end of the Class Period, instead of the illogical eighteen-month period alleged by Plaintiffs, a much different picture emerges. Plaintiffs allege that Nadal, Doft, Sabatino, Gendel, and Kirby each executed a trade on November 5, 2013, that Doft, Sabatino, and Gendel also executed trades on December 30, 2013, February 20, 2014, and February 23, 2015, and that Nadal alone executed an additional trade on May 16, 2014 for a combined total of 6,475,305 shares and $163,600,046 in gross proceeds. (*See id.* ¶¶ 135, 136, 147, 154, 159, 162.) However, when only the February 23, 2015 trades are considered (the only trades that were made after MDC received the SEC subpoena), two of the Individual Defendants, Nadal and Kirby, sold no shares (*see id.* ¶¶ 137, 162), and the remaining three individuals collectively sold only 8,630 shares for proceeds of $219,375 (*see id.* ¶¶ 147, 154, 159). Given these facts, the Court simply cannot infer scienter from far greater sale totals occurring over Plaintiffs' far less logical time period.

Plaintiffs offer no convincing arguments for why their eighteen-month period, or even some period other than the one described above, should be considered when

analyzing the Individual Defendants' trades. To get around the October 2014 subpoena date, Plaintiffs argue that the SEC began "questioning" MDC "about the way it presented earnings and accounted for its profitability" "[n]ot long after" CW 1 submitted his whistleblower complaint and that Defendants thus "likely knew of the SEC investigation" shortly thereafter. (Pl. Opp'n at 53–54 (quoting Compl. ¶ 41 (emphasis removed)).) But this is mere conjecture; Plaintiffs allege no facts suggesting that the Individual Defendants were aware of the investigation before they received the subpoena in October 2014. Moreover, the assertion that the SEC began "questioning" MDC about its financial reporting appears to be based on a comment letter the SEC sent to MDC on May 9, 2014 (*id.* ¶ 136), which was publicly filed and included certain instructions for MDC's reporting of non-GAAP metrics in "future filings." (*See* MDC Partners, Inc., SEC Comment Letter (May 9, 2014).) As Plaintiffs acknowledge, however, MDC had previously received and responded to several comment letters of this nature (*id.* ¶¶ 6–8), and the May 9, 2014 letter says nothing about GAAP violations or an ongoing or potential investigation.

The only other argument Plaintiffs offer in defense of the trading period alleged in the amended complaint is that, "when the Defendants disposed of their shares, they were aware of relevant issues that had been raised in the context of CW 1's lawsuit against [MDC], which was filed in July 2012" and touched on subjects relating to goodwill and Zyman Group. (Pl. Opp'n at 54.) But CW 1's lawsuit was filed nearly a year and a half before the alleged insider trading began, and CW 1's mere allegations – in a dispute over CW 1's own compensation – would hardly have put Defendants on notice that their alleged scheme would soon unravel. Nor, for that

Case 1:15-cv-06034-RJS   Document 61   Filed 09/30/16   Page 26 of 32

matter, does the filing of CW 1's lawsuit establish that Defendants knew or foresaw that issues raised in the litigation would later be submitted in a whistleblower complaint to the SEC and become the subject of an investigation. Thus, the amended complaint fails to support an inference of scienter based on the Individual Defendants' trading during the eighteen-month Class Period.

Even accepting the Class Period as a logical period of review for the Individual Defendants' trades, however, all of the trades except for the February 23, 2015 trades occurred nearly a year or more before the end of the Class Period. Courts in this District have consistently held that stock sales occurring even a few months before the alleged revelation of the fraud do not raise a strong inference of scienter. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (lapse of "approximately four months" between defendant's "substantial sales and the revelation of the alleged falsity" "inescapably attenuate[d] any inference of scienter"); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595–96 (S.D.N.Y. 2006) (stock sales "six months in advance of" an attorney general's complaint "d[id] not suggest a motive to commit fraud"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444–45 (S.D.N.Y. 2005) (stock sales that were "not clustered at [the] end" of the Class Period, "when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted," did not suggest scienter). Accordingly, because the vast majority of the Individual Defendants' trades occurred a year or more before the alleged revelation of the fraud, they do not support an inference of fraudulent motive

even if the Class Period were a logical measurement period.[9]

The Court also notes that information contained in the Forms 4 that reported the Individual Defendants' trades to the SEC suggests that the trades were executed for legitimate rather than fraudulent purposes.[10] The filings disclose that the Individual Defendants' November 5, 2013 trades all involved the exercise of stock appreciation rights that were set to expire in February 2014, and that the trades by Doft, Sabatino, and Gendel on December 30, 2013, February 20, 2014, and February 23, 2015 all involved the withholding of shares to satisfy tax requirements on vesting restricted stock.[11] Courts in this District have held

[9] Plaintiffs further allege that Nadal "continued to dump his MDC shares" *after* the Class Period, selling 1.842 million shares (approximately 48% of his MDC holdings) on October 29, 2015. (Compl. ¶ 137.) It is not clear what relevance this sale could have to Nadal's alleged motive to make fraudulent statements during the Class Period. If anything, the fact that Nadal waited to sell millions of shares until MDC's stock price had dropped following the revelation of the alleged fraud cuts against an inference that he sold stock illegally during the Class Period.

[10] Courts may consider "legally required public disclosure documents filed with the SEC," *ATSI Commc'ns*, 493 F.3d at 98, and they routinely look to "information from SEC filings regarding a defendant's stock sales to determine whether such sales were 'unusual' or 'suspicious,'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (collecting cases); *see also Glaser*, 772 F. Supp. 2d at 587 ("When a complaint alleges only 'incomplete information' concerning insider sales, the court is 'free to consider' defendants' SEC filings to fill gaps on [a] motion to dismiss." (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006)).

[11] See the Forms 4 filed on behalf of Nadal, Doft, Sabatino, Gendel, and Kirby on November 7, 2013, and the Forms 4 filed on behalf of Doft, Sabatino, and Gendel on January 2, 2014, February 24, 2014,

that the exercise of expiring stock appreciation rights and the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (where "the timing of [defendant's] transactions was tied to the predetermined expiration of his employee stock options," "[t]he fact that [defendant] exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (rejecting motive allegations where defendants' trading "show[ed] a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes"); *see also Lululemon*, 14 F. Supp. 3d at 586 (executive's "established practice of exercising stock options as they vested and selling a matching number of shares on a quarterly basis" was not "suspicious[]"). Thus, the disclosed nature of the Individual Defendants' trades also suggests the absence of fraudulent motive.

ii.  Compensation Tied to Earnings Results

Plaintiffs also allege that Nadal, Doft, Sabatino, and Gendel were motivated to artificially inflate MDC's financial performance using a "highly misleading EBITDA calculation" because their compensation was "[d]irectly [t]ied" to this figure. (Compl. ¶¶ 142–43, 150–51, 157, 160 (capitalization removed).) Plaintiffs also denounce Kirby for his alleged role in the decision by MDC's compensation committee to approve this EBITDA metric "as a critical component of MDC's executive compensation." (*Id.* ¶ 168.) However, the law is clear in the Second Circuit that a plaintiff cannot plead motive to defraud simply by "alleg[ing] goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability." *S. Cherry*, 573 F.3d at 109; *see also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Insufficient motives . . . can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."). These allegations accordingly do not support motive.

b.  Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Although Plaintiffs have failed to plead that Defendants had a motive to defraud, that failure "is not fatal" to a securities fraud claim, *Tellabs*, 551 U.S. at 325, since a plaintiff may also plead scienter by alleging "strong circumstantial evidence of defendants' conscious misbehavior or recklessness," *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). However, in the absence of motive, "the strength of th[ose] circumstantial allegations must be correspondingly greater." *Id.* Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount," *Novak*, 216 F.3d at 308 (citations omitted), while recklessness is defined as "a state of mind approximating actual intent, and not merely a heightened form of negligence," and "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *S.*

---

and February 25, 2015, available on the SEC's EDGAR website, samples of which are attached as Exhibits 14–17 to the Declaration of Craig S. Waldman in Support of Defendants' Motion to Dismiss the Amended Complaint. (Doc. No. 56.)

*Cherry*, 573 F.3d at 109 (emphasis removed). A plaintiff may plead recklessness by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements," or by "alleg[ing] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex*, 531 F.3d at 196.

### i. Approval of Nadal's Expense Reimbursements

Plaintiffs argue that Nadal's receipt of expense reimbursements that were later deemed improper, coupled with the fact that Doft, Sabatino, and Kirby signed off on those reimbursements, demonstrates that these defendants knew MDC was underreporting Nadal's compensation. (Compl. ¶¶ 138, 149, 155, 168.) But these allegations, without more, do not suggest that Nadal, Doft, Sabatino, or Kirby knew the expenses were not appropriate for reimbursement at the time of MDC's filings. The mere fact that a defendant held a supervisory position or a position of authority – including, here, Nadal's role as chairman of the board and CEO, which entitled him to "influence appointments" to MDC's compensation committee (*id.* ¶ 144), and Doft's and Sabatino's roles in the expense reimbursement approval process (*id.* ¶¶ 149, 155) – has been repeatedly rejected by courts in this District as supportive of an inference of scienter. *See, e.g.*, *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) ("[C]ourts in this District have long held that accusations founded on nothing more than a defendant's corporate position

are entitled to no weight." (internal quotation marks omitted) (collecting cases)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Plaintiffs' allegation that MDC announced "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses" (Compl. ¶ 170; *see also id.* ¶ 13) is likewise insufficient. *See Slayton*, 604 F.3d at 777; *Stevelman*, 174 F.3d at 84; *Magnum Hunter*, 26 F. Supp. 3d at 295.

Plaintiffs' only specific allegations regarding MDC's expense reimbursement process come from CW 2, whose assertions add little to Plaintiffs' claims. As noted above, Plaintiffs do not allege that CW 2 had any role in the actual approval of Nadal's expenses; rather, CW 2's job was to process reimbursements after they had already been approved. (Compl. ¶ 37.) And although CW 2 purports to have received a "cover sheet" containing the total amount (but not any of the details) of Nadal's travel and entertainment expenses, CW 2 does not assert that this was the only information that anyone reviewed in connection with approving expenses. (*Id.*) To the contrary, it is clear that CW 2 lacks personal knowledge of the review and approval of Nadal's expenses, given Plaintiffs' allegation that, "[a]s far as CW 2 understood, all of Nadal's expenses were approved by MDC's [b]oard of [d]irectors or the [c]ompensation [c]ommittee before CW 2 received the cover sheet." (*Id.*) Thus, the Court can infer no fraud from CW 2's allegations. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) ("Allegations premised on the testimony of confidential sources 'must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements . . . .'"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (rejecting confidential

witness allegation that "lack[ed] detail that might suggest that th[e] [witness] had personal knowledge").

Nothing in the amended complaint, moreover, comes close to explaining why Doft, Sabatino, and Kirby would have knowingly approved the payment of reimbursements to Nadal that he was not entitled to or why these defendants would have sat idly by while MDC failed to report these payments as compensation for Nadal. Indeed, with respect to Kirby, who sat on the board's compensation committee and "ma[de] recommendations to the [b]oard" on "the compensation of senior executives" (Compl. ¶ 168), Plaintiffs cannot logically explain why a board member who had no problem approving tens of millions of dollars of *disclosed* compensation to Nadal would feel the need to secretly approve, and fraudulently omit from MDC's disclosures, an additional one or two million dollars per year. Plaintiffs simply allege that because these individuals were involved in the approval process and because MDC ultimately disclosed that Nadal had received improper reimbursements, the individuals who approved the reimbursements must have known that they were improper and that MDC was misrepresenting its expenses – a plainly insufficient "fraud by hindsight" theory.

ii. Resignations of Nadal and Sabatino

Plaintiffs also ask the Court to draw an inference of fraud from the facts that (1) Sabatino moved from chief accounting officer to "work on special projects" toward the end of the Class Period, during MDC's internal investigation, and that (2) both Sabatino and Nadal resigned "abruptly" several months after the Class Period ended, during the SEC's investigation, and returned certain bonus payments or forwent certain severance packages. (*Id.* ¶¶ 139, 156.)

However, courts "have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *See Gillis v. QRX Pharma Ltd.*, No. 15-cv-4868 (PAE), — F. Supp. 3d. —, 2016 WL 3685095, at *35 (S.D.N.Y. July 6, 2016) (collecting cases); *see also Glaser*, 772 F. Supp. 2d at 598 (resignations support an inference of fraud only if they are "highly unusual and suspicious"). The fact that, as part of these resignations, Nadal and Sabatino forfeited or agreed to repay certain bonuses or severance packages does not connect a resignation to fraud any more than does the resignation itself. The amended complaint simply contains no allegations supporting an inference of fraud that is at least as compelling as an inference of mismanagement or one of the myriad other reasons an executive might resign.

iii. Involvement in Financial Reporting

Plaintiffs also attempt to plead scienter based on allegations that Nadal, Doft, Sabatino, Gendel, and Kirby were involved in MDC's financial accounting and reporting by reason of their positions at the company or their signing of SEC filings. (Compl. ¶¶ 145–46, 148, 152–53, 158, 161, 164–65.) But, as explained above, the argument that defendants must have known that alleged misstatements were false because they were high-ranking officers or board committee members has been repeatedly rejected by courts in this District. *See Mechel OAO*, 811 F. Supp. 2d at 873. Similarly insufficient are Plaintiffs' bare allegations that certain defendants signed SEC filings. *See Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, No. 15-cv-2492 (WHP), — F. Supp. 3d —, 2016 WL 4688862, at *7 (S.D.N.Y. Sept. 7, 2016) ("'required certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference of

scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA'" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003–04 (9th Cir. 2009))); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) (dismissing defendants who merely "signed [the company's] SEC disclosures"). The Court thus accords these arguments no weight in its comparison of fraudulent and non-fraudulent inferences.

iv. Kirby's Performance and Qualifications as Chairman of the Audit Committee

Finally, Plaintiffs assert that, at least with respect to Kirby, scienter can be inferred from his "reckless[] abdicat[ion] [of] his duties as chairman of MDC's audit committee" and his "lack[] [of] the requisite expertise to execute those duties." (Compl. at 77 (capitalization removed).) Plaintiffs base this contention on the fact that, in a deposition taken in connection with CW 1's dismissed lawsuit against MDC, Kirby testified that he (1) was not aware whether MDC's outside auditors "reviewed and tested" Zyman Group's goodwill or "propose[d] any adjustment" based on an impairment, and (2) "would rely totally on the outside auditors . . . on the audit questions," under "the assumption that [they were] treated appropriately because the accounting firm is a good accounting firm." (*Id.* ¶ 166.) In the first instance, Plaintiffs offer no authority for the striking proposition that it is improper or a "reckless[] abdicat[ion]" of duty for the chairman of a public company's audit committee to rely on the work of an outside auditor. Even if that were true, it would describe mismanagement and poor governance, not securities fraud. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d

202, 228 (2d Cir. 2000) ("[A] section 10(b) plaintiff cannot transform a fiduciary-duty claim or a mismanagement claim into a claim of non-disclosure."); *Magnum Hunter*, 26 F. Supp. 3d at 295 ("inference . . . of an oversight failure of management" did not support securities fraud claim). As for Plaintiffs' assertion that Kirby lacked "the requisite financial expertise to serve on MDC's [a]udit [c]ommittee, much less serve as its Chairman" (Compl. ¶ 167), this too alleges at most mismanagement, not securities fraud. The securities laws are not concerned with an individual's "reckless[] lack[] [of] the requisite . . . expertise" (*id.*) – only his "reckless disregard for the truth" of his public statements. *S. Cherry*, 573 F.3d at 109. This Plaintiffs have failed to plead.

c. Holistic Assessment of Scienter Allegations

Even though the Court has rejected all of Plaintiffs' scienter arguments individually, it must also consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322–23. In sum, the amended complaint alleges that MDC's senior-most executives and the chair of MDC's audit committee orchestrated a scheme to defraud investors by (1) marginally inflating MDC's total assets by maintaining goodwill for a small, defunct subsidiary, (2) boosting MDC's earnings by reporting a "nonstandard" version of "Adjusted EBITDA" that Defendants also defined in every earnings release, (3) concealing immaterial amounts of Nadal's widely reported eight-figure compensation, and (4) generally attesting to the adequacy of MDC's controls despite approving $10.5 million in expense reimbursements to Nadal that ultimately had to be repaid, with no alleged benefit to MDC or the other defendants. The Court finds that the implausibility of this theory of fraud

speaks for itself and is far less compelling than an inference of, at most, non-actionable mismanagement and negligence.

## B.  Alleged Violations of
## Exchange Act Section 20(a)

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78t(a)).  Because Plaintiffs' Section 20(a) claim "is necessarily predicated on a primary violation of securities law," and the Court has determined that Plaintiffs have failed to plead a primary violation, Plaintiffs' Section 20(a) claim "must also be dismissed." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

## C.  Required Findings as to the Parties'
## Compliance with Rule 11

The PSLRA mandates that, at the end of any private securities action, the district court must "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of" Federal Rule of Civil Procedure 11(b).  15 U.S.C. § 78u-4(c)(1); *see also Rombach*, 355 F.3d at 178 (remanding for findings under Rule 11 because the PSLRA "mandates" such findings and "the imposition of sanctions" if "the court finds that any party or lawyer violated Rule 11(b)").  Having carefully considered the amended complaint and the briefing on Defendants' motion to dismiss, the Court concludes that no party has violated Rule 11(b).

## D.  Leave to Amend

In their brief opposing Defendants' motion to dismiss, Plaintiffs request leave to amend the complaint a second time in the event that the Court grants Defendants' motion.  (Pl. Opp'n at 66.)  Plaintiffs' brief identifies a number of "newly discovered facts" that they propose to incorporate into a new complaint to "cure any deficiencies" identified by the Court's dismissal of their first amended complaint.  (*Id.* at 10–11, 66.) These facts include MDC's disclosures in its most recent annual report and its fiscal year 2015 earnings call that (1) Nadal has agreed to repay additional reimbursements, (2) MDC incurred expenses for "business use of an airplane and helicopter that are owned by entities controlled by Nadal," (3) the SEC's investigation is ongoing and MDC cannot predict how much the company will need to spend before it concludes, (4) MDC has "engaged an outside accounting firm to review and assess the company's historical goodwill accounting," (5) MDC's cooperation with the SEC's investigation has been expensive, (6) following the resignation of Kirby and another audit committee member, MDC has been "actively looking to revamp [its] [b]oard of [d]irectors with expanded strategic vision, financial and operational expertise[,] and stronger independence," (7) two new board members will include a former executive vice president of Scotiabank and a "long-time partner" at Ernst & Young, (8) the Scotiabank executive will bring "over 30 years of experience in financial services, governance[,] and risk management" to MDC's audit committee, and (9) MDC had been looking for a new director with the Scotiabank executive's qualifications and expects that she will "step into the audit committee in a very pronounced way."  (*Id.* at 10–11.)

The Court finds that these proposed new allegations would add nothing to cure the deficiencies identified in this Opinion. Rather, they are more of the same: irrelevant facts or mischaracterizations of

remedial efforts as evidence of prior misleading disclosures that amount, at best, to a claim of corporate mismanagement and breach of fiduciary duty, which are not actionable under the federal securities laws. *See Santa Fe Indus.*, 430 U.S. at 476 (rejecting the proposition that "a breach of fiduciary duty . . . , without any deception, misrepresentation, or nondisclosure, violates" Section 10(b) or Rule 10b-5). Since Plaintiffs have offered no facts to suggest that another amendment would be fruitful at this time, Plaintiffs' request for leave to amend is denied as futile. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (courts may deny leave to amend where amendment would be futile).

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss the amended complaint is GRANTED, and this case is dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 54, enter judgment in favor of Defendants, and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated:    September 30, 2016
          New York, New York

\*       \*       \*

Plaintiffs are represented by Kathleen M. Donovan-Maher, Steven J. Buttacavoli, and Steven L. Groopman of Berman DeValerio,

One Liberty Square, Boston, MA 02109, Joseph J. Tabacco, Jr. of Berman DeValerio, One California Street, Suite 900, San Francisco, CA 94111, and Samuel H. Rudman of Robbins Geller Rudman & Dowd LLP, 58 South Service Road, Suite 200, Melville, NY 11747.

MDC Partners Inc., Mitchell Gendel, and Michael J. L. Kirby are represented by Paul C. Curnin, Craig S. Waldman, and Daniel J. Stujenske of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017.

David B. Doft is represented by Steven G. Kobre and Jonathan D. Cogan of Kobre & Kim LLP, 800 3rd Avenue, New York, NY 10022.

Miles S. Nadal is represented by Lewis J. Liman, Katherine M. Sheridan, and Gregory N. Wolfe of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006.

Michael C. Sabatino is represented by Daniel J. Kramer, James L. Brochin, and Matthew J. Weiser of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/30/16